# EXHIBIT E

```
                   UNITED STATES BANKRUPTCY COURT

                 FOR THE DISTRICT OF PENNSYLVANIA

                                    :
IN RE:                              : Case No.  23-10763
                                    :
STREAM TV NETWORKS, INC.   CH: 11   : ADV. No.  23-00057
                                    :
Stream Tv Networks, Inc. Vs         : Philadelphia, Pennsylvania
Shadron L Stastney                  : November 27, 2023
                                    : 10:58 a.m.
A) Motion Re: Motion For            :
Preliminary Injunction Request      :
For Temporary Restraining Order     :
Filed By Alastair Crawford,         :
Delaware And Other Law Firms        :
Representing And Acting In          :
Concert With John Doe(S) And/Or     :
Jane Doe(S), Jane Doe(S), John      :
Doe(S), Asaf Gola, Kevin Gollop,    :
Hawk Investment Holdings Limited,   :
Investment Banks Employed By John   :
Doe(S) And/Or Jane Doe(S),          :
Krzysztof Kabacinski, Arthur        :
Leonard Robert "Bob" Morton,        :
Seecubic B.V., Sls Holdings Vi,     :
Llc, Shadron L Stastney,            :
Seecubic, Inc., Patric Theune       :
Represented By Rafael X.            :
Zahralddin                          :
                                    :
B) Motion For Sanctions For         :
Violation Of The Automatic Stay     :
Filed By Stream Tv Networks, Inc.   :
Represented By Rafael X.            :
Zahralddin                          :
. . . . . . . . . . . . . . . . .

            BEFORE THE HONORABLE MAGDELINE D. COLEMAN
               UNITED STATES BANKRUPTCY JUDGE
```

APPEARANCES:

For the Debtor:                    Keith Kodosky, Esq.
                                   Lewis Brisbois Bisgaard & Smith
                                   600 Peachtree Street NE
                                   Suite 4700
                                   Atlanta, GA 30308
                                   404-991-2183

                                   Rafael X. Zahralddin
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-985-6004

                                   Kevin F. Shaw
                                   Lewis Brisbois Bisgaard & Smith
                                   500 Delaware Avenue, Suite 700
                                   Wilmington, DE 19801
                                   302-295-9436

For Hawk Investment Holdings       Steven Caponi, Esq.
Ltd:                               K&L Gates
                                   600 N. King Street, Suite 901
                                   Wilmington, DE 19801
                                   302-416-7080

                                   Jonathan N. Edel, Esq.
                                   300 South Tryon St., Suite 1000
                                   Charlotte, NC 28202

For SeeCubic, Inc.:                Eben P. Colby, Esq.
                                   Marley Ann Brumme, Esq.
                                   Skadden Arps Slate Meagher &
                                   Flom, LLP
                                   500 Boylston Street, 23rd Floor
                                   Boston, MA 021116
                                   617-573-4800

For SLS Holdings VI, LLC:          Davis Lee Wright, Esq.
                                   Robinson Cole, LLP
                                   1201 North Market Street
                                   Wilmington, DE 19801
                                   302-516-1703

3

APPEARANCES:

For Rembrandt 3D Holding        Andrew Peter Demarco
Ltd.:                           Devlin Law Firm, LLC
                                1526 Gilpin Avenue
                                Wilmington, DE 19806
                                302-449-9010


For Shadron L. Stastney:        Terence M. Grugan
                                Ballard Spahr
                                1735 Market Street, 51st Floor
                                Philadelphia, PA 19103
                                215-864-8320

Proceedings recorded by electronic sound recording;
transcript produced by TheRecordXchange.

```
                              INDEX

                    Direct   Cross   Redirect   Recross

WITNESSES:

Christopher Michaels
  (By Mr. Kodosky)      8                211
  (By Mr. Colby)                196
  (By Mr. Caponi)               203
```

```
1   NOVEMBER 27, 2023                              10:58 A.M.

2              THE BAILIFF:  All rise.

3              THE COURT:  Good morning, counsel.

4              UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

5              MR. KODOSKY:  Good morning, Your Honor.

6              THE COURT:  Okay.  If I recall correctly -- well,

7   this the matter of Stream TV and Technovative, Inc., and it is

8   a motion for a preliminary injunction.  I'm not quite sure if

9   it's preliminary at this point, but that's what it's called.

10  And if I recall correctly after our rather lengthy telephone

11  conference, last -- was that Friday?

12             MR. KODOSKY:  Wednesday, Your Honor.

13             THE COURT:  Oh, it was Wednesday, the day before

14  Thanksgiving.  Yes, indeed.  If I recall correctly, what we

15  planned for today's hearing is for the Debtor movant to

16  conclude its case in chief with the testimony of its, of Mr.

17  Michaels, correct?  And then once that occurs, we were going to

18  then have the Respondents -- I have an echo.  Is that -- I'm

19  hearing and echo.  Okay.  Then the Respondents were going to

20  commence their rebuttal.  Well, I guess -- is it a rebuttal

21  witness or is it their response to the Debtor's case in chief?

22             UNIDENTIFIED SPEAKER:  It would be our response.

23             THE COURT:  Right.  I don't know why we're calling

24  them a rebuttal, but we're not even there yet.  Are we okay,

25  John?  We did address one technical problem.  I think Ken
```

```
 1   addressed that one.
 2            UNIDENTIFIED SPEAKER:  I got --
 3            THE COURT:  Okay.  I'm waiting for Taylor (phonetic)
 4   to bring me a -- I guess we can continue on this.  okay.  Let's
 5   start with entry of appearances, please.  First for the Debtor
 6   movant.
 7            MR. KODOSKY:  Keith Kodosky along with my partner,
 8   Rafael --
 9            MR. ZAHRALDDIN:  Zahralddin.
10            MR. KODOSKY:  -- Zahralddin.
11            THE COURT:  Thank you very much.
12            MR. KODOSKY:  And Your Honor, we also have Mr. Kevin
13   Shaw --
14            MR. ZAHRALDDIN:  Kevin Shaw.
15            MR. KODOSKY:  -- as well in the court with us.
16            THE COURT:  Okay.  Who's here for the responding
17   parties?
18            MS. BRUMME:  Morning, Your Honor.  Marley Ann Brumme
19   and Eben Colby of Skadden Arps for SeeCubic, Inc.
20            THE COURT:  For SeeCubic.
21            MR. CAPONI:  Morning, Your Honor.  Steven Caponi from
22   K&L Gates on behalf of Hawk.
23            MR. WRIGHT:  Good morning, Your Honor.  Davis Wright
24   of Robinson and Cole on behalf of SLS Holding Vincenzo, LLC.
25   Terence Burgan from Ballard Bar in Manhattan.  Anyone else
```

```
1   morning?

2           MR. GRUGAN:  Good morning, Your Honor.  Terance

3   Grugan from Ballard Spahr on behalf of Mr. Stastney.

4           THE COURT:  Anyone else?

5           MR. DEMARCO:  Morning, Your Honor.  Andrew DeMarco

6   from Devlin Law Firm here for Rembrandt.

7           THE COURT:  Are there any preliminary matters or can

8   we commence with the testimony of Mr. Michaels?

9           MR. KODOSKY:  Your Honor, I think we should commence

10  with the testimony and if there's anything that we need to

11  bring up later, I'll alert you to it for on the -- on the

12  Debtor's side.

13          THE COURT:  Mr. Colby?  Ms. Brumme?

14          MR. COLBY:  No, Your Honor.

15          THE COURT:  Mr. Caponi?  Anyone else?  Okay.  Let's

16  begin.

17          MR. KODOSKY:  Thank you, Your Honor.

18          THE CLERK:  Mr. Michaels, can you hear me?

19          MR. MICHAELS:  Yes, I can.

20        CHRISTOPHER MICHAELS, DEBTOR'S WITNESS, SWORN

21          THE CLERK:  Thank you.  Could you please state and

22  spell your name for the record?

23          THE WITNESS:  Christopher Michaels, spelled,

24  C-H-R-I-S-T-O-P-H-E-R Michaels, M-I-C-H-A-E-L-S.

25          THE CLERK:  And if you could please state your
```

```
 1   address for the record.

 2            THE WITNESS:  My residence address is 12417 Country

 3   Day Circle, usually abbreviated, CIR for the post office, Fort

 4   Myers Florida, 33913.

 5            THE CLERK:  Thank you.

 6                          DIRECT EXAMINATION

 7   BY MR. KODOSKY:

 8   Q    Good morning, Mr. Michaels.  Can you hear me okay?

 9            THE COURT:  Can we see him?

10            THE WITNESS:  Yes, I can.

11            THE COURT:  Can we see him.  Okay.  There we go.

12   BY MR. KODOSKY:

13   Q    To begin, Mr. Michaels, I'd like to start with just a few

14   questions regarding your personal background.

15            THE COURT:  Before we begin, counsel, Mr. Michaels,

16   do you have any -- can you adjust your camera, so that we can

17   see that you have nothing in front of you on -- if you're at a

18   desk or wherever it is you're seated.

19            THE WITNESS:  I can try.  Let's me see.  We have --

20   so I'm not sure what you're seeing.

21            THE COURT:  Or if you can just attest that there's no

22   documents or there's nothing in front of you.

23            THE WITNESS:  The only thing in front of me is -- I

24   deactivated my iPad meeting.  I put it in airplane mode and I

25   have a silent cell phone and then the computer monitor itself.
```

1          THE COURT:  Okay, but --

2          THE WITNESS:  And then just a mic.

3          THE COURT:  But no document?

4          THE WITNESS:  There's no papers.

5          THE COURT:  All right.

6          THE WITNESS:  No document.

7          THE COURT:  All right.

8          THE WITNESS:  -- in front of me.

9          THE COURT:  All right.  Thank you.  You may proceed,

10    Mr. Kodosky.

11          MR. KODOSKY:  Thank you, Your Honor.

12    BY MR. KODOSKY:

13    Q    Mr. Michaels, I'd like to start with a few questions

14    regarding your personal background.  Do you hold any degrees?

15    A    I hold a degree in Chemistry from Bucknell University.  I

16    hold a juris doctorate from Syracuse University and a Master in

17    Business Administration from the Wharton School University of

18    Pennsylvania.

19    Q    What years did you receive those degrees?

20    A    The degree from Bucknell 1989, '90s.  I finished early in

21    -- but the law degree was in 1993 and 2014 MBA.

22    Q    Thank you.  Are you a member of any bars?

23    A    Yes, the New York State Bar Association.  I was admitted

24    in New Jersey, but I let that lapse once my family moved out of

25    the state and I am a registered patent attorney.

1  Q    What year did you become a registered patent attorney?

2  A    I actually passed the agent's exam in 1990 and once you

3  pass the -- so I was admitted in April of 1990, but all you do

4  is inform that you are now an attorney and they move you from

5  an agent to patent attorney status.  It is not a

6  reregistration.  It's the same registration, 1990.

7  Q    Can you very briefly describe how one becomes a patent

8  attorney?  Is there a process?

9  A    Yes.  To be qualified to sit for the registration exam,

10  you need a technical background and the patent office changes

11  that from time to time, but generally, what they call the hard

12  sciences, physics, chemistry.  For a long time, biology, for

13  example, didn't even qualify.  And once they've approved your

14  -- you have the proper technical background, they allow you to

15  sit for a registration exam and once passed, they submit you to

16  an ethics review and then you become registered as someone

17  authorized to represent individuals before -- individuals and

18  companies before the patent and trademark office.

19  Q    Are you familiar with the term USPTO?

20  A    Yes, the United States Patent and Trademark Office.

21  Q    Thank you.  Are you a member of a law firm?

22  A    Yes.  I -- the image behind me is the foyer of my law

23  firm, Brown and Michael's.  Mike Brown has retired but practice

24  has been in existence since about 1980 it's had various

25  successors and partners come and go, but its current

1   incarnation is Brown and Michael's.

2   Q    And where is the firm located?

3   A    Ithaca, New York.

4   Q    Any other branch offices?

5   A    We have -- we're going to be moving our offices up into

6   Syracuse, but right now, we're largely working as remote.  I,

7   for example, am sitting in Florida.  My current business

8   partner is in Syracuse and one of our long term patent agents

9   is in Pittsburgh, Rochester, New York, so we work largely

10  remotely.

11  Q    And when did you begin to practice at Brown and Michaels,

12  PC?

13  A    1989.

14  Q    Are you the managing partner of the firm?

15  A    Yes.

16  Q    What year did you become managing partner?

17  A    January 1st, 1994.

18  Q    There's been reference made to Rembrandt in these

19  proceedings.  Are you also employed by Rembrandt 3D Holding

20  Limited?

21  A    I am an officer of the company.  I do not receive

22  compensation or W-2 employment, but I'm an appointed officer.

23  Q    And what office do you hold specifically?

24  A    Chief financial officer.

25  Q    And there are actually two companies with Rembrandt in the

1    name.  Is that correct?

2    A    Yes.

3    Q    What is the second company's name?

4    A    Rembrandt 3D Corp.  And it's a Delaware Corporation.

5    Q    In broad terms, can you please explain the difference

6    between the two companies?

7    A    Yes.  Rembrandt 3D Holding Limited is a holding company.

8    It owns most, if not all, of the intellectual property that is

9    related to these two companies for Rembrandt.  The Rembrandt 3D

10    Corp is an operating company.  It provides the installations,

11    purchases, contracts for our supply displays and then provides

12    services to clients who receive the displays.  For example,

13    Rembrandt 3D Corp was the entity that sold the system to the

14    Frank L. Wright Museum, Pittsburgh Airport, et cetera and where

15    you can see installations of the no glasses 3D product prepared

16    by the Rembrandt companies.

17    Q    Switching gears.  Are you familiar with the Debtor, Stream

18    TV Networks, Inc.?

19    A    Yes.

20    Q    Are you familiar with Stream's Ultra D products?

21    A    Yes.

22    Q    What do you know about those products?

23    A    We -- a fair amount, but we -- it is limited to what we

24    are able to see as users of the system.  We've not seen any of

25    the internal code.  We evaluated extensively the Stream TV

1  products before litigation was commenced and after and during

2  that litigation in the 2016, '17 litigation in the Southern

3  District of New York.  Part of the mediation process was we

4  were provided examples of the displays that they were selling

5  at the time.  And I sat in a room with executives and discussed

6  with our various team members the Ultra D product and what it

7  was capable of doing relative to various other products that we

8  had manufactured and various products that Phillips had

9  manufactured in the past.

10 Q    And we're going to come back to that.  In the meantime,

11 I'd like to ask you, does Rembrandt currently have a business

12 relationship with Stream TV?

13 A    Yes.

14 Q    Could you --

15 A    We have a settlement agreement -- go ahead.  Sorry.

16 Q    I was just going to ask if you could please explain.

17 A    Sure.  The resolution of the litigation between Stream TV

18 Networks, Inc. and Rembrandt was a settlement agreement and

19 license agreement that provided for a number of things.  One, a

20 cash payment; two, honoring the Rembrandt intellectual

21 property; three, the supply of at cost displays through

22 production agreements to be negotiated, but at all times at

23 cost.  And we're now up to, you know, millions of units that

24 would be owed under that agreement.  That works for both

25 companies, in that we're providing at least cost.  It's not

1  that Stream would be losing money, but we are now moving our
2  supplier from other sources to Stream.
3  Q    You referenced earlier Rembrandt's intellectual property.
4  What right does Stream TV have to use Rembrandt's IP under the
5  license agreement?
6  A    Stream is a nonexclusive licensee.  That allows them to
7  use it.  It does not allow them to transfer any rights to that
8  technology other than to a consumer.  And that's fairly
9  standard in the industry.  But the -- if they wanted to do a
10  deal where they transferred out a manufacturing license, for
11  example, to somebody else, they would have to come back to
12  Rembrandt and Rembrandt would directly license that
13  manufacturer, if we were willing to do so at all.  But in any
14  rate, we're -- the main existing relationship is going to be a
15  supplier -- Stream TV Networks to be a supplier to Rembrandt
16  and Rembrandt to have supplied technology in the form of a
17  license to Stream.
18  Q    I apologize if you've already mentioned this, but how long
19  has Stream TV had the license with Rembrandt?
20  A    That was actually the subject of the 2017 litigation.  It
21  involved a contract that purported to give a license to them
22  and in return, it was to give certain monetary and ownership
23  rights to Rembrandt.  As opposed to litigating that to
24  fruition,  we reached the settlement agreement in 2021.  So
25  arguably, the rights existed from 2010 forward.  And in fact,

```
1   that was the result.  I mean, as part of the settlement is --
2   and they exist today subject to performance under the
3   agreement.
4   Q    Thank you.  What about the other Debtor in this matter?
5   Are you familiar with Technovative Media, Inc.?
6   A    Yes.
7   Q    What do you know about Technovative's business?
8   A    Our understanding is that Technovative is a subsidiary to
9   Stream and is a holding company that controls various other
10  subsidiaries that are actively attempting to use Rembrandt's
11  technology without paying a license fee, without agreeing to
12  the other terms of the agreement.  So that is our -- I mean,
13  we -- our understanding is that it's Technovative that controls
14  those entities.
15  Q    And we'll come back to that.  In the meantime, does
16  Rembrandt have a business relationship with Technovative?
17  A    No, other than -- depending on how you define business
18  relationship.  Our license agreement is with Stream, the top --
19  our understanding is the top entity.  That's not an accident.
20  That was a purposeful -- they were purposely added as the
21  defendant in the litigation and the party with which we were
22  contracting with to resolve the agreement and the settlement.
23  Q    Does Technovative have any right to use Rembrandt's IP
24  under the license agreement?
25  A    Only if they're supplying product to Stream.
```

1  Q    Are you familiar with SeeCubic, Inc., which sometimes in

2  this proceeding has been referred to as SeeCubic of Delaware?

3  A    Yes.

4  Q    What do you know about SeeCubic, Inc.?

5  A    Our understanding is that SeeCubic, Inc., is actively

6  trying to use and is using Rembrandt technology and trying to

7  provide content for no glasses 3D using Rembrandt tools and

8  providing and offering to sell no glasses 3D TVs.  They have --

9  we have provid -- and we have pursued litigation to enjoin them

10  from doing so.  The -- that is, I mean, I can keep going on,

11  but that's the general gist of what I understand at this point.

12  Q    And we'll speak about that, but what is your understanding

13  as to whether or not SeeCubic, Inc. is a competitor of Stream

14  TV?

15  A    I think they're about as competitive as an entity can be.

16  They're actively on their website and in their PPM saying

17  they're taking over the technology of Stream TV.  They're

18  working with employees that worked back in the day with 3D

19  Fusion, the predecessor to Rembrandt.  They're trying to market

20  all of the same products and services as Stream.  So they're a

21  competitor.

22  Q    Does Rembrandt have a business relationship with SeeCubic,

23  Inc.?

24  A    No.

25  Q    Has Rembrandt ever had a business relationship with

1  SeeCubic, Inc.?

2  A    No.

3  Q    Does SeeCubic, Inc. have any right to use Rembrandt's IP

4  under the license agreement with Stream TV?

5  A    No.

6  Q    Are you familiar with an entity that's been referred to on

7  these proceedings as SCBV, SeeCubic BV?

8  A    Yes.

9  Q    What do you know about --

10  A    Yes.

11  Q    What -- I'm sorry to interrupt you.  What do you know

12  about SeeCubic BV?

13  A    It is our understanding that SeeCubic BV is a Netherlands

14  corporation that employs a number of people that used to work

15  for 3D Fusion Rembrandt and then it was controlled by Stream

16  through Technovative to design and develop various tools for 3D

17  content creation and the hardware for a no glasses, 3D TV.

18  They actively have access to Rembrandt's trade secrets and are

19  actively using technology covered in Rembrandt patents in

20  creation of various prototypes and products for Stream and --

21  well now, SeeCubic of Delaware.

22  Q    Is SCBV using Rembrandt's IP with Rembrandt's blessing?

23  A    Only if they're creating product for Stream.  In that

24  configuration, we license Stream and they're free to have

25  product made for itself and provide products to the world.

1  They are not free, SCBV is not free to provide that to any

2  other entity, not Technovative and not even -- and certainly

3  not SeeCubic of Delaware.

4  Q    I take it, Rembrandt does not have a business relationship

5  with SCBV.  Is that correct?

6  A    That is correct, other than as a -- that is a -- we have a

7  relationship with Stream, but not with SCBV directly.

8  Q    Has Rembrandt ever had a direct business relationship with

9  SCBV?

10  A    No.

11  Q    Does SCBV have any right to use Rembrandt's IP under the

12  license agreement?

13  A    Only to make product and provide services through Stream.

14  So no, not -- they can't provide anything to any other party

15  outside of our licensing.

16  Q    Do you know Mr. Shadron Stastney?

17  A    Yes.

18  Q    When did you first meet Mr. Stastney?

19  A    I believe the first time we met or spoke, for that matter,

20  was during the mediation process in the Southern District of

21  New York litigation between Rembrandt and Stream.

22  Q    You listened to the testimony that Mr. Stastney provided

23  in connection with a TRO proceeding back on October 6th 2023.

24  Is that correct?

25  A    Yes, I did.

```
1  Q    Did you note any inaccuracies in Mr. Stastney's testimony?

2  A    I did.

3  Q    We'll come back to that.  Now, Rembrandt filed a brief in

4  support of the Debtor's motion for a temporary restraining

5  order.  Correct?

6  A    Yes.

7  Q    Why does Rembrandt support the Debtor's TRO motion?

8  A    For a variety of reasons, but it really goes back to the

9  the core of Rembrandt's interests.  The -- specifically, we're

10 looking to protect our intellectual property and to see it

11 commercialized effectively.  We have licensed Stream.  Stream,

12 continuing to do business in the no-glasses 3D space, is in our

13 interest.  That means they can pay us.  That means that Stream

14 can provide us the products we're looking to sell to other

15 customers, which quite frankly, is where we will make far more

16 revenue than from the licensees.  So we are very interested in

17 not seeing the technology leak into the marketplace.  We do not

18 want to see our tools and techniques, and the things that we

19 have developed, and the trade secrets go to particular

20 jurisdictions in, specifically, China.  India would be, of

21 course, concern to us.  So we're interested in seeing that

22 technology protected.

23 Q    Are you familiar with SeeCubic Inc.'s business model?

24 A    I am familiar with their business model and the private

25 placement memo they've published.
```

1    Q    The private placement memorandum, that's also referred to

2    as a PPM, correct?

3    A    Yes.

4    Q    Are you familiar with the 2020 SeeCubic PPM that's been

5    submitted and marked, and introduced as an exhibit in this

6    case?

7    A    Yes.

8              MR. KODOSKY:  Your Honor, I am going to ask the

9    witness to take a look at what has been previously introduced

10   as Debtor's Exhibit Number 6.  If I may, I've got a copy for

11   the Court in this binder that I can pass out.

12             THE COURT:  Okay.  Is it -- right.  Well, let's start

13   -- I know I thought the parties had no objection to me looking

14   at documents prior -- but this has been admitted into evidence

15   already.  All right.  And is it in another binder, or you just

16   put this together for my ease?

17             MR. KODOSKY:  For your ease.

18             THE COURT:  All right.  Let's -- anybody object to me

19   looking at it in that binder?

20             MR. COLBY:  No, Your Honor.

21             THE COURT:  All right.  Great.  So I don't have to go

22   searching through binders.  Great.  Okay.

23             MR. KODOSKY:  And the witness, I've -- in preparation

24   for today, I had sent the witness a copy of --

25             THE COURT:  He doesn't need to pull any documents.

 1  That's why I asked him what did he have in front of him.  Don't

 2  take out anything.

 3              Jon, how are we going to do this?  Can we pull it up?

 4              MR. EDEL:  Is it the complaint?

 5              MR. KODOSKY:  It's Exhibit Number 6.  It is --

 6              THE COURT:  SeeCubic, Inc.  It was admitted in

 7  Debtor's Cases 6?

 8              MR. KODOSKY:  I believe so, Your Honor.

 9              THE COURT:  In this proceeding?

10              MR. KODOSKY:  Yes, Your Honor.  And I've got a second

11  copy if --

12              THE COURT:  Well, we have to have him look at it.

13  How's he going to -- had anybody through that through?  Because

14  typically, when we have a Zoom hearing, we pull up the document

15  on the screen so that the witness can see it.  That means you

16  don't need to see me.  I don't care.  Can we take me off and

17  can we add another --

18              MR. EDEL:  I just don't have it.  Do you have a --

19              MR. KODOSKY:  I can email it to you.

20              THE COURT:  Yes.

21              MR. KODOSKY:  I've got a PDF that I can --

22              MR. EDEL:  Yeah.

23              THE COURT:  Yes.  Would you?  Oh, I thought -- yes,

24  no one -- PDF document.  Send it to you, Jon?

25              MR. EDEL:  Not from this side.  We've --

```
1              THE COURT:  Okay.  Counsel, can you send all of the

2    documents that you intend to have this witness testify

3    regarding?  Because the only way -- we want to make sure that

4    we are in control of the documents and that we're all looking

5    at the same documents, and that there's nothing different.

6              Yes, Jon?

7              MR. KODOSKY:  I'm happy to, Your Honor.

8              THE COURT:  Doing --

9              MR. KODOSKY:  I would just ask for your email

10   address --

11             MR. EDEL:  Share them and then --

12             MR. KODOSKY:  -- and I will send those to you.

13             THE COURT:  Wait, what did you say?  Hold on.  Hold

14   on.

15             MR. EDEL:  I'm just wondering if it's easier for them

16   to share on their end.

17             THE COURT:  Is it on your -- can you share it?

18             MR. EDEL:  But that might complicate things.

19             THE COURT:  That's going to complicate, okay.  Here's

20   what we're going to do.  I'm going to take a few minutes so

21   that you can email the documents to Jon, and then we'll have

22   all of them.  And when I say a few minutes, I'm not even moving

23   from here.  We're just going to be in recess for a few minutes

24   so that we can deal with the technical issues, okay?  So we're

25   off the record for now.
```

1      (Record taken)

2              THE COURT:  All right.  You may proceed, Mr. Kodosky.

3              MR. KODOSKY:  Thank you, Your Honor.

4    BY MR. KODOSKY:

5    Q    Mr. Michaels, are you able to see on your screen Debtor's

6    Exhibit Number 6?

7    A    Yes.  Yes, I am.

8    Q    Do you recognize this to be the SeeCubic 2020 PPM that you

9    had referenced before we just took this short break?

10   A    Yes, I do.

11   Q    If we can please take a look at page 13 of 34.  And

12   specifically, what I'd like to direct your attention to, Mr.

13   Michaels, is the part of this page that begins, "Business

14   Model" in bold.  If you can see that paragraph, and take a

15   moment to review it, please.

16   A    Yes, I've reviewed it.

17             THE COURT:  Wait a minute.  Counsel, where are we at?

18             MR. KODOSKY:  On page 13 of 34, which is page -- I'm

19   sorry.  Jon, if you can scroll to the bottom of the page to see

20   what the page number is of this.  It says 4 at the bottom, but

21   it's page 13 of 34, so --

22             THE COURT:  Well, how about we use the number,

23   because this also has been -- was this file of record?

24   Apparently.  All right.  Page 4, business model.  All right.

25   Page 4.  I don't know whether it's 13 or -- well, for my

1   reference, page 4.  Okay.

2   BY MR. KODOSKY:

3   Q    Mr. Michaels, if you could take a moment to review the

4   business model description from the SeeCubic 2020 PPM, and

5   please let us know when you've finished reviewing that.

6   A    I have finished reviewing it.

7   Q    Had you seen this PPM and this business model description

8   before today?

9   A    Yes, I have.

10  Q    And is this the provision that, at least partly, informs

11  your understanding of the SeeCubic, Inc. business model?

12  A    Yes, it is.

13  Q    Thank you.

14          MR. KODOSKY:  If we can please show the witness

15  Debtor's Exhibit Number 5.  Previously introduced, which is the

16  -- well, I'll hold off.

17  BY MR. KODOSKY:

18  Q    Do you recognize this to be the SeeCubic 2022 PPM that you

19  had referenced earlier?

20  A    Yes, I do.

21          THE COURT:  Which year?

22          MR. KODOSKY:  2022. Jon, I'd like to begin by

23  directing the witness to page 10 of 29.

24          THE COURT:  And that is Exhibit -- what, again?

25  Five?

```
 1              MR. KODOSKY:  Yes, Your Honor.

 2              THE COURT:  Exhibit 5.  And that is page 10 down at

 3    the bottom or -- because I have PPM 9 and then -- yes, okay.

 4    BY MR. KODOSKY:

 5    Q    You see, Mr. Philips (sic), the section that begins in

 6    bold, "The Company"?

 7    A    Yes, I do.

 8    Q    Where it states, "The company was founded in 2020 by the

 9    secured creditors of Stream TV Networks, Inc. to acquire

10    substantially all of the assets of Stream TV, including all

11    subsidiaries and all the technology assets."  And it goes on to

12    state that, "The company's technology, when licensed to a

13    consumer device manufacturing partner, and incorporated as a

14    component of any panel device" -- and it lists, "-- television,

15    monitor, phone, etcetera, displays content in glasses-free 3D."

16    Do you see that?

17    A    I do.

18    Q    Is that consistent with your understanding of SeeCubic's

19    business model, where they license, or intend to license the

20    technology?

21    A    Yes, it is.

22              MR. KODOSKY:  If we could please take a look at page

23    28, please.

24              THE WITNESS:  Are you waiting on me?  I can see page

25    28, if that's the question.
```

```
1              MR. KODOSKY:  I'm sorry.  I am --

2              THE COURT:  Wait, 28?  That's a different -- Jon, are

3     we on 28?

4              MR. EDEL:  I'm on 28 of 29 on the file, but we want

5     the page, actual page 28?

6              THE COURT:  At the bottom.

7              MR. KODOSKY:  Yes.  The page 28.  It would be 26 of

8     29.  I'm sorry, Jon.

9              MR. EDEL:  Gotcha, yup.

10             THE COURT:  I mean, I just looked down at the bottom.

11    Okay.

12    BY MR. KODOSKY:

13    Q   Mr. Michaels, could you please read into the record the

14    third paragraph there and the certain important transactions

15    section that begins, "The company also".  Do you see that?

16    A   "The company also maintains licensing arrangements for

17    various technologies and products with a variety of

18    manufacturers.  Each agreement requires payment per product

19    sold or for use of technology, or -- as applicable."

20    Q   How do you interpret this provision?

21    A   I believe --

22             MR. COLBY:  Objection.

23             THE WITNESS:  -- it is my understanding upon reading

24    it that it --

25             THE COURT:  Objection.  Objection.  Basis?
```

1           THE WITNESS:  Sorry, I didn't hear the objection.

2           MR. COLBY:  Yeah.  Objection, Your Honor.  Relevance.

3  The witness testified he has no -- or Rembrandt has no business

4  relationship with SeeCubic, Inc.  He's reading out of a

5  document that he didn't prepare, and has testified merely that

6  he saw it.  So I don't know exactly where this is going.  I'm

7  trying to give Mr. Kodosky some rope, but I don't see the

8  relevance of Mr. Michaels testifying about what this document

9  means.

10           THE COURT:  Counsel, response?  His objection is on

11  relevance.

12           MR. KODOSKY:  Mr. Michaels has already stated that he

13  is familiar with SeeCubic's business model based on these PPM

14  materials, that he has a problem with the business model, and

15  my next question is going to be what problem, if any, he has

16  with the business model and why --

17           THE COURT:  Okay.

18           MR. KODOSKY:  -- it resulted in litigation.

19           THE COURT:  All right.  Mr. Colby, withdrawing your

20  objection?

21           MR. COLBY:  I would withdraw for that --

22           THE COURT:  All right.

23           MR. COLBY:  -- forthcoming question, Your Honor.

24           THE COURT:  All right.  Keep going.

25  BY MR. KODOSKY:

1    Q    Mr. Michaels, what problem, if any, do you have with the

2    business model, SeeCubic, Inc. business model description, that

3    you've looked at in these PPM materials?

4    A    The company's business model, as stated, requires a

5    license from Rembrandt, and I read the two sentences in this

6    third paragraph as stating that they have a license from

7    Rembrandt and Philips.  Specifically, the per product sold is

8    the format of the Philips license, and the for use of the

9    technology is the format of the Rembrandt license to Stream,

10   and that I personally negotiated with Shad & Stastney, who

11   likely wrote this.  So my understanding is the company is

12   falsely claiming that it has the licenses it needs when it does

13   not.

14   Q    In other words, SeeCubic does not own any of the

15   technology as attempting to license the others, correct?

16   A    To my knowledge, they don't own any of it.  You're right,

17   but if it's .001 percent, that isn't -- they don't own the

18   technology they're referencing here, and it's necessary to

19   provide hardware, software, or content creation that was

20   developed by Philips 3D Fusion, Rembrandt, and then Stream TV

21   Networks.  So --

22   Q    Is it accurate to state that all business between

23   SeeCubic, Inc. and SCBV was blocked at least through September

24   20th, 2023, when Mr. Stastney was appointed as director of

25   SCBV?

```
1              MR. COLBY:  Objection.

2              THE WITNESS:  I'm sorry.  I didn't follow --

3              THE COURT:  I didn't follow either.

4              THE WITNESS:  -- that question.

5              THE COURT:  So, restate the question.  Before you

6   object, Mr. Colby, he's going to restate it, because I didn't

7   understand it either.  Not that I'm the witness, but I'm trying

8   to follow.  What was your question, Mr. Kodosky?

9   BY MR. KODOSKY:

10  Q    Was all business between SeeCubic and SCBV blocked,

11  B-L-O-C-K-E-D, at least through September 20th of '23 when Mr.

12  Stastney was appointed as director of SCBV?

13  A    I think I --

14             MR. COLBY:  Objection.

15             THE WITNESS:  -- understand your --

16             THE COURT:  Okay, wait a minute.  He's objecting.

17             MR. COLBY:  Well, the witness has no firsthand

18  knowledge.  I don't understand the basis, how he could be

19  testifying as to a relationship or not between two companies of

20  which he's not a part, and testified as to one of them he has

21  no business relationship.

22             THE COURT:  Okay.  Counsel?

23             MR. KODOSKY:  He does have firsthand knowledge, Your

24  Honor.  He's already described what rights SCBV and SeeCubic,

25  Inc. have to use the Rembrandt IP that's been licensed to
```

```
 1   Stream TV.

 2              MR. COLBY:  That has to do, Your Honor, with, I

 3   guess, Stream TV's ability to use Rembrandt technology.  The

 4   question was whether or not all business was blocked between

 5   SeeCubic, Inc. and SeeCubic BV.  That has nothing to do with

 6   Rembrandt's --

 7              THE COURT:  Well, I guess he can rephrase this thing.

 8   Rephrase the question.  I understand what he's asking.  He's

 9   just not stating it --

10              MR. COLBY:  Okay.

11              THE COURT:  -- succinctly.

12              MR. COLBY:  Then --

13              THE COURT:  Rephrase the question.

14   BY MR. KODOSKY:

15   Q    To your knowledge, Mr. Michaels, does SeeCubic intend to

16   have SCBV supply SeeCubic's customers with Ultra D products and

17   services?

18              MR. COLBY:  Objection, Your Honor.

19              THE WITNESS:  That is my understanding.

20              THE COURT:  Wait.  He objected.

21              MR. COLBY:  I don't know --

22              THE WITNESS:  Okay.

23              MR. COLBY:  -- Mr. Michaels can testify firsthand

24   knowledge about what SeeCubic, Inc. intends to do.  He read it

25   out of this document, but so can all of us.  That's not
```

```
 1   firsthand knowledge.  He can testify about what the document

 2   says, I guess, but not as to SeeCubic's intent.

 3            MR. KODOSKY:  Rembrandt has sued both entities, Your

 4   Honor, for exactly this purpose.

 5            THE COURT:  Okay.  So I guess based on -- you can

 6   ask --

 7            MR. COLBY:  I know that bringing a lawsuit gives you

 8   firsthand knowledge about it, but he can testify why he's --

 9            THE COURT:  Counsel, I mean, just rephrase it.

10   BY MR. KODOSKY:

11   Q    Do Ultra D products require a license to the Rembrandt

12   intellectual property to be made, used, sold, offered for sale,

13   exported or imported, Mr. Michaels?

14   A    Yes.

15   Q    Do Ultra D products require a license to the Philips

16   intellectual property to be made, used, sold, offered for sale,

17   exported or important?

18   A    Yes.

19   Q    Do Ultra D products require a license to the Stream TV

20   intellectual property to be made, used, sold, offered for sale,

21   exported or imported?

22   A    Yes.

23   Q    Do Ultra D products require a license to the Ultra D

24   Cooperatief U.A. intellectual property to be made, used, sold,

25   offered for sale, exported or imported?
```

```
 1    A     Yes.

 2              THE COURT:  Who?  Ultra D Cooperatief?

 3              MR. KODOSKY:  U.A.  Yes, Your Honor.

 4    BY MR. KODOSKY:

 5    Q     Does SeeCubic, Inc. have a license from Rembrandt?

 6    A     No.

 7    Q     Does SeeCubic, Inc. have a license from Philips?

 8    A     No.

 9    Q     Does SeeCubic, Inc. have a license from Stream?

10    A     No.

11    Q     Does SeeCubic, Inc. have a license from Ultra D

12    Cooperatief U.A.?

13    A     No.

14    Q     Does SCBV have a license from Rembrandt?

15    A     No.

16    Q     Does SCBV have a license from Philips?

17    A     No.

18    Q     Does SCBV have a license from Stream?

19    A     No.

20    Q     Does SCBV have a license from Ultra D Cooperatief U.A.?

21    A     No.

22    Q     Prior to Mr. Stastney being appointed director of the

23    Netherland subsidiaries of Stream TV, what ability to SeeCubic,

24    Inc. have to do business with SCBV, absent the licenses, in

25    your view?
```

```
 1              MR. COLBY:  Objection, Your Honor.

 2              THE COURT:  Basis?

 3              MR. COLBY:  Same basis.  And Mr. Michaels, I suppose,

 4   can testify about what various parties may or may not be able

 5   to do under the Rembrandt license, but other licenses between

 6   Philips or these other entities that he's not a part of, I

 7   don't think he has firsthand knowledge.

 8              THE COURT:  We already answered on that one.

 9              MR. COLBY:  Well --

10              THE COURT:  This is the new question.  I mean, you

11   objected and he already testified that he didn't have a

12   license.  SeeCubic didn't have a license with any of the above,

13   Philips, Rembrandt, Stream, Ultra D, and SCBV, Inc. did not

14   have a license from any of the above, from my own short hands.

15   And then he went on to another question.  So you didn't object

16   to those.  I kind of think it's too late to object to his

17   answer, to those he's already answered.  Now, there was a new

18   question that you then objected to.  Now, the new question,

19   you're objecting on the basis that he doesn't have firsthand

20   knowledge with respect to that particular question?

21              MR. COLBY:  Correct, Your Honor.

22              THE COURT:  All right.  Counsel, response?

23              MR. KODOSKY:  He has already answered that --

24              THE COURT:  Well, that, but this is a new question.

25   The new question was -- and I forgot what it was.  What was the
```

1    new question that you were objecting to -- that Mr. Colby was

2    objecting to?

3                MR. KODOSKY:  And I'm able to limit it -- maybe this

4    will address his objection to the Rembrandt.  Without having a

5    license from Rembrandt --

6                THE COURT:  Okay.

7                MR. KODOSKY:  -- what ability to SeeCubic, Inc. have

8    to do business with SeeCubic BV absent the Rembrandt license?

9    It's actually the question I asked him earlier about being

10   blocked until Mr. Stastney became a director.

11               THE COURT:  All right.  Let's -- I mean, you're

12   trying to rephrase it.  I get he objected and he's trying to

13   address that.  So the question now is what, Mr. Kodosky?

14   BY MR. KODOSKY:

15   Q    Prior to September 20th, 2023, when Mr. Stastney was

16   appointed a director, was SeeCubic, Inc. blocked in their

17   contract with SCBV?

18   A    Yes, for the sale of a no-glasses 3D product.  I mean,

19   they could sell pencils back and forth, but for the relevant

20   technology, they needed a license from all the entities you

21   mentioned.

22   Q    And it's --

23               MR. COLBY:  Your Honor, I wasn't quite quick enough.

24   That was the same objectionable question as before.  Again, if

25   Mr. Kodosky wants to ask about the implications of a Rembrandt

```
 1   license or not having a Rembrandt license, I think that's

 2   appropriate, but asking whether or not the -- you know, such a

 3   broad question -- Mr. Michaels doesn't have sufficient

 4   firsthand knowledge to answer that.

 5           THE COURT:  Okay.

 6           MR. COLBY:  And I thought --

 7           THE COURT:  What?

 8           MR. COLBY:  I thought we'd agree to limit it to

 9   Rembrandt, but then the question was --

10           THE COURT:  Right.  It was -- okay.  So the objection

11   is that Mr. Michaels does not have firsthand knowledge

12   regarding the relationship between SeeCubic, Inc. and SCBV with

13   respect to, I guess, an agreement between those parties to sell

14   the technology or use the technology?

15           That was the objection, Mr. Colby?

16           MR. COLBY:  Yes, Your Honor.  It's Mr. Michaels would

17   seem to have a basis to testify about the implications of the

18   Rembrandt license, but not quite so broadly about the

19   relationship between the -- I'm trying to be economical in my

20   objections here, Your Honor, but at the same time, I would like

21   to keep us focused on things about which the witness has

22   firsthand knowledge.

23           THE COURT:  All right.

24           MR. COLBY:  And I think if the question were asked

25   about the implications of the Rembrandt licenses that were
```

1  properly sold is --

2           MR. KODOSKY:  These relate on each other, Your Honor,

3  to the extent that you need the Rembrandt license and the

4  Stream license to be able to do business.  He does have

5  firsthand knowledge regarding the Rembrandt license.  He's

6  already testified to that, and I believe he's also -- I'm going

7  to be asking him what action Rembrandt took when it learned

8  that an independent director had been appointed and --

9           THE COURT:  So your response is that he has firsthand

10  knowledge because Rembrandt didn't have a license with SeeCubic

11  or SCBV, that prior to that, it wasn't authorized to use the

12  license?

13          MR. KODOSKY:  Before Mr. Stastney --

14          THE COURT:  Just prior to that.  That's all you've

15  got to -- okay.  Did you -- the question is, and I think the

16  question is, that prior to 9/20/23, did SCBV or SeeCubic have a

17  license from Rembrandt or Stream to use the technology?  Is

18  that the question?

19          MR. KODOSKY:  The technology is the Ultra-D.  And

20  it's --

21          THE COURT:  The -- use Ultra-D technology.

22          MR. KODOSKY:  And it's made up of licenses from

23  Rembrandt.

24          THE COURT:  I get that.

25          MR. KODOSKY:  From Philips.

```
1                THE COURT:  But is that what -- so you're just
2   saying --
3                MR. KODOSKY:  Stream.
4                THE COURT:  -- prior to that they didn't have
5   authority, or they weren't using it?  What's the question?
6   What was the -- what existed prior to 9/2023 that you're asking
7   him about?
8                MR. COLBY:  Right.  And my objection is to Mr.
9   Michaels testifying as to things beyond the Rembrandt
10  technology.
11               THE COURT:  Okay.
12               MR. COLBY:  So if the question were to be limited to
13  the Rembrandt technology licenses or lack of licenses.  I have
14  no --
15               THE COURT:  Well, and what --
16               MR. COLBY:  -- objection.
17               THE COURT:  -- about his knowledge with respect to
18  the Stream license to those -- because he already testified
19  that he knew that they didn't have a license from Stream or --
20  from Stream.  He already testified that he knew that.
21               MR. COLBY:  Yeah.  If he has firsthand knowledge of a
22  license from Stream, that's fine.  I don't think Mr. Michaels
23  has any firsthand knowledge of any relationship between, for
24  example, Philips and SCBV or SeeCubic, Inc., or as between
25  Ultra-D and SCBV.  So I think if we --
```

```
1              THE COURT:  Well, he's already testified regarding

2    that.

3              MR. COLBY:  He --

4              THE COURT:  And said it.

5              MR. COLBY:  You're right.  He testified what did and

6    didn't exist.  He didn't actually give his basis for firsthand

7    knowledge as -- again, I'm trying to be economical in my

8    objection.

9              THE COURT:  Well, counsel, you didn't object at the

10   time.  I'm just saying.  Like, all right.  We're not going to

11   get bogged down.  I mean, I already heard what I -- I mean,

12   this isn't a jury here.  Can you just rephrase the question?

13   Otherwise, I'm going to sustain his objection.

14   BY MR. KODOSKY:

15   Q    As a director of the Netherland subs --

16   A    Uh-huh.

17   Q    -- is not -- is Mr. Stastney attempting to use color of

18   law or act under a color of law to disrupt the arrangement, Mr.

19   Michaels?

20   A    Yes.

21             MR. COLBY:  Objection.

22             THE COURT:  All right.  Objection -- all right.  I

23   knew you were going to object.  Basis for objection, counsel?

24             MR. COLBY:  If the witness has firsthand knowledge of

25   some actions, he can testify as to those.  But I don't think
```

```
 1   that's been established.  I don't understand --
 2            THE COURT:  Right.
 3            MR. COLBY:  -- I thought we were talking about the
 4   implications of the Rembrandt license, who has it and who
 5   doesn't.
 6            THE COURT:  Well, I think -- I get what he's trying
 7   to -- but you have to lay a foundation.  You have to tell me
 8   how he knows all of this stuff.  I'm going to sustain.  But you
 9   need to lay a foundation.
10   BY MR. KODOSKY:
11   Q    All right.  Mr. Michaels, when did you learn, or did you
12   learn that SC -- or that SeeCubic, Inc. was attempting to
13   utilize SCBV inappropriately without having a license from
14   Rembrandt?
15   A    Yes, we learned it from Shadron Stastney's testimony in
16   the bankruptcy and in this hearing.
17   Q    What action did Rembrandt take upon learning that
18   information?
19   A    It took a variety of actions, not the least of which was
20   to request more information about what the actual activities
21   were.  That resulted in us getting copies of the 2022 PPM that
22   we have on -- on the screen.  And it expressly states that
23   they're trying to license out our technology.  Even claiming to
24   have a license to do so.  So that -- that's -- and to our
25   knowledge, that has not happened yet, even though they are
```

1    expressly stating they intend to do so.  And that's with him as

2    director of that entity, we are very concerned that they will

3    actively start transferring information and technology out to

4    parties that are unlicensed.

5    Q    Let me ask you a different way, Mr. Michaels.  Before Mr.

6    Stastney was appointed director on September 20th of 2023, who

7    had the authority to your knowledge to make that decision?

8    A    Stream TV and specifically Matthu -- Matthu Rajan.

9    Q    And at some point, did you become aware that SeeCubic,

10   Inc. and Mr. Stastney were attempting to have remove Mr. Rajan

11   removed as director of the Netherlands subsidiaries?

12   A    Yes.

13   Q    Did you at some point become aware of who replaced Mr.

14   Rajan as the director of the Netherlands subsidiaries?

15   A    It is our understanding that there was first -- Ian Liston

16   (phonetic) who was -- I think is his name, was -- was added as

17   a receiver and then dismissed when the bankruptcy was filed.

18   And later an attorney from Jones Day was appointed by the

19   Netherlands Court as a -- as an -- the independent director.

20   Q    And that's the gentlemen, his name -- do you recall his

21   name?  Jasper?

22   A    That sounds familiar.  I wrote him an email.  I'd -- I'd

23   easily be refreshed -- my recollection would be refreshed by

24   that email.  But I don't recall his name exactly.

25   Q    So is it fair to say that there was a period of time after

```
1   Mr. Rajan was removed and before Mr. Stastney was appointed

2   that there was a "independent or neutral director" making that

3   decision?

4   A    Yes.

5   Q    And upon learning that an independent director had been

6   appointed, what action did Rembrandt take to express his view

7   on whether or not the technology could be used?

8   A    I sent the independent director an email outlining our

9   position, importantly referencing the publicly available

10  documents that went into those rights further, and specifically

11  requested that we setup a meeting or a phone call with US IP

12  Practitioners to review the situation.

13  Q    And what response did you receive from the independent

14  director?

15  A    The -- we received a response that -- that he had talked

16  to various people we have -- for many years accused of taking

17  our trade secrets and that we had heavily documented the

18  exchange of trade secrets with specifically Dr. Barenbrug

19  (phonetic) and had told him that they weren't using our trade

20  secrets.  And that was sufficient for him, and we responded

21  then.

22  Q    What was your response?

23             MR. COLBY:  Objection, Your Honor.

24             THE COURT:  Wait, wait, wait.  Okay.  Objection,

25  Mister --
```

1          MR. COLBY:  Witness is testifying as to hearsay.

2    What somebody else told him out of court.

3          THE COURT:  Okay.

4          Counsel?

5          MR. KODOSKY:  Your Honor, first of all, it's not

6    being offered for the truth of the matter being asserted, and

7    I'd also like to provide the Court with a cite that hearsay at

8    the preliminary injunction stage, the Court does -- the Court

9    may rely on affidavits and hearsay materials, which would not

10   be admissible evidence.  It is the --

11         THE COURT:  What case is that?

12         MR. KODOSKY:  *Kos Pharms*, K-O-S, Pharms --

13         THE COURT:  All right.

14         MR. KODOSKY:  -- P-H-A-R-M-S.

15         THE COURT:  K-O-S.

16         MR. KODOSKY:  I'm sorry?

17         THE COURT:  K-O-S.

18         MR. KODOSKY:  K-O-S space Pharms, P-H-A-R-M-S.

19         THE COURT:  Oh Kos pharms.  Okay.

20         MR. KODOSKY:  369 F.3d at 718.  And that cite is

21   actually referenced in a Western District of Pennsylvania, June

22   9th, 2022, case opinion, styled *Not an LLC v. Bureau of*

23   *Alcohol*, Civil Action number 2:22-CV-747.

24         THE COURT:  And what's the circuit for the *Kos*

25   *Pharms*?

```
1                MR. KODOSKY:  Third Circuit, Your Honor.

2                THE COURT:  What year?

3                MR. KODOSKY:  I want to say that it's from 2001.  But

4    if I can maybe get back to you over break?

5                THE COURT:  Okay.  So Kos Pharms cited in a case

6    called Not an LLC v. who?

7                MR. KODOSKY:  Bureau of Alcohol, from the Western

8    District of Pennsylvania, June 9th, 2022.

9                THE COURT:  Okay.

10   BY MR. KODOSKY:

11   Q    What response --

12               THE COURT:  Wait a minute, wait a minute.

13               MR. KODOSKY:  Oh, sorry.

14               THE COURT:  I've got to rule.  I've got to rule,

15   counsel.  You said that at a hearing on a preliminary

16   injunction, the Court can consider hearsay matters.  You also

17   believe it's not hearsay because it's not being offered for the

18   truth of the matter, correct?

19               MR. KODOSKY:  Correct.

20               THE COURT:  What is it being offered for?

21               MR. KODOSKY:  I'd have to --

22               THE COURT:  I mean --

23               MR. COLBY:  I don't feel terribly strong about this

24   objection.

25               THE COURT:  Right.
```

```
1                MR. COLBY:  I think the testimony on balance was
2     actually helpful to us.
3                THE COURT:  Right.  I mean --
4                MR. COLBY:  But I would like to --
5                THE COURT:  -- he spoke to someone whose --
6                MR. COLBY:  Yeah.
7                THE COURT:  -- his understanding in the response from
8     the independent director was that -- responded that he didn't
9     believe that they were using their technology.
10               MR. COLBY:  Right.  We'll take a look at the cases.
11    I do think, you know, those have not necessarily --
12               THE COURT:  Other --
13               MR. COLBY:  Hearsay free for all are not the rules
14    we've been living under to date in this hearing.
15               THE COURT:  Right.  But also, counsel --
16               MR. COLBY:  I'd like to keep this focused.
17               THE COURT:  -- other than what somebody else told
18    him, told the independent director.  Somebody -- this other
19    doctor or whatever his name was, he could -- his understanding
20    of what the response was is sufficient.  Was that -- he
21    responded, his understanding was that they didn't believe they
22    were using trade secrets.
23               MR. COLBY:  Right, right.  Yeah.
24               THE COURT:  And that could be understanding.  He just
25    couldn't tell me that -- what it says.  So we'll strike the
```

```
 1   portion about Mr. -- the independent director.  We don't know

 2   his name.  We're not talking about Mr. Liston.  We're talking

 3   about the independent director who was a Jones Day attorney?

 4             MR. KODOSKY:  Jasper Berkenbosch, I believe was his

 5   name, Your Honor.

 6             And actually, SCBV is a Defendant in this case.  And

 7   so, to the extent that he was serving as an independent

 8   director of one of the Defendants in the case -- party

 9   admission.

10             THE COURT:  That's a new one.

11             MR. COLBY:  Yes, it --

12             THE COURT:  What's your response to that?

13             MR. COLBY:  Your Honor, I don't feel terribly

14   strongly about this because I --

15             THE COURT:  Right.  Because -- all right.

16             MR. COLBY:  -- think the statement was helpful so --

17             THE COURT:  So it's a party admission.  It's a -- I

18   was going to strike the portion about who told him what,

19   because the real bottom line is, he responded, we're not using

20   your trade secrets.  That was his understanding of the response

21   from Mr. Berkenbosch.

22             MR. COLBY:  Correct.  I'm fine with that.

23             THE COURT:  Okay.  All right.  So -- and now that you

24   said it's a statement -- a party admission, because Mr.

25   Berkenbosch was the independent director of one of the
```

```
 1    Defendants, it -- I think it can all come in, but okay.
 2              So I'll admit it as a party admission and then we'll
 3    move on. It was going to come in anyway, but except for that --
 4              MR. KODOSKY:  Thank you, Your Honor.
 5              THE COURT:  -- one limited portion.  Go ahead.
 6    BY MR. KODOSKY:
 7    Q    Ultimately, Mr. Michaels, what action did Mr. Berkenbosch
 8    take in response to Rembrandts concerns?
 9    A    We -- we included the US headquarters of Jones Day, again,
10    outlining our positions and requesting a meeting.  I found it
11    highly unlikely that a reputable IP firm would conduct the
12    actions that SCBV and SeeCubic were attempting.  And then Mr.
13    Berkenbosch, the independent director of SCBV resigns -- well,
14    or sent a letter to the Court asking to resign.  And that was
15    apparently granted.
16    Q    And then after he resigned is when Mr. Stastney was
17    appointed director?
18    A    Yes.
19    Q    What assurances have you received from Mr. Stastney since
20    he's been appointed director that he would not act in
21    contravention of Rembrandts instructions or wishes?
22    A    It's my understanding and directly from his mouth, both in
23    court and our out of court discussions that he fully intends to
24    license out the technology, including our -- what is Rembrandt
25    technology and Philips without paying any license fee to
```

1    Rembrandt or honoring the license in any way.

2    Q    And is that one of, if not the primary reason, why

3    Rembrandt supports the Debtors Motion for a TRO?

4    A    Yes, and it's why we've brought a similar action in

5    Delaware to enjoin SeeCubic from doing the same.

6    Q    And that's great timing.  The SeeCubic, Inc. filed a

7    response to the Debtors Motion for a TRO in this matter.  It's

8    a Docket 77 on page 26.

9              THE COURT:  Wait a minute.  Response.  Docket entry

10   what?

11             MR. KODOSKY:  Docket 77.  It's the SeeCubic, Inc.

12             THE COURT:  In the adversary proceeding or in the

13   bankruptcy?

14             MR. KODOSKY:  in the advisory, Your Honor.

15             THE COURT:  Okay.

16             Response.  Okay.  77 in adversary.  We just want to

17   keep the record straight, because I doubt hardly it was number

18   77 in the bankruptcy.  We were up to 400 or 500 or something in

19   the bankruptcy.

20             Okay.  So you want us to bring that up?

21             MR. KODOSKY:  No, if I can just Mr. Michaels for his

22   reaction to, in footnote 17 --

23             THE COURT:  Well, can we --

24             MR. KODOSKY:  -- of SeeCubic, Inc.'s --

25             THE COURT:  -- see footnote 17, so we all know what

```
 1   we're talking about?

 2              Jon, can you pull that up?

 3              MR. KODOSKY:  And it should be on page 26, 32 of 39.

 4              THE COURT:  Page what?

 5              MR. KODOSKY:  The page number is 26 at the bottom of

 6   the page.  But on the top, it's page 32 of 39.

 7              THE COURT:  On the docket.  But in the pleading

 8   itself, it's page 26, correct?

 9              MR. KODOSKY:  That is correct.

10              THE COURT:  All right.  And so, you want him to

11   review footnote 17?

12              MR. KODOSKY:  Yes, he had just mentioned about --

13   that he had filed a TRO against SeeCubic, among other parties,

14   in the District of Delaware.  And footnote 17, this is from --

15              THE COURT:  Wait a minute.  Let him read it and tell

16   me what that -- does that relate to his testimony or whatever.

17   BY MR. KODOSKY:

18   Q    Please take a moment, Mr. Michaels, and review footnote 17

19   there on page 26.

20   A    Yes, I've read it.

21   Q    My question to you was going to be, what is your reaction

22   to, do you see where it states, "The District of Delaware

23   applied this reasoning in its denial of the Motion filed in the

24   summer of 2023 of nonparty Rembrandt 3D Holdings, Ltd. for a

25   TRO against SeeCubic among parties based on similar
```

1  allegations."  Do you see that?

2  A    Yes.

3  Q    The Court did not deny Rembrandt 3D Holdings, Ltd. TRO

4  Motion, correct?

5  A    It did not.

6  Q    In other words, this statement in the SeeCubic, Inc.

7  response is inaccurate, correct?

8  A    It is with respect to the TRO Motion.

9  Q    Is it accurate to state that on August 1st, 2023 -- or I'm

10  sorry, prior to that, that Rembrandt had withdrew its TRO

11  Motion?

12  A    Yes, after hearing the representations by SeeCubic's

13  counsel during the bankruptcy hearing with the Court, we

14  understood that they were going to discontinue their activities

15  in the Netherlands to have their own director appointed.  And

16  we wrote the Court -- the District Court in Delaware saying

17  that the basis of our TRO was no longer valid because --

18  because that -- they were discontinuing that Motion to have a

19  new director appointed.

20  Q    So in other words, Rembrandt withdrew its TRO Motion based

21  on representations made by Defendants counsel in this court?

22  A    Yes, well, in the bankruptcy court.  I don't know if this

23  is the same -- it's a different -- I think it's under a

24  different docket.

25  Q    Understood.

1    A      But yes.

2    Q      And then not only did they not cease and desist in their

3    efforts to take over the Netherland subsidiaries, but they

4    included this misrepresentation in their brief stating that the

5    District of Delaware denied Rembrandt's TRO, would you agree

6    with that?

7    A      Yes.

8    Q      Mr. Micheals, did you ever personally test Stream TV

9    products to make sure that the content was protected?

10   A      Yes, I was in a room full of Rembrandt associated people

11   evaluating the Stream TV products that they had provided during

12   the mediation and one that we had purchased prior to bringing

13   the litigation.

14   Q      And what did you find whenever you investigated whether or

15   not the content was protected?

16   A      With respect to content being protected, we actively tried

17   to get access to the firmware and various tools that were being

18   used, especially for real time conversion. But also, evaluating

19   some of the hardware components and we could not access them.

20   We --

21   Q      Do you have any personal knowledge as to whether or not

22   the content is protected now via the actions of the Netherland

23   subsidiaries?

24   A      Only what I've heard testimony in this proceeding.  Every

25   Stream TV product that we have reviewed in the past has been

```
 1   protected.  And while we -- we could tell that our technology

 2   was being used by various techniques of providing content and

 3   seeing how it was processed and then processing it through our

 4   tools and it coming out the same, the -- we could tell that it

 5   was being -- that our tools were incorporated.  However, we

 6   were not able to see the tools or reverse engineer those tools

 7   from those products.

 8   Q    Have you personally investigated whether Mr. Stastney

 9   and/or SeeCubic, Inc. have been involved with moving IP assets

10   owned by Stream TV to SeeCubic, Inc.?

11   A    I have investigated that, yes, and I have seen that they

12   have done -- attempted to do so.

13            MR. KODOSKY:  Your Honor, I'd like to show the

14   witness first Exhibit Number 71.

15            If I can, Kevin, get another binder with 71?

16            Permission to approach, Your Honor?

17            THE COURT:  This is another binder?

18            MR. KODOSKY:  Yes, Your Honor.

19            THE COURT:  And have you sent those documents to

20   Mister --

21            MR. KODOSKY:  Yes, I have -- Your Honor.  I have.

22            THE COURT:  Okay.  All right.  All right.

23            Any objection to that being handed up, Mr. Colby?

24            MR. COLBY:  No objection to it being handed up.

25            Which document?
```

1              MR. KODOSKY:  The second one.

2              THE COURT:  Counsel, just give me a minute.  I want

3    to try to organize my desk here.

4              MR. KODOSKY:  No problem, Your Honor.

5              THE COURT:  Okay.  All right.  What am I looking at,

6    counsel?

7              MR. KODOSKY:  I'm sorry, Your Honor?

8              THE COURT:  What am I looking at?

9              MR. KODOSKY:  Exhibit 71.

10             THE COURT:  Okay.  Okay.  All right.  All right.

11             We brought that up.  Go ahead.

12   BY MR. KODOSKY:

13   Q    Mr. Michaels, you stated that you personally investigated

14   whether or not SeeCubic, Inc., and/or Mr. Stastney were

15   involved with moving Stream Intellectual Property IP assets

16   from Stream to SeeCubic, Inc.  Do you recall testifying to that

17   just a few moments ago?

18   A    Yes.

19   Q    What is being shown to you on the screen is what -- a

20   document that's been marked for identification as Debtors

21   Exhibit Number 71.  Do you recognize this document?

22   A    Yes, I do.

23   Q    Is this a document that you uncovered as part of the

24   investigation that you performed?

25   A    Yes, it is.

1  Q    Could you please describe for us what this document is?

2  A    This is an application to register a trademark for

3  SeeCubic Inc for the mark SeeCubic.

4  Q    And what was the date of this -- did you call it an

5  application?

6  A    Yes, I did.

7  Q    What is the date of this application?

8  A    The application was filed on October 18th, 2023.

9  Q    So the application was filed after this TRO was filed?

10 A    Yes, it was.

11         MR. KODOSKY:  If we can scroll down to the second

12 page.

13 BY MR. KODOSKY:

14 Q    Do you see where it states at the top, first use anywhere

15 date?

16 A    Yes.

17 Q    Where it states that SeeCubic -- I'm sorry.  Could you

18 please describe what it states?

19 A    So the first use anywhere refers to the first time a mark

20 has been used in commerce in the sale of goods or sale of

21 services.  And that date is June 1st -- it's purported to be

22 June 1st, 2020.  The first use in commerce actually references

23 commerce that the federal government can regulate.  So it has

24 to be interstate or international commerce, and they're saying

25 that at some point it was at least as early as December 8th,

1  2020, that it crossed state lines or international boundaries.

2  Q    And you were physically present in this courtroom with us

3  during the hearing that was held on October 27th, correct?

4  A    Yes.

5  Q    You drove down from upstate New York to be here?

6  A    Yes.

7  Q    And do you recall Mr. Rajan being shown website materials

8  and news articles prior to June 1st of 2020 using the SeeCubic

9  mark?

10 A    Yes, I do.

11 Q    And based on that, do you believe that that first use

12 anywhere date of June 1st, 2020, is accurate?

13 A    Well, it's certainly not accurate with respect to SeeCubic

14 Inc.  The first use was by Stream TV and/or SC BV.

15 Q    And do you see the webpage URL there of SeeCubic.com?

16 A    Yes.

17 Q    And the information as to who submitted this application,

18 do you see that on this second page?

19 A    Yes.

20 Q    Who was it submitted by?

21 A    Shadron Stastney.

22 Q    On behalf of SeeCubic Inc?

23 A    On behalf of SeeCubic Inc.

24 Q    I'd like to direct your attention to page -- the bottom of

25 page 3, under the section that begins in all bold,

1    "Declaration."  Do you see where I'm referring to?

2    A    Yes.

3    Q    If you could please explain what this section is referring

4    to.

5              THE COURT:  Wait, where are we, counsel?

6              MR. KODOSKY:  I'm sorry, Your Honor.  Bottom of page

7    3, top of page 4, the part that states --

8              THE COURT:  Oh, declaration.

9              MR. KODOSKY:  -- declaration.

10              THE COURT:  Okay.  Thank you.

11              THE WITNESS:  This is -- the declaration filed under

12    penalty of perjury in our federal system, it's where the

13    applicant is required to make certain representations with

14    respect to their belief in their ability to register the mark.

15    This is a very important aspect of the application.  In our

16    internal training, you know, for our attorneys, we have them

17    take this very seriously and it can be the basis of

18    invalidating the mark if registered if any of these provisions

19    are violated, and this frequently is used to do so.  In

20    addition, the person signing the declaration is risking

21    prosecution for perjury, and there are times when that's taken

22    very seriously and in fact enforced.

23    BY MR. KODOSKY:

24    Q    It's a potential criminal liability?

25    A    Yes.

1  Q    And here, the person signing the declaration was who?  Mr.

2  Stastney?  Is that accurate?

3  A    Yes.

4  Q    On page 4, do you see the checkmark in the box in the

5  section that says, "to the best of the signatory's knowledge

6  and belief, no other persons except if applicable concurrent

7  users have the right to use the mark in commerce either in the

8  identical form or in such near resemblance as to be likely when

9  used on or in connection with the goods, services of such other

10  persons, to cause confusion or mistake or to deceive."  Do you

11  see that?

12  A    I do.

13  Q    Restated, is that Mr. Stastney stating to the best of his

14  knowledge and belief that, for example, Stream TV does not have

15  any right to use the word SeeCubic?

16  A    That's exactly what it means.  And I might add, it's not

17  just Stream.  It would be SeeCubic BV.  And he certainly would

18  know that they did not -- that they might have a reason to

19  register the mark as well.

20  Q    And then the next box with a checkmark there, do you see

21  where it states, "To the best of the signatory's knowledge --"

22  And again, signatory would be Mr. Stastney?

23  A    Yes.

24  Q    "To the best of the signatory's knowledge, information,

25  and belief, formed after an inquiry reasonable under the

1  circumstances, the allegations and other factual contentions

2  made above have evidentiary support."  Do you see that?

3  A    Yes.

4  Q    What does that -- what does that mean?

5  A    That the -- and in particular with respect to when you're

6  claiming use, that you're going to be -- you're actually going

7  to be able to show the sale, a contract for sale, purchase

8  order, some product or service being exchanged in commerce

9  that's defined by our various regulations and statues related

10 to our trademark issues.  And in this case, it would also

11 reference as to whether or not there was, going up to the prior

12 paragraph, whether or not some other party had a better right

13 and had earlier use with respect to the mark.  And as director

14 of SeeCubic BV, he certainly would have known that SeeCubic BV

15 had many, many years of prior use of this mark as well as

16 Stream TV using it when he was CFO of Stream TV.  That would be

17 better rights than SeeCubic Inc.  I mean, this is -- has to be

18 knowingly false that he filed it, in these statements.

19 Q    And if he is called to testify, it would be fair

20 questioning in your view for us to ask him what evidentiary

21 support was being referenced in this box?

22 A    Absolutely.  In any trademark to speak --

23          MR. COLBY:  Objection.  Objection.

24          THE COURT:  Woah, objection.

25          MR. COLBY:  Objection, Your Honor.  I think it's for

```
 1   the Court to decide what's fair questioning, not Mr. Michaels.
 2           THE COURT:  Response?  You can rephrase that.
 3   Sustained, but you can rephrase.
 4   BY MR. KODOSKY:
 5   Q   Mr. Phillips -- is it fair to as Mr. Stastney what the
 6   evidentiary support he has?
 7           THE COURT:  Objection.
 8           MR. COLBY:  Objection.  Yeah, to the extent he's
 9   asking for opinion testimony.
10           THE COURT:  For an opinion.
11           MR. COLBY:  Yeah.
12           THE COURT:  Hasn't been qualified as an expert.
13           MR. COLBY:  I also just don't see the point of the
14   question.
15           THE COURT:  Right.
16           MR. COLBY:  I mean, he can ask him --
17           THE COURT:  He can ask him --
18           MR. COLBY:  Right.  Ask Mr. Stastney.  Go ahead.
19           MR. KODOSKY:  We intend to ask.
20           THE COURT:  Right.  But you don't have to ask him
21   whether you can ask him.  You can ask me if you can ask him.
22   Move on.  I'll sustain the objection.
23           MR. KODOSKY:  And -- okay.  Thank you, Your Honor.
24   BY MR. KODOSKY:
25   Q   The next box that has a checkmark in it, Mr. Michaels, I'm
```

1  not going to read all of that into the record, but is that

2  referring to the potential criminal liability and the fines or

3  imprisonment that you had referred to earlier in making false

4  statements in an application?

5  A    Yes.  It refers to 18 USC 1001 specifically.  But any

6  attorney in our office that prepared and filed such an

7  application like this, it would be grounds for immediate

8  dismissal.  Zero exception.  We've never -- I mean, in 40

9  something years, we've never had anybody that would have filed

10 something like this, knowing even if they believed it was

11 untrue, if there was a dispute like there is currently between

12 two companies, we would have filed a statement with the

13 application or something to indicate that other uses were

14 claiming rights to the mark.  We would not have just blanketly

15 said we were entitled to this registration, absent informing

16 the patent and trademark office of the other party's rights or

17 claim to rights.

18 Q    And right below those boxes with the checkmarks, do you

19 see the electronic signature of Mr. Shad L. Stastney?

20 A    Yes.

21 Q    CEO of SeeCubic Inc?

22 A    Yes.

23 Q    Dated October 18th, 2023?

24 A    Yes.

25 Q    Which was after the TRO motion was filed and after at

```
1   least two hearings were held in connection with that motion,

2   correct?

3   A    Yes.

4            MR. KODOSKY:  If we can please scroll down to page 6.

5            THE COURT:  Hold on one second.  Sorry.  I'm sorry.

6   You may continue.

7            MR. KODOSKY:  Thank you, Your Honor.

8   BY MR. KODOSKY:

9   Q    Directing your attention to page 6 of this document, Mr.

10  Michaels.

11  A    Uh-huh.

12  Q    It's being shown on the screen.  Do you see that?

13  A    Yes, I do.

14  Q    Is this the evidentiary support that was submitted by Mr.

15  Stastney and SeeCubic Inc in support of their declaration?

16  A    It is.  It's referred to as a specimen showing the mark in

17  use on their website.  And it's -- you're required to file

18  something showing how the mark is being used in actual

19  practice.

20  Q    And so the evidence that they submitted was the same

21  website materials that we looked at in the last hearing?

22            MR. COLBY:  Objection, Your Honor.

23            THE WITNESS:  I don't know if -- I don't recall if we

24  looked at this in the last hearing, but --

25            THE COURT:  All right.  Hold on.  Hold on, Mr.
```

1   Michaels, objection.  Objection.

2           MR. COLBY:  Yeah.  The objection is I don't think

3   that it was established -- it's been established that these are

4   the same or that Mr. Michaels can -- is in a position to do

5   that as the same website that was shown by Debtors in the last

6   hearing.

7           MR. KODOSKY:  We can pull up the exhibit from the

8   last hearing and compare.  There's the $170 million language

9   that we asked Mr. Rajan about.

10          THE COURT:  Wait a minute, wait a minute, we don't

11  need you to testify, counsel.  All you can do is say were you

12  present at the last hearing?  Did you see this exhibit?  Is it

13  the same?  Pull it up, unless Mr. Colby's going to say it was,

14  pull it up.  If it is and you want to waste your time, go

15  ahead.  Pull it up.  You said it was -- what exhibit was it at

16  the last hearing?  You need some time for that, counsel?

17          MR. KODOSKY:  I should be able to get to it pretty

18  quickly, Your Honor.  Exhibit 60 was the SeeCubic website as of

19  October 27th, 2023.

20          THE COURT:  All right.  So pull up Exhibit -- do we

21  have that?

22          MR. KODOSKY:  If not, I can email it to --

23          THE COURT:  Well, he's going to have to send it to

24  you so that he can look at it.

25          So while we're doing that, we're going to take a

```
1   five-minute break.  Court is in recess until 12:45.  Okay.  I

2   only need five -- actually, I want to give you five minutes.

3           All right.  I'll be back at 12:45.

4       (Recess taken)

5           THE BAILIFF:  All rise.

6           THE COURT:  Please be seated.

7           I took my pen?  That is why I do not go back in

8   chambers.  Two emergencies.  And I think I left my pen.  Let's

9   hope I have one more.

10          All right, counsel.  Before we begin, I think there's

11  some concern about who's on -- who's observing?  That right,

12  John?

13          THE CLERK:  Yeah.

14          THE COURT:  All right.  Let's just have them identify

15  themselves, please?

16          THE CLERK:  I have someone on here just labelled as

17  Creditor.  Could you identify who you are, please?

18          MR. HAWKINS:  Did you want my name?

19          THE CLERK:  I'm sorry?

20          MR. HAWKINS:  Did you want my name?

21          THE COURT:  Yes.

22          THE CLERK:  Well, we're trying to figure out who --

23          THE COURT:  Creditor.

24          THE CLERK:  -- is virtually in the courtroom, yes.

25          MR. HAWKINS:  I'm just a creditor.  Small creditor.
```

```
 1              THE COURT:  Well, what's -- what's your name, small
 2    creditor?  This is the judge.
 3              MR. HAWKINS:  John.
 4              THE COURT:  John?
 5              MR. HAWKINS:  John Hawkins.
 6              THE COURT:  John Hawkins.
 7              MR. HAWKINS:  Correct.
 8              THE COURT:  And okay.  Who else?
 9              MR. HAWKINS:  I'm insignificant, Judge.
10              THE COURT:  No, you're not.  Everybody in my
11    courtroom is significant.  I wouldn't say that you're
12    insignificant, sir.
13              MR. HAWKINS:  I appreciate that.  Thank you.
14              THE COURT:  All right.  Who else is observing?
15              THE CLERK:  So I have a phone number ending in 4843.
16              THE COURT:  And who is that?
17              THE CLERK:  Again, phone number ending in 4843.
18              THE COURT:  Can they hear us?
19              THE CLERK:  They should be able to hear us.
20              I'm just going to let you know, we're probably going
21    to remove you then.
22              MR. BLUMENTHAL:  Can you hear me now?
23              THE COURT:  Yes.  Who are you?
24              MR. BLUMENTHAL:  Steven Blumenthal.
25              THE COURT:  And your relationship to the case, Mr.
```

```
 1  Blumenthal?

 2          MR. BLUMENTHAL:  I'm the CEO of Rembrandt 3D Holding.

 3          THE COURT:  Okay.  Okay.  Who else we have, John?

 4          THE CLERK:  A phone number ending in 9793.

 5          THE COURT:  Give them a little -- do you know who

 6  that is?

 7          MR. COLBY:  I don't know the phone number.  We do

 8  have two colleagues observing remotely, one whose name you can

 9  see, Rebecca Ritchie and also Becky Gonzalez-Rivas.

10          THE COURT:  Yeah.  I think we're more like who we

11  can't identify.

12          MR. COLBY:  Yeah, yeah.  And Ms. Gonzalez-Rivas is

13  4843.  I just got confirmation.

14          THE CLERK:  Oh.  What is it?  Gonzalez?

15          THE COURT:  Okay.  That's 4843.  Who else we have?

16  That everybody?

17          THE CLERK:  I have someone just named Steven.

18          MR. COLBY:  That was Steven Blumenthal who spoke up

19  earlier, I believe.

20          THE COURT:  No there's two people.

21          THE CLERK:  Then I'm looking for someone just named

22  creditor.

23          THE COURT:  Wait, I thought that was Mr. Hawkins.

24  Small -- he said he's a small creditor.

25          THE CLERK:  Gotcha.
```

```
 1                THE COURT:  And then we had --

 2                THE CLERK:  Sorry, Mr. Hawkins.

 3                THE COURT:  And then we have -- so I have four people

 4   so far.  How many unidentified people you have?

 5                THE CLERK:  A phone number ending in 9793.

 6                THE COURT:  Hello?  Maybe they -- can they -- give

 7   them a time.  Maybe they're on mute.

 8                THE CLERK:  Yeah.

 9                THE COURT:  Give them a chance to come off mute.  Are

10   they on mute?

11                THE CLERK:  Again, it's a 516 number ending in 9793.

12                THE COURT:  I feel like we're at bingo.  Is that

13   anybody's colleague?  Does anybody recognize this number?

14                MS. BRUMME:  Yes, Your Honor, I believe that's Tom

15   Warns of K&L Gates.

16                THE COURT:  Well, can he not respond?

17                MS. BRUMME:  He may have stepped away from the Zoom.

18                THE CLERK:  It's possible.

19                THE COURT:  Is that your colleague, counsel?

20                MS. BRUMME:  That's Tom Warns with K&L Gates, Mr.

21   Caponi's colleague.

22                THE CLERK:  That's Tom Warns, okay.

23                THE COURT:  Is that your colleague?  716 -- what's

24   the number?

25                THE CLERK:  That was the one ending in 9793.
```

 1              MS. BRUMME:  Yeah, he's just messaged me.  He's

 2   trying to respond, but we can't hear him.

 3              THE COURT:  That's fine.  All right.  Okay.  Okay.

 4              THE CLERK:  And lastly, and I think I recognize this

 5   number, though, ending in 4411?  Ending in 4411.

 6              THE COURT:  What's the beginning?  A 215?

 7              THE CLERK:  A 215 number.

 8              THE COURT:  That's not Eileen, is it?

 9              THE CLERK:  No, but I thought that it might be

10   Callahan.

11              THE COURT:  Who?

12              THE CLERK:  Mr. Callahan, but I'm not 100 percent

13   sure.

14              THE COURT:  All right.  Who's on -- who's 4411?

15              THE CLERK:  That's the last one.

16              MR. COLBY:  Your Honor, both -- it seems like Mr.

17   Warns and our colleague Ms. Gonzalez-Rivas were trying to

18   unmute to respond --

19              THE COURT:  That's fine.

20              MR. COLBY:  -- and weren't able to.  Others may be

21   having the same issue.

22              THE CLERK:  Right.

23              THE COURT:  Right.  That's -- okay.  Can we unmute

24   441 -- that's why I was asking, can they respond?

25              THE CLERK:  If they're on a phone, they're not seeing

```
 1   the prompt to unmute off the Zoom.  It's a little clunky.

 2            THE COURT:  But they can hear us.

 3            THE CLERK:  They can hear us, but they might not be

 4   able to --

 5            THE COURT:  So if you're on 441 -- ending in 4411,

 6   could you please unmute your telephone and at least advise us

 7   who we are?  Which is why we need to start requiring that you

 8   put a name.

 9            THE CLERK:  Well, the problem is they beep in while

10   we're in the middle of stuff, so I'm not -- yeah.

11            THE COURT:  All right.  Last call, 4411.

12            THE CLERK:  Should I dump them?

13            THE COURT:  Dump them and they can call back.

14            THE CLERK:  All right.

15            THE COURT:  I mean, or they can email you.  I mean if

16   it's someone -- because it's a 215.

17            THE CLERK:  Right.

18            THE COURT:  They can email you.  They have your email

19   and Ms. Godfrey's email address to say I got kicked off.  I

20   want to hear, okay.  All right.

21            MR. ALEXANDER:  Your Honor, I think we can see all

22   the names.  I saw Mr. Crawford, who's a party.  Mr. Wallace is

23   Rembrandt.

24            THE COURT:  Right.  It was only the people who did

25   not have identifications that we wanted to know who they were,
```

```
 1   only because they're not in the courtroom and I can't see them.
 2           Yes, counsel?
 3           MS. BRUMME:  I believe 215 ending in 4411 is Mr.
 4   Callahan.
 5           THE CLERK:  I thought so, damn.
 6           THE COURT:  Well, he didn't answer.  Did you kick him
 7   off?
 8           THE CLERK:  Yes.
 9           THE COURT:  He's going to have to call back.  Sorry,
10   Mr. Callahan -- Mr. Callahan is upstairs.
11           THE CLERK:  I was going to say, he's got to walk down
12   a block or whatever.
13           THE COURT:  Come take the elevator down unless he's
14   working from home.  I don't know.  I don't know their schedule.
15   They could be working from home because our staff rotates also
16   and they work what two days remotely, three days remotely?
17           THE CLERK:  Yeah, two.
18           THE COURT:  And in the mornings, I actually do my
19   hearings telephonically and if I come in, I come in for the
20   afternoon.  Or unless today, I come in for the morning.
21           All right.  You may proceed --
22           THE CLERK:  I'm sure we're doing him a favor.
23           THE COURT:  What?
24           THE CLERK:  I'm sure we're doing him a favor.
25           THE COURT:  I'm sure.
```

```
 1              Mr. Kodosky, you may continue.

 2              MR. KODOSKY:  Thank you, Your Honor.

 3  BY MR. KODOSKY:

 4  Q    Mr. Michaels, before we took a break, we were looking at

 5  what has been marked for identification as Debtor's Exhibit

 6  Number 71, page 6 of 6.

 7  A    Yes.  Yes.

 8  Q    Which is the evidentiary material submitted by Mr.

 9  Stastney and SeeCubic Inc in support of their trademark

10  application?

11              MR. KODOSKY:  I'm sorry, John.  If we can go back to

12  Exhibit 71?

13              THE COURT:  Oh, we're back to 71.

14              THE CLERK:  71.

15              MR. KODOSKY:  Page 6 of 6?  There we go.

16              THE COURT:  Page 6.

17              MR. KODOSKY:  And I had made the representation that

18  these materials were the same website materials that we had

19  looked at in the last hearing.  Over break, I was incorrect

20  about my exhibit reference number.  It was Exhibit 61, not

21  Exhibit 60.  But we now have Exhibit 61 on the screen and if we

22  can please scroll down to the third page.  Right there.

23  BY MR. KODOSKY:

24  Q    Do you see the third page of Exhibit 61 to be able to

25  compare it with the sixth page of Exhibit 71, Mr. Michaels?
```

1   A    Yes.

2   Q    And does that appear to be the same materials?

3   A    Yes, it does.

4        MR. KODOSKY:  Staying on Exhibit 71, if we can scroll

5   below a little bit further.

6   BY MR. KODOSKY:

7   Q    We're next going to see the picture of the astronaut that

8   we had seen on Exhibit 5 earlier today from the 2022 PPM.  Do

9   you see that astronaut?

10  A    I do.

11       THE COURT:  Wait a minute.  The astronaut on exhibit

12  -- on the snow -- astronaut -- is that an astronaut on the

13  snowboard?  Where am I at?  Okay.  Is that a snowboard?  I

14  mean, that's what I would call it.  I don't know.  Maybe it's

15  an electronic something.  Okay.  So we're looking at the

16  astronaut on page --

17       MR. KODOSKY:  The cover page of Exhibit 5.  The

18  SeeCubic Inc 2022 private placement memorandum.

19       THE WITNESS:  Yes.

20       THE COURT:  Wait a minute.  Exhibit 5, you said?

21       MR. KODOSKY:  Yes, Your Honor.

22       THE COURT:  Of which PPM?

23       MR. KODOSKY:  2022.  And then back to Exhibit 71.

24  The last piece of evidentiary support they submitted, below the

25  astronaut picture.  I'm sorry, if we can scroll below the

1    astronaut picture, there's a quote there.

2    BY MR. KODOSKY:

3    Q    "Quite frankly, 3-D glasses have never failed to be

4    anything but a headache inducing, slightly blurry mess for me.

5    That might be why a recent demo of a new glasses free 3-D TV

6    blew me away.  It just works."  Do you see that, Mr. Michaels?

7    That quote from ARS --

8    A    Yes, I do.

9          MR. KODOSKY:  If we go back to Exhibit 61, John, page

10   7.  This is the SeeCubic.com website on page 7 -- right there.

11   BY MR. KODOSKY:

12   Q    Do you see that same quote?  The "Quite frankly, 3-D

13   glasses have never failed to be anything but a headache

14   inducing, slightly blurry mess for me.  That might be why a

15   recent demo of a new glasses free 3-D TV blew me away.  It just

16   works."  Do you see that, Mr. Michaels?

17   A    Yes.

18   Q    So the same quote from the SeeCubic website was submitted

19   by Mr. Stastney and SeeCubic Inc on October 18th, 2023, as part

20   of their trademark application?

21   A    Yes.

22   Q    And you were in court at the last hearing when --

23   A    Yes.

24   Q    -- we established that this quote was actually written

25   about Stream TV and SeeCubic and not SeeCubic Inc.  Do you

```
 1   recall that testimony from Mr. Rajan?

 2   A    Yes.  Yes, I do.

 3   Q    Thank you.

 4             MR. KODOSKY:  Move to admit Exhibit 71, Your Honor.

 5             THE COURT:  Any objection, counsel?

 6             MR. COLBY:  No, Your Honor.

 7             THE COURT:  All right.  Exhibit 71, which is the

 8   application, right?

 9             MR. KODOSKY:  Correct.

10             THE COURT:  Admitted.

11        (Debtor's Exhibit 71 admitted into evidence)

12             THE COURT:  Okay.

13             MR. KODOSKY:  Next, if we can take a look at Exhibit

14   77, what has been marked for identification as Exhibit 77.  If

15   we can scroll to the second page.

16   BY MR. KODOSKY:

17   Q    Do you recognize this document, Mr. Michaels?

18   A    Yes.

19   Q    What is it?

20   A    It is a application to register a trademark, or a service

21   mark filed on October 18th, 2023, by SeeCubic Inc.

22             MR. KODOSKY:  Sorry, Your Honor.  Exhibit 78 is the

23   next document that I intended to show this witness.

24             THE COURT:  78?

25             MR. KODOSKY:  Apologies, yes.
```

```
1              THE COURT:  Not 77?

2              MR. KODOSKY:  Correct.

3              THE COURT:  Which appears to be the same as 71.

4              MR. KODOSKY:  Correct.

5              THE COURT:  Okay.  Exhibit 78, okay.

6    BY MR. KODOSKY:

7    Q    Mr. Michaels, you are being shown what has been marked for

8    identification as Debtor's Exhibit Number 78.  Do you recognize

9    this document?

10   A    Yes, I do.

11   Q    What is it?

12   A    It is a trademark -- or an application to register a

13   trademark or service mark filed on May 26th, 2023.  The mark is

14   for SeeCubic Labs.  The owner of the mark is purported to be

15   SeeCubic Inc.

16             MR. KODOSKY:  And if we can scroll down to show who

17   signed the declaration on page 4 of 5.

18   BY MR. KODOSKY:

19   Q    Who submitted this?

20   A    Shad Stastney.

21   Q    After having made the same representations by checking the

22   boxes above his electronic signature?

23   A    Yes.

24             MR. KODOSKY:  Move to admit, Your Honor.

25             THE COURT:  Any objection, Mr. Colby?
```

```
 1              MR. COLBY:  No, Your Honor.

 2              THE COURT:  So D-78 admitted.

 3         (Debtor's Exhibit 78 admitted into evidence)

 4              MR. KODOSKY:  Next, we'd like to ask Mr. Michaels to

 5    please take a look at the document that has been marked for

 6    identification as Debtor's Exhibit Number 72.

 7    BY MR. KODOSKY:

 8    Q    You recognize this document, Mr. Michaels?

 9    A    I do.

10    Q    Is this a document that you had uncovered as part of your

11    investigation?

12    A    Yes.  It's a -- do you want me to go onto what it is?

13    Q    Yes, sir.

14    A    This is the coversheet that's filed when recording an

15    assignment of a trademark filed with the patent trademark

16    office.  And it becomes a public record of the transfer.

17    Q    And what is the date of this document?

18    A    The -- the document itself, the coversheet was prepared

19    and filed on February 16th, 2022, and alleges to be recording a

20    document executed on December 8th, 2020.

21    Q    And are you able to tell us who filed this document?

22    A    Yes.  I -- you can go down and it -- it'll show that.  The

23    person submitting it was Shad Stastney.

24    Q    And what trademarks is this document related to?

25    A    If you go down, there'll be a schedule.  But it has a
```

1    number -- Ultra D if you go down it'll show the --

2    Q    Actually, I'm -- if we can go back up, I believe it was on

3    page 1.  Property numbers?  Total --

4    A    Yeah.  Property numbers -- it'll be under property

5    numbers, three.  So in this case, it was SeeCube and Ultra --

6    two different files for SeeCube and Ultra -- and then another

7    one for Ultra D.

8    Q    And so if you could briefly explain what this document is

9    attempting to do?

10   A    It is recording the assignment of intellectual property

11   from -- this indicates in this case, three trademark registry -

12   - two trademark registrations and one trademark registration

13   application.  The trademark registration application is the

14   first one, where it just lists the serial number and that was

15   for a mark owned by Stream transferring to SeeCubic Inc.  Then

16   the next one is the registration for -- registration for

17   SeeCube.  And even though it's the same mark, you can have

18   different registrations for different classes of goods and

19   services.  And then finally, Ultra D was being transferred from

20   Stream to SeeCubic.

21   Q    And what support -- what evidentiary support was submitted

22   by Mr. Stastney and SeeCubic Inc in support of this purported

23   assignment?

24   A    The omnibus agreement that was later invalidated by the

25   Delaware Supreme Court.

1  Q    So this was dated February of 2022.  You were present

2  during the last and previous hearings when the June 15th, 2022,

3  Delaware Supreme Court opinion was referenced invalidating the

4  omnibus agreement, correct?

5  A    Yes, I was.  Yes.

6  Q    And so in other words, this was filed by Mr. Stastney and

7  SeeCubic Inc approximately four months prior to the omnibus

8  agreement being invalidated?

9  A    Yes.

10  Q    As part of your investigation, did you uncover any

11  documents showing that any reverse action was taken by Mr.

12  Stastney and/or SeeCubic Inc after the Delaware Supreme Court

13  issued its opinion on June 15th of 2022?

14  A    No, there are none filed with the patent trademark office.

15  They would have shown up in the same search that uncovered this

16  one.

17         MR. KODOSKY:  Move to admit, Your Honor.

18         THE COURT:  Any objection?

19         MR. COLBY:  No, Your Honor.

20      (Debtor's Exhibit 72 admitted into evidence)

21         MR. KODOSKY:  I'd next like to show Mr. Michaels what

22  has been marked for identification as Debtor's Exhibit Number

23  74.

24  BY MR. KODOSKY:

25  Q    Do you recognize this document, Mr. Michaels?

1  A    Yes.

2  Q    Is this a document that you uncovered as part of your

3  investigation?

4  A    Yes.

5  Q    Can you please explain what it is?

6  A    It is also a recording of a -- in this case, a security

7  interest in the underlying property identified therein.  It

8  records a security interest provided by SeeCubic Inc to Hawk

9  Investment Holdings Limited.

10 Q    What was the date that this was recorded?

11 A    June 15th, 2022.

12 Q    So the same day that the Delaware Supreme Court issued an

13 opinion invalidating the omnibus agreement, SeeCubic Inc filed

14 an assignment of the SeeCube and the Ultra D -- I'm sorry, a

15 security interest in the SeeCube and the Ultra D to Hawk

16 Investment Holdings Limited?  Is that accurate?

17 A    Yes.  If you page down a bit --

18        MR. COLBY:  Objection.

19        THE COURT:  Wait a minute.  Wait a minute.

20 Objection.

21        MR. COLBY:  Objection, Your Honor.

22        THE WITNESS:  Oh, I'm sorry.

23        MR. COLBY:  I believe Mr. Kodosky previously

24 referenced the June 15th date.  There's also an execution date

25 of June 11th.

```
 1              THE COURT:  Well, he said when it was filed.

 2              MR. KODOSKY:  Recorded.

 3              THE COURT:  Recorded.

 4              MR. KODOSKY:  Correct.

 5              MR. COLBY:  Right.  So I just want to make sure

 6  we're --

 7              THE COURT:  Well, he said recorded.  I know there's a

 8  difference between both of these and when they were executed

 9  and when they were filed.

10              MR. COLBY:  Thank you.

11              THE COURT:  All right.  All right.  And you can point

12  out when you cross-examine when they were executed.  But he was

13  clear when they were -- when it was filed.

14              All right.  Go ahead.

15  BY MR. KODOSKY:

16  Q    Mr. Michaels, you were answering?

17  A    If you page down on the document, it'll show the effected

18  properties.  And it's the same -- same properties.

19  Q    And, who are the attorneys listed there in terms of having

20  -- would the attorneys there have prepared this assignment

21  document?

22  A    I don't know if they prepared the assignment document.  We

23  do know that they filed the -- they were the ones that recorded

24  the document with the patent and trademark offices.  They're

25  listed as the correspondence address and the name of the
```

1  submitter is Alison Lasher, who is identified as being

2  associated with Scadden.

3  Q    So this assignment was recorded the same day that the

4  Delaware Supreme Court opinion was issued.  Did your

5  investigation uncover any reverse action taken by Scadden or

6  SeeCubic Inc or Mr. Stastney or Hawk after June 15th, 2022?  In

7  other words, reassigning it back to Stream TV?

8  A    My search was to look at all transactions related to these

9  marks, and there's no reversal of this transaction and it would

10  have shown up in my search if there had been one.

11          MR. KODOSKY:  Move to admit Exhibit 74, Your Honor?

12          THE COURT:  Any objection?

13          MR. COLBY:  No objection.

14          THE COURT:  Okay.  Admitted.

15      (Debtor's Exhibit 74 admitted into evidence)

16          MR. KODOSKY:  Next ask to show Mr. Michaels what has

17  been marked for identification as Debtor's Exhibit Number 73.

18  BY MR. KODOSKY:

19  Q    Do you recognize this document, Mr. Michaels?

20  A    Yes.

21  Q    What is it?

22  A    This is what is referred to as a statement of use.  And

23  it's filed with the patent and trademark office at various

24  times to affirm that the mark is being used in commerce that

25  the federal government can regulate, and to show the nature of

```
1    that use as being consistent with the registration application
2    or registration.
3              MR. KODOSKY:  If we can scroll to page 5.
4    BY MR. KODOSKY:
5    Q    I'm sorry.  What trademark is this referencing?
6    A    The SeeCube.
7              MR. KODOSKY:  If we can please scroll to page 5 of 8.
8              THE COURT:  Did somebody come on?  Did somebody
9    leave?
10             THE CLERK:  Callahan came back in.
11             UNIDENTIFIED SPEAKER:  -- Callahan came back, and
12   this is someone named Patrick Miles.
13             THE COURT:  All right.  And who's he?  Mr. Miles, who
14   are you associated with?  Hello?  Anybody know who Patrick
15   Miles is?
16             MR. COLBY:  My guess is that it is a Patrick Miles
17   who is or was an investor, is an investor in Stream TV and
18   SeeCubic.
19             UNIDENTIFIED SPEAKER:  He just hung up.
20             THE COURT:  Okay.  I mean, I can't see who comes and
21   goes in the court.  If you're here, I'm going to assume that
22   you have some interest.  But our goal is to gatekeep.  Again
23   because we don't want people who have no interest just
24   listening in and -- I mean, they can because it's open to the
25   public but typically we'll know who they are.  And we don't
```

1  anybody disrupting so we're keeping everybody on mute.

2          Okay.  You may continue.  I apologize.  This is D73,

3  counsel, you were asking Mr. Michaels questions regarding?

4  BY MR. KODOSKY:

5  Q   Yes.  If -- on page 5 of 8, if you're able to tell us who

6  signed the declaration making the same representations that Mr.

7  Stastney had made earlier on this document.

8          THE COURT:  Page 5 of 8?

9          THE WITNESS:  Yes.  This was signed by --

10         THE COURT:  Wait a minute.

11         THE WITNESS:  I'm sorry, was that an objection?

12         THE COURT:  Okay, the --

13         MR. KODOSKY:  Declarations.

14         THE COURT:  -- declarations?

15         MR. KODOSKY:  Yes, Your Honor.

16         THE COURT:  Okay.

17 BY MR. KODOSKY:

18 Q   Who signed this declaration, Mr. Michaels?

19 A   Raja Rajan as chief operating officer of Stream.

20 Q   And what is the date that he signed it?

21 A   This was back in March 28th of 2018.

22 Q   And if we scroll to page 6 of 8, it appears there some

23 materials that were submitted along with this, pages 6, 7.  Do

24 you see those materials?

25 A   Yes, I do.

1  Q    And does that indicate to you -- what does that indicate

2  to you?

3  A    These are specimens showing the actual use and in somewhat

4  of an ideal specimen.  And it is showing the mark being used on

5  the box and the actual product itself, which is what the patent

6  trademark is looking for.  It's indicating the source of the

7  goods.  That's its primary functionality in term of a trademark

8  or service mark.  In this case a trademark.  And this is the

9  back of the TV showing SeeCube (sic) being used and then the

10 box it came in.  That's the classic way a trademark is used.

11 Q    So whereas SeeCubic, Inc., and Mr. Stastney submitted

12 website materials containing quotes written about Stream TV,

13 when Stream TV was filing their materials, they actually

14 included pictures of the product in the box and the mark being

15 used, correct?

16 A    Yes.

17            MR. KODOSKY:  Move to admit Debtor's Exhibit Number

18 73, Your Honor.

19            THE COURT:  Any objection?

20            MR. COLBY:  No objection, Your Honor.

21            THE COURT:  Admitted.

22      (Debtor's Exhibit 73 admitted into evidence)

23 BY MR. KODOSKY:

24 Q    Next ask that Mr. Michaels be shown what has been marked

25 for identification as Debtor's Exhibit Number 80.  Do you

```
 1   recognize this document, Mr. Michaels?

 2   A    Yes, I do.

 3   Q    What is it?

 4        THE COURT:  Hold on.

 5        MR. KODOSKY:  I'm sorry, Your Honor.

 6        THE COURT:  Okay.  What is it?  Go ahead.

 7   BY MR. KODOSKY:

 8   Q    What is it, Mr. Michaels?

 9   A    This is the -- a copy of the registration certificate for

10   SeeCube.

11   Q    What's the date of this document?

12   A    This was registered on June 5th, 2018.

13        MR. KODOSKY:  Move to admit, Your Honor.

14        THE COURT:  Any objection?

15        MR. COLBY:  No objection, Your Honor.

16        THE COURT:  Okay.

17        (Debtor's Exhibit 80 admitted into evidence)

18   BY MR. KODOSKY:

19   Q    Shifting gears, Mr. Michaels.  What interaction, if any,

20   have you had with the Receiver, Mr. Liston, in this case?

21   A    We reached out to Ian Liston in a variety of ways.  One,

22   wanted to express our rights as we understood them in hoping to

23   enter into a productive conversation with respect to providing

24   the use of the TV's.  Secondly, we reached out with a specific

25   project we were working on, and we offered to pay the
```

1  production costs of setting up an entire line to start

2  fulfilling our needs for, our need/hope for the TV units.  This

3  would be a cost completely born by Rembrandt.  We received zero

4  response to both inquiries.

5  Q    And who -- if you're able to say, I don't know if you're

6  able to say or if it would be violating any confidentiality

7  provisions, but are you able to say who the Rembrandt proposal

8  was with, whose companies?

9  A    We were -- yes, I can.  It was -- we were looking to do a

10  project with James Cameron and the associated companies that

11  managed some of their 3D creation content.  And we were looking

12  to create a series of hardware and content solutions that would

13  be used in both provision of the 3D content he creates, but

14  also to advertise it in movie theaters with the no glasses 3D

15  TV.

16  Q    Is that the same James Cameron who directed the movie

17  Titanic and the move Avatar and so forth, Terminator?

18  A    Yes.

19  Q    And I'm sorry, what response did you receive from the

20  Receiver in regards to your proposal?

21  A    Silence.  Nothing.

22  Q    Again, shifting gears.  The Defendants have noted that

23  they intend to call Bart Barenbrug as a rebuttal witness in

24  this matter.  Do you know Mr. Barenbrug?

25  A    I've never met him.  But I certainly know of him and have

1    read his declarations and numerous email interactions with

2    Steven Blumenthal.

3    Q    What declaration are you referring to?

4    A    He filed a declaration in 2017 in the Southern District of

5    New York action, the *Rembrandt v. Stream*.  He was also a

6    defendant in that case.

7              MR. KODOSKY:  Would ask that Mr. Michaels be shown

8    what has been marked for identification as Debtor's Exhibit

9    Number 84.

10             THE COURT:  Is this another binder?

11             MR. KODOSKY:  I apologize, Your Honor.  We've got a

12   hard copy.

13             THE COURT:  Have you sent that to --

14             MR. KODOSKY:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. KODOSKY:  Yes, Your Honor.

17             THE COURT:  All right, because mine went up to 80.  I

18   just wanted to make sure.  And have you shared that with Mr.

19   Colby?

20             MR. KODOSKY:  Yes, Your Honor.  Permission to

21   approach?

22             THE COURT:  Yes.  All right.

23   BY MR. KODOSKY:

24   Q    Mr. Michaels, you're being shown what has been marked for

25   identification as Debtor's Exhibit Number 84.  Do you recognize

1  this document?

2  A    Yes, I do.

3  Q    What is it?

4  A    This is the declaration of Bart Barenbrug filed in the

5  action brought by Rembrandt against Stream and the other named

6  Defendants, the Rajan's, Walter Roelen, Bart Barenbrug, Peter

7  Roelen, and Hans Zuidema.  This was filed on February 6th,

8  2017.

9  Q    Can you please point us to the provision of this

10 declaration pertaining to a nondisclosure agreement that you

11 had referenced earlier?

12 A    Yes.  It's paragraph 7.  He -- I mean, basically this

13 entire thing is untrue.  But it says, "During my time with my

14 discussions with 3D Fusion Corp, paren, I was never employed by

15 the company, end paren.  I did not enter into a nondisclosure

16 agreement NDA with a New York Company or negotiate such an

17 agreement in New York.  I do recall reviewing a draft NDA.  I

18 have never -- I never received an employment contract with 3D

19 Fusion EUBD.  And to the best of my knowledge, the DNA was

20 never fully consummated.  I never received or acknowledged

21 receipt of an executed DNA."

22            MR. KODOSKY:  Move to admit, Your Honor.

23            MR. COLBY:  Objection, Your Honor.  I think it's

24 hearsay.  Plus Mr. Barenbrug will be here to testify himself.

25            THE COURT:  All right.  Counsel, hearsay.

1            MR. COLBY:  I also don't see the relevance of it to

2    the present TRO motion.

3            MR. KODOSKY:  And to the hearsay, Your Honor, I did

4    promise to get back to you with a case cite for that Kos Pharms

5    case over break.  It's 369 F.3d --

6            THE COURT:  Wait a minute.  Wait a minute.  Let me go

7    -- well, you just can give -- give me the name again.  Which

8    was the name of the case?

9            MR. KODOSKY:  The name of the case is Kos Pharms --

10           THE COURT:  Versus?

11           MR. KODOSKY:  It's Kos Pharmaceuticals Inc., versus

12   -- I'm going to pronounce it Andrx, A-N-D-R-X, A-N-D-R-X

13   Corporation.  It's a May 24th, 2004 3d Circuit opinion with a

14   case cite of 369 F.3d 700.

15           THE COURT:  Okay.  And it is 3d Circuit what?

16           MR. KODOSKY:  May 24th, 200 --

17           THE WITNESS:  Four.

18           MR. KODOSKY:  Four.

19           THE COURT:  And that addresses the issue of hearsay

20   materials in a preliminary injunction hearing?

21           MR. KODOSKY:  Thus formal evidentiary requirements

22   applying in --

23           THE COURT:  Preliminary injunction.

24           MR. KODOSKY:  It was also a trademark infringement

25   case, Your Honor.

```
1          THE COURT:  And the court said what because my law

2   clerk is out on another meeting, so.  Oh, he's back.  Perfect

3   timing because there was a case that they cited and I said,

4   well, you're going to have to tell me what it says because my

5   law clerk is not here.  He's out on another meeting.

6          MR. ZAHRALDDIN:  Your Honor -- this is Zahralddin.  I

7   think in order -- instead of just whispering to Mr. Kodosky.

8   The reason this is relevant is there's been testimony here that

9   everything is fine as long as the folks as SCVB are handling

10  the trade secrets.  The trade secrets, as the testimony will

11  show and as the documents will show, have been in the past

12  mishandled by the same people at SCBV (sic) that are still

13  there.  The same engineers that were there before.  So it's

14  entirely relevant to hear about these same trade secrets, the

15  Rembrandt Trade Secrets and the Stream Trade Secrets through

16  Mr. Michaels who is worried obviously that his trade secrets

17  will be misused as are we worried that they're being misused.

18          THE COURT:  Let me just say this.  The focus of this

19  TRO as I understand it is to say you want a restraining order

20  saying don't use -- not don't use.  Don't license or use our

21  technology.  Our meaning Stream and Rembrandt's technology that

22  apparently was somebody else's technology that is now somebody

23  else's technology.  All of which doesn't look good to me, but

24  I'm going to keep that comment to myself.  About, you know,

25  who's using what and who's using whatever.
```

1              But in any event, you're saying it's relevant because

2    you believe that these people in the Netherlands because that's

3    -- and I don't mean to say these people in a bad way.  But the

4    folks, that might be a better word.  The folks in the

5    Netherlands are using or plan to use technology that they

6    shouldn't be using, or licensing, not using because I'm not

7    saying -- I haven't heard anything that says they can't use it.

8    But they can only use it for -- at least the allegation from

9    Rembrandt and Stream is they could only use it for a specific

10   purpose.  And you believe that they are going to use this for

11   some unallowed purpose.

12             MR. ZAHRALDDIN:  Well, we've heard testimony to that

13   effect, Your Honor, from Mr. Stastney.

14             THE COURT:  Well, Mr. Stastney hasn't testified yet.

15   But you believe you heard it from him in the Netherland

16   proceedings, no?

17             MR. ZAHRALDDIN:  Oh, no.  He testified, Your Honor.

18   He did.  He testified on October and indicated that -- that was

19   the most recent issue that we had was with --

20             THE COURT:  Well, was that in the other hearing?

21             MR. KODOSKY:  No.

22             MR. ZAHRALDDIN:  No.

23             MR. COLBY:  Your Honor, Mr. Stastney was called as

24   part of the Debtor's other case.

25             THE COURT:  As of cross?

```
1                MR. COLBY:  Part of the Debtor's.

2                MR. KODOSKY:  Part of the Debtor's yeah.

3                THE COURT:  Listen, these -- no offense, these

4    hearings -- I just said that to my law clerk.  This is all

5    starting to blur together --

6                MR. COLBY:  Understand.

7                THE COURT:  -- because I've had so many -- and I'm

8    glad you guys are keeping it straight.  And I'm sure that if I

9    go back and think about it I will.  But this TRO hearing, Mr.

10   Stastney was called as of cross, correct?

11               MR. COLBY:  Right.

12               MR. ZAHRALDDIN:  Yes.  He was part of our -- one of

13   our witnesses and --

14               THE COURT:  Right.  And you believed that his

15   testimony at that time --

16               MR. ZAHRALDDIN:  He indicated that there was some

17   sort of sublicensing protection that would allow him to use the

18   technology through the SCVB.  This is directly relevant because

19   the folks at SCVB have committed trade secret violations in the

20   past, have been the subject of the original -- the same people,

21   including Mr. Barenbrug, if I'm pronouncing his name correctly,

22   and that's why this is relevant testimony.  It is simply to

23   show that that testimony may not be as stalwart as we would --

24   they'd like it to be.

25               THE COURT:  Do you want to try and impeach Mr.
```

1    Barenbrug before -- Barenbrug --

2              MR. ZAHRALDDIN:  I don't believe it's impeachment,

3    Your Honor.  I believe we are asking Mr. Michaels what has

4    happened in a prior case where Mr. Barenbrug -- it's not our

5    fault that they chose the guy who --

6              THE COURT:  All right.  Keep the commentary.  I don't

7    need to hear that.

8              MR. ZAHRALDDIN:  I'm just explaining that it's not

9    our choice to put Mr. Barenbrug up.  Mr. Barenbrug happens to

10   be the person primarily who where the evidence was shown or

11   will show signed a declaration here in the United States saying

12   that he did not sign an MDA.  And we would like to walk through

13   the rest of this to show the MDA that he signed.

14             THE COURT:  So what's -- is Mr. Michaels a -- is he

15   rebutting something? What's he doing?

16             MR. ZAHRALDDIN:  He's simply showing that Mr.

17   Barenbrug, a former engineer at 3D Fusion, an engineer --

18             THE COURT:  Well, he says he wasn't an engineer, and

19   he said he didn't have an MDA.

20             MR. ZAHRALDDIN:  It's interesting because there's a

21   -- here's a signed employment agreement.

22             THE COURT:  Oh, I -- okay.

23             MR. ZAHRALDDIN:  That's what we would like to show,

24   Your Honor.  That's why it's relevant.

25             THE COURT:  Why -- okay.  Are you anticipating -- I

1    mean, I get it.  I get the question is -- I mean, if Mr.

2    Barenbrug --

3                MR. COLBY:  You nailed it, Your Honor.  You nailed

4    it.

5                THE COURT:  Barenbrug comes and testifies, and he

6    says all these things and you got signed documents, why do I

7    need Mr. Michaels to tell me anything because you can ask him,

8    did you sign this?

9                MR. ZAHRALDDIN:  I'm not worried about that, Your

10   Honor.  He may never ask him that question and they cancel him.

11               THE COURT:  Well, then you can ask him.

12               MR. ZAHRALDDIN:  Well, he may never show up if --

13   once this is shown.

14               THE COURT:  Well, that's their problem.

15               MR. ZAHRALDDIN:  But it's our problem if we can't get

16   in the evidence in our case in chief.  Our case in chief was

17   responding to Mr. Stastney and his allegation that everything's

18   fine if it goes over to the engineers at the SCVB because

19   they're protect the licenses and the technology.

20               THE COURT:  And so you're rebutting Mr. Stastney's

21   testimony that these people at -- I mean, these folks at SC,

22   SB, SCVB are protecting the license because they're not doing

23   anything untoward.  And your response is that the people at S -

24   - you want Mr. Michaels to testify that no, they're not

25   protecting it.  And they're not protecting it because they've

1    done these things in the past.  And is that past behavior?  Is

2    that MO?  I don't know what that -- I mean, listen.  I don't

3    know.

4              MR. COLBY:  Your Honor, I think there's an overarch

5    of the larger overarching problem with this, which is that

6    we've gotten really far removed from what a TRO or a

7    preliminary injunction is supposed to be about.  It's supposed

8    to be about the potential for immediate.  And the Debtor's have

9    the burden of showing that there is going to be an immediate

10   irreparable harm.  What they're now saying is we should be

11   granted this injunctive relief because Mr. Barenbrug and others

12   are careless.  And so, something bad might happen.  That's

13   essentially what they're trying to say.  They're trying to

14   impugn their character as stewards of technology of the

15   confidentiality of technology.  And therefore, you know, we

16   should get injunctive relief.

17             THE COURT:  Well --

18             MR. COLBY:  That's just on its face fails the test

19   that's required for --

20             THE COURT:  Well, I'm not quite sure if it's that --

21   as that limited as you're saying.  Because what I'm

22   understanding them to say is we're going to have irreparable

23   harm because these people in charge of our technology are not

24   protecting it and they haven't in the past.  So that's the

25   indication that they're not protecting it.  And we're going to

1  suffer harm because they're not protecting it.  That's -- I

2  mean, it's not as limited as you're saying, which is that they

3  might.  They're saying they didn't do it and we don't believe

4  they're doing it now and we're going to be irreparably harmed.

5          MR. COLBY:  There's a number of issues with that.

6          THE COURT:  Woah.  I was talk -- you'll get a chance.

7  I'm having a conversation with Mr. Colby here.

8          MR. COLBY:  There's a number of issues with that.

9  Including that these are the same engineers and it's the same

10 operation that Stream TV itself, the Debtor's owned and

11 operated prior to Judge Laster's opinion in 2020.  And

12 subsequent to the reversal under the Delaware Supreme Court.

13 So it's just like --

14         THE COURT:  Well, I mean, all of this -- listen.

15 I'll probably say something I'll regret.  But this seems to be

16 that engineer from here, to here, to here, to here and -- never

17 mind.  Never mind.  I just don't look to -- never mind.

18         MR. ZAHRALDDIN:  Your Honor --

19         THE COURT:  Go ahead.

20         MR. ZAHRALDDIN:  -- I have to say, let me respond to

21 just a couple things.  The law does not say, it's not

22 characterized irreparable harm the way Mr. Colby set it up.

23 We've cited plenty of cases in this district that all say the

24 same thing.  Any showing of a harm to a trade secret that it

25 may be revealed is irreparable.  Any showing of it is

1    irreparable.  We have those cases.

2         So it's overstating.  This is not -- when you're

3    talking about intellectual property and trade secrets, which

4    are not protected like patens or copyrights or trademarks,

5    there's a very significant issue.  Very significant issue with

6    irreparable harm.  It is immediate.  And, you know, Mr. Kodosky

7    can discuss those a little bit further if you'd like us to.

8         THE COURT:  Well, no.  I mean, we're going far a

9    field because the issue that is -- the precise evidentiary

10   issue is whether Mr. Michaels should be allowed to testify

11   regarding Mr. Barenbrug's relationship with the IP at issue.

12   I'm going to call it IP.  I don't know if that's the trademark.

13   Is it trademark, IP?  What's the correct --

14        MR. ZAHRALDDIN:  It's a trade secret, Your Honor.

15        THE COURT:  Trade secret.

16        MR. ZAHRALDDIN:  The nondisclosure agreement is what

17   the employee would be forced to keep the secret --

18        THE COURT:  Right.

19        MR. ZAHRALDDIN:  -- the trade secret secret.

20        THE COURT:  But was that issue in this TRO hearing is

21   that it's technology that allegedly belongs to the Debtor that

22   they believe is at risk because the entity in the Netherlands

23   is likely to do something with the Debtor's asset that they're

24   not allowed to do.  And that the Debtor will suffer irreparable

25   harm if they're not prevented from doing whatever it is you

```
1    think they're going to do to harm, or they are doing with

2    respect to that technology.  And with respect to Mr. Michaels'

3    testimony, his testimony is that Mr. Barenbrug did not protect

4    this in the -- I guess did not protect it when he was working

5    at Rembrandt and can't be trusted to --

6              MR. ZAHRALDDIN:  Well, and at Stream, Your Honor.

7    Because this all is the timeline, and these are materials that

8    Mr. Michaels got through a discovery when he sued Stream

9    originally.

10             THE COURT:  And sued Mr. Barenbrug.

11             MR. ZAHRALDDIN:  Excuse me?

12             THE COURT:  And sued Mr. Barenbrug.

13             MR. ZAHRALDDIN:  Yes, and all the other engineers

14   that were involved in the --

15             THE COURT:  That allegedly were working for this

16   other company and somehow ended up at Stream and now it's

17   SeeCubic.

18             MR. ZAHRALDDIN:  Which then led to the settlement

19   that we're talking about and that's why it's relevant.  It's

20   relevant because it shows that Mr. Barenbrug and the other

21   engineers have -- well, I --

22             THE COURT:  Can't be trusted with the IP trade --

23   they could be trusted when they were at Stream.

24             MR. ZAHRALDDIN:  That's I believe --

25             MR. COLBY:  It's like a character point, Your Honor.
```

```
 1   It's tempting to get in at a TRO based on impugning --

 2            THE COURT:  Well --

 3            MR. ZAHRALDDIN:  It's a violation of the trade

 4   secret.

 5            THE COURT:  Well, I'm seeing about impugning.  The

 6   question for me -- again, I have my own thoughts on this stuff

 7   and I'm trying to restrain myself from saying something that's

 8   likely irrelevant.  It's highly irrelevant, just my view of

 9   this.  It's not going to have anything to do on how I decide.

10   But what I'm hearing is that we're going to be harmed because

11   the engineers who are in charge and who are supposedly

12   protecting -- and that's the word.  I'm going to use supposedly

13   or allegedly, protecting our trade secret technology are not

14   protecting it and can't -- and Mr. Stastney testified that they

15   are and there's nothing going on.  And they're saying, no, you

16   can't because these people -- these people that I'm -- I hate

17   using that word, these people, but the engineers have a

18   propensity not to protect trademark, which -- anyway, so that's

19   what I'm hearing.

20            MR. COLBY:  Yeah.  Based upon an NDA with -- or -- or

21   not, and a declaration in a different case from five years ago.

22   I think what -- what -- what the appropriate focus should be is

23   what protections are in place now and -- and the --

24            THE COURT:  Well, the protection that I heard was in

25   place from Mr. Stastney was that, you know, I guess the
```

```
1   engineers, or whoever's working on protecting these assets, and

2   their position is these people can't -- whoever you're relying

3   on can't be trusted to protect it.

4           MR. COLBY:  And that's -- that's the point.  It's

5   attempting to obtain injunctive relief based on

6   the -- impugning the reputation --

7           THE COURT:  You don't have to impugn anyone's

8   reputation.  You can see what they did or didn't do and tell

9   me, no, I'm not doing that.

10          MR. COLBY:  And that's -- and that's -- and that's

11  what the focus should be, not -- not attempting to -- and it

12  is.  They're saying that they can't be trusted.  That is

13  impugning somebody's --

14          THE COURT:  Well, I'm not saying they can't be

15  trusted.  They're saying this is what they did in the past.  We

16  believe they're doing it right now.  Is that impugning your

17  reputation?  Maybe it is.  I don't know.

18          MR. COLBY:  It's impugning their character as

19  stewards of trade -- of trade secrets.  It's attempting to get

20  injunctive relief now based on what -- what Debtors say is

21  their -- their character or -- for protecting trade secrets.

22          THE COURT:  Is that their character or their history?

23          MR. COLBY:  Either -- that -- that's what --

24          THE COURT:  That's a little different.

25          MR. COLBY:  That's what character testimony is.
```

 1  | That's what character evidence is.

 2  |         THE COURT:  Well, no.  Character testimony isn't

 3  | necessarily your history.  I mean, it could include that, but

 4  | I'm not quite -- and you may be right, Mr. Colby.  I'm trying

 5  | to figure out --

 6  |         MR. COLBY:  It's also -- it's -- it's an allegation.

 7  | It's a claim that they made in the past in a lawsuit that was,

 8  | you know, dismissed.

 9  |         THE COURT:  Settled.  No.  It was settled.

10  |         MR. COLBY:  Well, the -- the claim for violation of

11  | an NDA, I believe, was the contract claim that was settled.

12  | That was between Stream TV and -- that was between Stream TV

13  | and Rembrandt, not Mr. Barenbrug.

14  |         THE COURT:  Well, I don't know.

15  |         MR. COLBY:  That was --

16  |         THE COURT:  I don't know because --

17  |         MR. COLBY:  That was Stream TV and Rembrandt.

18  |         THE COURT:  -- I don't have -- I don't have the

19  | settlement, unless someone put it in evidence, because it could

20  | be and I just don't recall.

21  |         MR. ZAHRALDDIN:  Your Honor, let me -- let me stop

22  | Mr. Colby before he misrepresents something yet again about

23  | that --

24  |         THE COURT:  All right.  Ba, ba, ba --

25  |         MR. ZAHRALDDIN:  No, no, because this is important.

```
 1            THE COURT:  Wait a minute.
 2            MR. ZAHRALDDIN:  This is important.  They keep on
 3   saying --
 4            THE COURT:  Wait.  Wait, wait, wait.  Wait, wait,
 5   wait.  I have told all of you guys, I don't like the, you know,
 6   misrepresent -- he maybe -- he is not recalling correctly,
 7   he's -- something.  But don't -- don't throw those words out.
 8   I don't like those words.
 9            MR. COLBY:  And particularly, it wasn't even -- I --
10   that was very uncivil, and I've done my best to be civil.
11   That -- it wasn't even that I misrepresented something or
12   misstated something.  It was that I was about to.  And
13   that's -- that's --
14            THE COURT:  All right.  All right.
15            MR. COLBY:  -- frankly, the same point they're making
16   about Mr. Barenbrug.
17            THE COURT:  So let's just get to the point.  What was
18   it that you wanted to tell me, because I said I thought it was
19   settled, and Mr. Colby said only with Stream.  And you're going
20   to tell me something else.
21            MR. ZAHRALDDIN:  Well, Your Honor, the part that was
22   dismissed without prejudice was the patent infringement piece,
23   because the Supreme Court decided the Hartland (phonetic) case
24   and said that all patent infringement cases had to be refiled
25   in the place of incorporation, which would be Delaware.
```

```
 1              THE COURT:  Okay.

 2              MR. ZAHRALDDIN:  They instead, as I think has been

 3   produced in evidence in this Court before, have said, no, we

 4   didn't pursue that, we didn't pursue anything further because

 5   we had a settlement.  We had a settlement so we don't pursue

 6   the patent cases.  It's been put into papers without the

 7   qualification of without prejudice multiple times.

 8              THE COURT:  Okay.

 9              MR. ZAHRALDDIN:  So that is a misrepresentation.

10   That is not a disparaging comment.  It is a less -- a less than

11   accurate --

12              THE COURT:  All right.

13              MR. ZAHRALDDIN:  -- portrayal of a dismissal.

14              THE COURT:  Okay.  So it's a less -- let's use

15   the -- let's keep to the phrase.

16              MR. ZAHRALDDIN:  We can tone it down if you'd like

17   but --

18              THE COURT:  Yes.

19              MR. ZAHRALDDIN:  -- that would offend most people.

20              THE COURT:  Less than accurate representation.  And

21   maybe the -- maybe because they didn't think -- I mean, to me,

22   it was without prejudice.  I would put it in there because it

23   means something.  Maybe there's a reason they didn't.  I don't

24   know.  But I would not jump to the conclusion that it -- I

25   could -- I don't know about counsel, but I could come to find
```

that it was a mis- -- it wasn't even a -- we just didn't think it was relevant. I don't know. But the whole point is don't use misrepresentation. Use inaccurate, not a complete representation. The word misrepresentation just has so much --

MR. ZAHRALDDIN: I will -- I will --

THE COURT: Please use -- that's for everybody.

MR. ZAHRALDDIN: But I'll make sure I do that in the future. I just know that oftentimes, because it's such a large record, a lot of things slip by --

THE COURT: Well, they might slip by for now, but if it's on the record, I will read the transcript.

MR. ZAHRALDDIN: Okay.

THE COURT: Don't ever believe, because I don't recall the specifics, that when it comes time to decide, that I'm not going to go over these 50 transcripts. This is not something that I'm just going to do off the top of my head.

So you can point out and say, well, I'd like to make the record complete because Mr. Colby did not give a complete representation --

MR. ZAHRALDDIN: I will do so in the future.

THE COURT: All right. Then -- and Mister -- that's for everybody in here. So Mr. Zahralddin, you want to point out that there were some things omitted by Mr. Colby that would give a more complete representation of what occurred with respect to the --

```
 1              MR. ZAHRALDDIN:  The settlement.

 2              THE COURT:  -- action in --

 3              MR. ZAHRALDDIN:  The settlement.

 4              THE COURT:  -- in the Southern District of New York,

 5   which I think you've already said --

 6              MR. ZAHRALDDIN:  Yes, ma'am.

 7              THE COURT:  -- that it was a case that required the

 8   filing in Delaware.  It was dismissed without prejudice.

 9              MR. ZAHRALDDIN:  Yes, ma'am.

10              THE COURT:  And the parties resolved the entire

11   litigation, which is why you didn't go to Delaware.  "You"

12   meaning --

13              MR. ZAHRALDDIN:  Not me, but Stream obviously and --

14              THE COURT:  Stream -- not Stream --

15              MR. ZAHRALDDIN:  Stream and Rembrandt --

16              THE COURT:  -- Rembrandt did not go.

17              MR. ZAHRALDDIN:  -- decided to settle, yes.

18              THE COURT:  Okay.

19              MR. ZAHRALDDIN:  Which I believe was in testimony in

20   prior hearings --

21              THE COURT:  And what SeeCubic --

22              MR. ZAHRALDDIN:  -- here.

23              THE COURT:  -- would not know because it didn't even

24   exist at the time.

25              MR. ZAHRALDDIN:  Well, SeeCubic wouldn't have because
```

```
 1    Mr. Stastney is the one who signed that agreement.

 2              THE COURT:  Okay.

 3              MR. ZAHRALDDIN:  And Mr. Stastney was the CFO at that

 4    time of Stream.

 5              MR. COLBY:  So --

 6              THE COURT:  So Mr. Stastney, who is now the --

 7              MR. ZAHRALDDIN:  CEO of SeeCubic.

 8              THE COURT:  Would have had that information.

 9              MR. ZAHRALDDIN:  Yes, he would have.

10              THE COURT:  In his -- in his capacity as an officer

11    of --

12              MR. ZAHRALDDIN:  He was, I think, vice chair of the

13    board as well as CFO of Stream at the time, and he's the one

14    who executed the settlement agreement, which we've heard

15    testimony on before in here.

16              MR. COLBY:  Yes.  Your Honor, if I might?  All of

17    this was covered in great detail the first time Mr. Michaels

18    testified and when Mr. Stastney testified on the Hawk motions.

19    I don't have --

20              THE COURT:  Do you really think I recall that?

21              MR. COLBY:  Yeah.  No, no.

22              THE COURT:  Come on, Counsel.

23              MR. COLBY:  That's why I'm trying to --

24              THE COURT:  And nobody has said they wanted to

25    incorporate by reference any of that testimony.  And to be
```

1    honest, you know, I don't recall it.  I recall some of it.

2    That's why I'm asking, did I see this settlement agreement?

3              MR. COLBY:  And that's why, Your Honor, that's why I

4    bring it up.  Not to suggest that you should have recall of it

5    sitting here today, but simply to say that I don't know why we

6    seem to have a controversy over this.  The record -- it's in

7    the record.  It's abundantly clear --

8              THE COURT:  But it's not a record --

9              MR. COLBY:  -- what happened.

10             THE COURT:  -- I'm going to look at for this.

11             MR. COLBY:  Right.

12             THE COURT:  Nobody's asking me to go -- because it

13   would be inappropriate for me to say, well, I heard this in

14   here and I'm going to incorporate it here without having the

15   parties address it.  I mean, it's not a continuation of the

16   same matter.  They involve the same parties but they're a

17   different record.  And I don't -- unless the parties ask me to,

18   I do not go look at records in a prior matter.  Now, some

19   things I just may recall and I might drop a footnote saying the

20   Court, you know, based on my understanding, understood

21   something.

22             MR. COLBY:  Well, I think we're talking about it

23   primarily as background for the evidentiary objection for Mr.

24   Michaels' testimony today, not because it's relevant to the

25   current motion.

1              THE COURT:  Right.

2              MR. COLBY:  That's why we're talking about it.

3    So -- but my broader point was it's all in the -- it's all in

4    the record.  I don't think we agree about the facts.  The facts

5    are the facts.

6              THE COURT:  But the facts for me today --

7              MR. COLBY:  Right.

8              THE COURT:  -- are whether the technology, trademark,

9    IP, whatever the appropriate term, is at risk for the Debtor

10   being harmed.  And that is what I am trying to ultimately

11   decide, at least with respect to a TRO.  Okay.  And your

12   position is it's irrelevant because what Mr. Bru -- Barenbrug

13   did in -- what year is this?  2017.  How many years is that?

14   Eight years ago?  No.  That's eight and seven is '25.  Six

15   years ago?  Or soon to be -- soon to be seven.

16             MR. ZAHRALDDIN:  Soon to be seven.

17             THE COURT:  Soon to be seven years ago has no bearing

18   on what -- whether the assets, the trademark of the Debtor is

19   at risk.

20             MR. COLBY:  Correct, Your Honor.  And suffice it to

21   say there was a dispute between Rembrandt and Stream and,

22   apparently, Mr. Barenbrug in that 2017 time period.  There was

23   a dispute.  Rembrandt has made allegations.  The litigation,

24   what happened happened.  Those are just simply facts.

25             The point that I'm making is that that's not -- I'm

```
1   sure there's, like everything else, two sides to that story.

2   We don't need to litigate it here today.  It's irrelevant

3   and -- it's irrelevant to try to litigate it for its own sake

4   and it's not relevant to the present question about whether or

5   not, you know, injunctive relief is warranted now here today

6   with respect to those assets in the Netherlands.

7           THE COURT:  Well, I understand why the Debtors think

8   it's relevant because they think their IP, trademark, trade

9   secrets are not going to be protected because one of the

10  persons in -- who's allegedly protecting it -- and I don't know

11  Mr. Barenbrug's position, but he's an engineer, I gather.  He's

12  one of the engineers working presently on the disputed IP.

13  Okay.

14          And the question becomes then, is this person who is

15  charged, presumably charged, with protecting the assets of the

16  Debtor can be -- will protect -- will protect that.  And

17  they're saying, no, you can't, see what he did.

18          And so my question again, is this something better

19  left to confronting Mr. Barenbrug about when he testify -- if

20  and when he testifies.  Their position is if you do not call

21  Mr. Barenbrug, they will be unable to show that the people who

22  are in charge of protecting the IT weren't going to protect it.

23  That's their position.

24          MR. COLBY:  Understand that.

25          THE COURT:  And so what I have to figure out is do I
```

1  let it in now, because you may not call Mr. Barenbrug --

2          MR. ZAHRALDDIN:  Or he may make himself unavailable

3  once he has --

4          THE COURT:  Well, we don't know what he does or won't

5  do.  The question becomes, is how then do they show that it

6  might not be protected by these -- this engineer?  That's the

7  issue for me.  All this other stuff about who did what in New

8  York or said what, this is their attempt to show that it's not

9  being protected and it's not because they're relying on people

10  who have not protected trademarks in the past.

11          MR. ZAHRALDDIN:  And, Your Honor, you were talking

12  about it, is this a character issue or is it an acts issue?

13  It's an acts issue.  And that's something I wasn't able to yet

14  address and I'd like to discuss it with you.

15          THE COURT:  Okay.  You believe it's --

16          MR. ZAHRALDDIN:  Every single time that you have a

17  trade -- there is a common fact pattern with trade secret

18  violations.  Trade secrets can't be protected like other parts

19  of intellectual property.  So what normally happens is a bunch

20  of employees will leave one place, go to the next --

21          THE COURT:  Uh-huh.

22          MR. ZAHRALDDIN:  -- and then it will be a contract,

23  and whatever's not covered by contract is covered by the trade

24  secret laws.  Usually the contract contains a non-disclosure

25  agreement or confidentiality provision.  That's the basis for

1    the fact pattern.  Oftentimes, it's hard to figure out whether

2    or not they've actually done this or not.

3              In this case, it's not that difficult to see this

4    because we have a prior act.  And, again, these are the same

5    engineers that went from Philips to 3D Fusion, then to Stream.

6    And it was --

7              THE COURT:  And then from Stream to where?

8              MR. ZAHRALDDIN:  Well, right now they're still

9    supposed to be with Stream, but they have an interim CEO who's

10    taken over our subsidiary.

11              THE COURT:  Oh, okay.  Okay.

12              MR. ZAHRALDDIN:  So --

13              THE COURT:  So they are now -- whoa, whoa, whoa.

14              MR. ZAHRALDDIN:  So they're now at the SC BV.

15              THE COURT:  They're at SC BV, who was related

16    to -- is some --

17              MR. ZAHRALDDIN:  It was, yeah, an indirect

18    subsidiary.

19              THE COURT:  -- related to -- to Stream.

20              MR. ZAHRALDDIN:  Yes.

21              THE COURT:  They are -- I don't know how -- I mean,

22    I'm not -- nobody's saying they're not related to Stream,

23    unless you're telling me they're not, Mr. Colby, because I see

24    you moving around over there.

25              MR. COLBY:  They are.  Sorry, I'm -- I'm very

```
 1  interested to respond but I'm doing my best to not.

 2          THE COURT:  The problem, as I see it, is that --

 3          MR. ZAHRALDDIN:  Your Honor, we had to discipline

 4  these engineers once before.  It resulted --

 5          THE COURT:  I don't want to hear all that.

 6          MR. ZAHRALDDIN:  No, no.  I'm saying it resulted in a

 7  billion dollar claim in this case with Rembrandt.

 8          THE COURT:  Oh, I -- well -- well, if we're really

 9  going to be frank, they came from Rembrandt and then --

10          MR. ZAHRALDDIN:  And they --

11          THE COURT:  Ah, ah, ah, ah --

12          MR. ZAHRALDDIN:  You're right.

13          THE COURT:  They had some association with Rembrandt,

14  whether they were employees, consultant, something.

15          MR. ZAHRALDDIN:  We believe --

16          THE COURT:  Wait, wait, wait.  And Mr. Rajan, I

17  definitely recall this, said that when they got sued, they knew

18  that the people, the engineers that were now related to -- in

19  the company with -- however they were related to Stream, they

20  knew that they had some relationship, and he said some other

21  word, and I think he may have said were engineers at Rembrandt,

22  but I'm going to use the word association, affiliation, some

23  relationship with Rembrandt.  And during the course of the

24  litigation, they came to understand that that association was

25  much more than what they understood.
```

1          MR. ZAHRALDDIN:  Yes, ma'am.

2          THE COURT:  Okay?  And then -- then -- then, you

3   know, you kind of -- never mind.

4          MR. ZAHRALDDIN:  But that's -- that's exactly it,

5   Your Honor.

6          THE COURT:  But they are now these same engineers who

7   had some -- at least during the course of the litigation,

8   according to Mr. Rajan, had some affiliation with Rembrandt,

9   were now affiliated with Stream and now SC BV and now SeeCubic.

10         So you're now saying these same people who went from

11  here to here to here to here, we don't believe our -- our

12  Stream is being protected.  That's what I get out of this.

13         MR. COLBY:  Understand, Your Honor, a couple of

14  things.  I think this demonstrates why -- two primary points

15  really.  I think this demonstrates why we should limit the

16  degree to which the parties, the Debtors, are trying to address

17  their current request for a TRO by litigating issues that were

18  a part of litigation five years ago, and that was resolved.

19  Like I said, there are, I'm sure, two sides to that story.  I'm

20  resisting the urge to litigate it here just by --

21         THE COURT:  Well, I'm not --

22         MR. COLBY:  -- testifying from the podium.

23         THE COURT:  -- quite sure that the parties are trying

24  to litigate it, but go ahead.

25         MR. COLBY:  Well -- and so it's -- it's -- I think

1    we'd all be well served by staying focused on, you know, the

2    current issue at hand, protections around trade secrets at

3    SeeCubic BV and not trying to relitigate these old claims.

4         Secondly, these -- just -- the -- I'm not sure that

5    the facts are quite as they've been portrayed, at least in the

6    following sense.  These individuals had been at SeeCubic BV

7    since 2011.  They were at Philips prior to that.  There's not

8    been hopscotching from entity to entity.  They've been at

9    SeeCubic BV since 2011.

10        THE COURT:  I'm not saying hopscotching.

11        MR. COLBY:  And -- and -- so I -- and then to Mr.

12   Zahralddin's point about trade secret cases where employees

13   move from one company to another, that's not happening here.

14   There's no claim that the engineers are about to leave to go

15   to --

16        THE COURT:  I'm not talking about them leaving, and

17   I --

18        MR. COLBY:  Right.

19        THE COURT:  I'm just repeating the history as has

20   been set forth in this company as to the evolution of these

21   engineers --

22        MR. COLBY:  And --

23        THE COURT:  -- and where they've gone -- and where

24   they started, where they went, and where they are.

25        MR. COLBY:  And I'm not sure that that's -- I'm not

```
 1   sure that that evolution is accurate.  I don't think it is, but
 2   I'm -- again, I'm trying not to relitigate all that here.
 3            THE COURT:  Well, you're telling me -- so you're
 4   saying Mr. --
 5            MR. COLBY:  But they've been at -- they've been at
 6   SC SeeCubic BV since 2011.
 7            THE COURT:  That's nice.
 8            MR. COLBY:  The ownership by virtue of this
 9   litigation and the omnibus agreement has changed, but they've
10   been at SeeCubic BV since 2011.  This is not a case where
11   employees have moved to a new entity or have plans to move to a
12   new entity.  They've been there doing the same work while
13   people fight about who -- who owns them.
14            THE COURT:  Well, I think it's more than they fight
15   about who owns it.  These engineers are engineers.  They
16   probably just want to do their work, leave me alone and then
17   pay me.  Okay?  I suspect that's what they want.
18            MR. COLBY:  Probably.
19            THE COURT:  Okay.  But, Counsel, you cannot, unless
20   somebody's telling me I have a misunderstanding of what the
21   testimony in -- was here, was that these people were at
22   Michaels -- I mean at Philips, Philips, Rembrandt claimed they
23   worked for their predecessor, whatever their name is because I
24   cannot recall --
25            MR. ZAHRALDDIN:  3D Fusion.
```

1          THE COURT:  -- 3D Fusions, which they said they

2   didn't, they ended up at Stream, Rembrandt sued Stream saying

3   these people really work for us and took our technology to you.

4   I think that was the -- I haven't read the complaint, but based

5   on the testimony that I've heard, that was what was going on.

6          MR. COLBY:  No.  There was no trade secret claim in

7   that case.

8          THE COURT:  Whatever -- whatever --

9          MR. COLBY:  It was a patent case.

10          THE COURT:  Whatever it was, the claim from Rembrandt

11   is that you took our information and went to Stream with it.

12   Mr. Rajan's testimony was, during the course of the litigation,

13   we claim to understand that that was a more -- I'm not sure

14   what word he used, deeper, maybe, relationship between these

15   engineers and Rembrandt.  And then these engineers ended up at

16   SC BV.  They went from here to here.  Sometimes maybe you reap

17   what you sow.

18          But in any event, these same engineers have had a

19   relationship with -- with Philips, perhaps with Rembrandt, and

20   definitely with Stream and Stream's subsidiary -- whatever --

21   however related company or something.  Or they have a

22   relationship, maybe not directly with Stream, but a company

23   related to Stream because it's owned by a subsidiary who's a

24   subsidiary of Technovative, who's owned by Stream, or whatever.

25   But they're not some unrelated, unknown entity.  And that's the

 1  course of where they've gone.  Okay?

 2          And what I'm hearing is Mr. Barenbrug in particular,

 3  you know, said one thing here and we believe he's not going to

 4  protect us because he did this.  I don't know if he is or

 5  isn't.

 6          So we have spent more time than necessary trying to

 7  figure out whether I'm going to allow Mr. Michaels testify

 8  regarding what Mr. Barenbrug did in a hearing and whether, in

 9  fact, Mr. Baren- -- what he really, I'm sure, wants to show is

10  that Mr. Barenbrug actually had some sort of -- whatever that

11  relationship was, and we -- and they -- and that somehow will

12  show that if Mr. Barenbrug is one of the people who's supposed

13  to be protecting it, he likely will not.  That's what this is

14  about.

15          And you're saying, who cares what he did in '17.

16  That didn't mean he's doing it today.  Is that what

17  you're -- even if -- even if we find that what he did in '17 is

18  correct, what does that have to do with today?

19          MR. COLBY:  It's an allegation from 2017.

20          THE COURT:  Well, it's an allegation that this is

21  what he said and we have some document.  Again, the question

22  becomes:  Do we just wait until Mr. Barenbrug testifies and

23  then they confront him with this?  And what happens if he

24  doesn't?  How do they then prove that the engineers who were

25  supposed to be protecting this can't be trusted to protect?

```
 1   Then they go call Mr. Barenbrug?  Maybe you call him.  I don't
 2   know.
 3              MR. COLBY:  I think, Your Honor, I mean, that's part
 4   of the problem with the -- that's part of the problem with
 5   where we are on this request for injunctive relief to begin it.
 6   It's incumbent upon the Debtors to establish that there is a
 7   serious risk of irreparable, imminent harm and -- and they
 8   really have not, other than Mr. Rajan's sort of say-so, they've
 9   really not put forth any evidence that there is a lack of
10   protections around the trade secrets at --
11              THE COURT:  Well, they want to with the information
12   about Mr. Barenbrug.
13              MR. COLBY:  And -- and the idea that somebody was on
14   the receiving end of allegations related to a patent seven
15   years ago, therefore, warrants immediate injunctive relief now
16   is what I'm suggesting, it's insufficient, it's not relevant.
17   We should be focused on what's here.
18              THE COURT:  Well, we're not -- okay.
19              MR. COLBY:  Or we're going to end up relitigating the
20   2017 case --
21              THE COURT:  Well, we're not relitigating anything.
22              MR. COLBY:  -- and the history of the employees and
23   why they left Philips and the fact that Philips was getting out
24   of business.  I mean, there's a whole other --
25              THE COURT:  I don't need to know -- the whole point
```

```
 1    of the matter is the history is what the history is, and I'm

 2    going to -- I'm going to see it the way I see it.  And that's

 3    just the way it is.

 4              MR. ZAHRALDDIN:  Your Honor, we're not trying to show

 5    any of that.  We just want to show that we have two documents,

 6    one of which has already been partially discussed where Mr.

 7    Barenbrug says under oath A, B, C, D, E, and F.  And --

 8              THE COURT:  And what relevance does it have --

 9              MR. ZAHRALDDIN:  It's relevant because, Your Honor,

10    unfortunately, maybe Mr. Colby doesn't remember his own

11    comments from 10 minutes ago, he says this was not a trade

12    secret case.  As I explained, all trade secret cases are

13    non-disclosure agreement contract disputes unless you're going

14    under the statute, one statute of which had no private right of

15    action and didn't exist at that time, which is a defend trade

16    secret act.  You have trade secrets that you go under state law

17    under statute and then you always have a contractual dispute.

18    That is what was focused on in this case.  So it was

19    completely -- all that was left was a trade secret case.  So

20    this is completely -- maybe a failed --

21              THE COURT:  Inaccurate description.

22              MR. ZAHRALDDIN:  An inaccurate description.  So what

23    we're simply trying to do is show that this was an act by this

24    engineer who is now here, and I'm going to give him the benefit

25    of the doubt even though --
```

```
1              THE COURT:  Even -- no.  No comment.

2              MR. ZAHRALDDIN:  He doesn't know who he's supposed to

3    be listening to at this point.  We don't even know if we can

4    call him since he's one of our employees, because we have an

5    interim director over there at this point in time.

6              THE COURT:  Well, apparently the interim director

7    didn't -- couldn't force them to testify.

8              MR. ZAHRALDDIN:  Apparently.

9              THE COURT:  Apparently he couldn't because the only

10   reason they agreed to testify was because their personal

11   attorneys -- personal attorneys directed them to do so, which

12   is why I was a little irate because I couldn't understand why,

13   if these parties were so -- wanted to bring these people, why

14   they didn't go to the company and ask the company.

15             MR. ZAHRALDDIN:  And the --

16             THE COURT:  I already said what I was going to.

17   Don't get me started on that again.

18             MR. ZAHRALDDIN:  I just don't know who their personal

19   attorneys are, Your Honor.

20             THE COURT:  I don't know either.  I have no -- and I

21   was assured that their personal attorney was not the company's

22   attorney.

23             MR. ZAHRALDDIN:  Or SeeCubic's attorney or

24   Mr. Stastney's attorney or anybody else.

25             THE COURT:  Well, I didn't know --
```

1          MR. ZAHRALDDIN:  We weren't sure of any of those

2    things.

3          THE COURT:   -- that they were there -- they weren't

4    the company's.  I didn't ask anybody if they were

5    Mr. Stastney's.  I didn't ask anybody if they were SeeCubic

6    Inc.'s.  I didn't ask anybody if they were Hawk's, SLS, or

7    anybody else's attorney.  I understood that they were their

8    personal attorney, having nothing to do with any of the

9    parties, and that they had engaged their own counsel for their

10   own reason.  I guess they felt they had to, whatever, given

11   what was going on in the Netherlands.  That is what I

12   understood.

13         I'm not going to rehear that because I'm just going

14   to be a little more annoyed and I -- I -- the way I am is I say

15   what I have to say the day I say it.  You come back and talk to

16   me tomorrow and I'll be going, well, that was yesterday, and I

17   want to leave that for last Wednesday.

18         MR. ZAHRALDDIN:  I've -- I wholeheartedly agree.  And

19   we simply want to be able to show what was done by the prior

20   engineers.  It happens to be it's also Mr. Barenbrug.  And we

21   also have information as to why he doesn't want to come here.

22   It has nothing to do --

23         THE COURT:  Well, I don't know why he don't want to

24   come.  That has nothing to do with whether you get to put in

25   the information about who's supposed to be protecting this -- I

1    don't know what you guys want to call it now.  Trade secrets,

2    is that --

3            MR. ZAHRALDDIN:  It's intellectual property.  It's

4    our intellectual property.

5            THE COURT:  I said IP but I was heard -- said no,

6    it's trade secret.  I don't know what --

7            MR. ZAHRALDDIN:  It's --

8            THE COURT:  Whatever it is, the asset, I'm going to

9    call it the asset of the Debtor that you're trying to protect,

10   which I understand, I'm sure there's a disagreement, but what

11   I'm hearing, that the Debtor has a license with Rembrandt and

12   that's the asset the Debtor wants to protect.

13           MR. ZAHRALDDIN:  As well as our trade secrets which

14   are --

15           THE COURT:  Whatever else that is.

16           MR. ZAHRALDDIN:  On top of that, yes.

17           THE COURT:  But that's the asset.  And you believe

18   it's not being protected because the people in charge of

19   protecting it -- which, really, I'm not sure how the engineers

20   are in charge because they're going to do what they're told.

21           MR. ZAHRALDDIN:  That's not --

22           THE COURT:  They're not the ones running out here

23   supposedly licensing this.

24           MR. ZAHRALDDIN:  No.  But that's the problem, Your

25   Honor.  That's what they've seen.  Mr. Theune and all the other

1   folks are all engineers.

2          THE COURT:  I don't want to hear about them.

3          MR. ZAHRALDDIN:  They're all engineers, though, Your

4   Honor.  There's nobody running the place other -- it's been in

5   limbo --

6          THE COURT:  Well, somebody's --

7          MR. ZAHRALDDIN:  -- during this dispute.

8          THE COURT:  -- in charge of this company.

9          MR. ZAHRALDDIN:  The engineers are in charge.  There

10  is no other person who's there.

11         THE COURT:  Mr. Stastney is there.  Now, is he

12  direct -- supposed to be directing them?

13         MR. ZAHRALDDIN:  Well, we can -- we can discuss

14  that --

15         THE COURT:  Ah, ah, ah.  I didn't --

16         MR. ZAHRALDDIN:  Not now but we can discuss it when

17  it comes up.

18         THE COURT:  When Mr. Stastney come up here and

19  testify, you can ask him whatever.

20         MR. ZAHRALDDIN:  That's exactly what I'm going to do.

21         THE COURT:  But I'm -- that's not my point.  My point

22  is, are these people the people running the company, Mr.

23  Barenbrug?

24         MR. ZAHRALDDIN:  They certainly would be the ones who

25  would have access to the technology and access or ability to

1  open up the technology to other people --

2          THE COURT:  Why would they do that?  They're not

3  running the company.

4          MR. ZAHRALDDIN:  Because that's what was -- the

5  testimony was let's go to Hyundai (phonetic) and theirs is an

6  open kimono business plan.  They give them --

7          THE COURT:  But that's a company.

8          MR. ZAHRALDDIN:  Excuse me, Your Honor?

9          THE COURT:  That's the company.  How does that --

10         MR. COLBY:  That also wasn't the testimony.

11         THE COURT:  Well, okay.  Well, maybe you mis -- mis

12 --is there such a word as misremembering?  Probably not but I'm

13 going to use it anyway because my kids use it all the time.  I

14 misremembered.

15         Yeah, okay.  But that's the point.  We have spent

16 more than enough time on whether I -- I could have just said

17 I'll allow it for what it's worth, and whether I'll consider

18 it, I don't know.  I think that's probably what I should have

19 done, because we have already spent I don't know how much time

20 trying to figure out whether I'm going to allow this for what

21 it's worth, which may be nothing.

22         And, you know -- and, Counsel, I think that's going

23 to be typically my approach, is I'll allow it for what it's

24 worth, whatever weight I think it is I'll give it, and if

25 somebody thinks I shouldn't have, because somebody is not going

```
1   to like what my -- somebody's not going to like my decision and
2   so, dimes to doughnuts, somebody's going to -- well, I don't
3   know if you can do one on a -- but at some point appeal and you
4   want to preserve the record.  I get it.  And that's why I'm
5   being very cautious about my evidentiary rulings because I know
6   this is what -- this is not even for me.  This is for the
7   district court.  Let's call it like it is.  Okay.  And so now
8   that we have spent --
9           Jon, what time we started talking about this?  Do you
10  keep track of time?  Well, we know it was before Mr. Sutton
11  (phonetic) returned --time you got back.
12          UNIDENTIFIED SPEAKER:  It was one --
13          THE COURT:  No, two.
14          MR. CAPONI:  One thing we probably all agree on is
15  that we spent some time on this, Your Honor.
16          THE COURT:  Yes.  Too much time.  So I'm going to do
17  what I should have done at the beginning.  I'll allow it for
18  what it's worth, which may be nothing.  I may give no weight to
19  it.
20          UNIDENTIFIED SPEAKER:  But --
21          THE COURT:  Who's saying "but" over here?  Did I hear
22  somebody say something?
23          UNIDENTIFIED SPEAKER:  No.  No, ma'am.
24          THE COURT:  All right.  Who's talking?
25          UNIDENTIFIED SPEAKER:  Here's some information.
```

```
 1              THE COURT:  No thank you.  My watch is going to give

 2   me information on Adco (phonetic) records.

 3              UNIDENTIFIED SPEAKER:  Oh, Adco --

 4              MR. CAPONI:  Your Honor?

 5              THE COURT:  Uh-huh?

 6              MR. CAPONI:  Sorry.  Logistically, what time do you

 7   think we'll be going to today and would this be an appropriate

 8   time to take a break so no one gets angry?

 9              THE COURT:  Well, I did take a snack when I went

10   back.

11              MR. CAPONI:  Okay.

12              THE COURT:  Because I had to deal --

13              MR. CAPONI:  I was talking about Mr. Colby, not you,

14   Your Honor.

15              THE COURT:  No.  I -- I have -- I have recognized

16   that I can be -- which I accuse my kids of being hangry.

17   Apparently, I have the same trait.  And I thought I was doing

18   pretty good.  I haven't gotten angry today.  But I also walked

19   a mile and a half this morning before I came in here to set the

20   tone.  So that would be fine.

21              I also probably can go late.  I just have to confirm

22   that -- not with -- I need to confirm with the CSOs how late

23   they want us in here.  You know, I went to midnight.  They were

24   very unhappy with me.  So I don't plan to do that.  Okay.

25   Extremely unhappy.  So we can -- we need to go 6, 6:30, I need
```

1   to confirm with them first.  That's not a problem because I

2   made my schedule so that was a possibility.

3          And we still haven't even finished Mr. Michaels.  And

4   then we have to do Mr. Stastney, which we have not -- I

5   don't -- I think our schedule did not -- I think our next

6   hearing on this is with the two Zoom witnesses; right?

7          MR. COLBY:  Yes, ma'am.  And we're waiting for the

8   other side to provide some dates, is my understanding.

9          THE COURT:  But we didn't have a continued date from

10  today.

11         UNIDENTIFIED SPEAKER:  Correct.

12         MR. COLBY:  Correct.  Correct, Your Honor.

13         THE COURT:  You guys think about that, okay,

14  about -- because there's no way we're going to get through

15  Mister -- unless you have five minutes for --

16         MR. COLBY:  I actually don't expect to be long with

17  Mr. Michaels.

18         THE COURT:  But I don't expect we're going to finish

19  Mr. Michaels and Mr. Stastney today, are we?

20         MR. COLBY:  I don't know.  It depends, I suppose, on

21  how much cross for Mr. Stastney.  I don't -- Ms. Brumme's

22  actually going to handle Mr. Stastney as a witness.

23         THE COURT:  Oh, the boss is going to handle it;

24  right?  Right.  Okay.

25         So what I would suggest is you guys think about some

1    dates in the events we do not get through Mr. Stastney's

2    testimony.  We already -- what date do we have -- we don't have

3    dates for the Zoom people -- I'm calling them the Zoom people.

4    The Netherlands folks we don't have.  And it's almost December.

5    I -- I'd like to at least rule on this if I have to while in

6    the same time striving to get the other -- working on that.

7                MR. ZAHRALDDIN:  And, Your Honor, we also have a

8    rebuttal witness to their engineers as well, Mr. Banergy

9    (phonetic), which I need to get names for.  So we mentioned him

10   on Wednesday as well.  But he would be remote.  He would be by

11   Zoom as well.

12               THE COURT:  I get it as -- the thing about remote, we

13   can do it in -- we don't need a whole day.  If you say, I want

14   to do this witness from 12 to 6, we can do that.  The problem

15   is, is that, and I'm not sure -- you know, I have allowed one

16   attorney to -- with all the witnesses here because she had

17   medical issues.

18               When I was talking, when we were trying to look

19   through the logistics, it's not going to work for half of us to

20   be here and half of the attorneys on Zoom.  It just,

21   logistically, is not going to work.  I know we have two of

22   these things, but I don't -- we can't do that.  I have two at

23   one time.  The old one and the new one.  Or might have bought

24   -- is this the one we're sharing with everybody?

25               THE CLERK:  Yes.  What -- what do you mean two to

1   have?

2          THE COURT:  Like half the people on one screen, half

3   on another.

4          THE CLERK:  I mean, in theory, there would just be

5   another bubble on the -- on the screen.

6          THE COURT:  I know.  They told me that that's not

7   going to work.  Never mind.

8          So, in theory, I thought about it but it didn't make

9   sense.  But, you know, I don't know if people want to just keep

10  running to Philadelphia for a half a day.  That's the -- I

11  mean --

12         UNIDENTIFIED SPEAKER:  Understand.

13         THE COURT:  You know, but if that's the way it's

14  going to work, maybe you do it two afternoons so you come in on

15  the Monday, you're doing Monday afternoon, you stay overnight,

16  you do it Tuesday afternoon, we're done.  Instead of the other

17  way.  So think about all of that.

18         And, again, I'm going to tell everybody, Ms.

19  Godfrey's gone December 31st and I'm not quite sure -- you

20  know, she had 30 years as a courtroom deputy so whoever's new

21  is not going to have any experience.  Not saying they're not

22  going to do a good job.  I'm sure whoever is going to do a

23  great job.  I'm just saying you're going to have to be patient

24  at that point.

25         Okay?  All right.  We'll go in recess.  Let's say

1    3:15, unless you guys need longer to run and get something to

2    eat.  Around here, I don't know what they have now.  Chinatown

3    but that's kind of far.  What do they have?

4                UNIDENTIFIED SPEAKER:  Not for a half an hour.

5                MR. CAPONI:  3:30?

6                THE COURT:  3:30.  45 minutes.  If you need longer,

7    just come back.  Court is in recess until 3:30.

8                UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

9                UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

10      (Recess taken)

11                THE CLERK:  All rise.

12                THE COURT:  Please be seated.

13                Okay.  We left with Mr. Michaels going to be examined

14    regarding Exhibit 84 and whatever else.  And again, I reserve

15    to give it whatever weight, if any, with respect to these

16    matters.

17                All right.  And with respect to the issue of

18    addressing the issue of a preliminary injunction, what it says

19    is well-established that a preliminary injunction is

20    customarily granted on the basis of procedures that are less

21    formal and evidence that is less complete than in a trial on

22    the merits.

23                So I mean, at this point, I am not even sure if we

24    are talking about, really talking about a TRO because a TRO --

25                Oh, is that rain?  I know it couldn't be rain.

```
 1              MR. COLBY:  It looks like the 4:15 is a little early.

 2              THE COURT:  I am like, it can't be rain.

 3              You know, in my experience, which is, you know, for

 4    what it is worth, when I needed a TRO, I had a hearing in the

 5    morning and I had a decision by the afternoon, at most, the

 6    next day.

 7              This hearing, this has been going on since October

 8    6th.  Is this really a TRO or are we doing a -- what are we

 9    doing that -- you know?  And so that is why I am kind of, you

10    know, is this really a temporary restraining order?  Is this a

11    TRO, a permanent?  What exactly are we doing here?  That is

12    sort of my question.

13              When you said to me that a preliminary injunction is,

14    you know, you don't have all of the niceties with a formal

15    final trial.  But we are doing that.  I mean, I don't know.

16              Mr. Zahralddin, you stood up, so you tell me.

17              MR. ZAHRALDDIN:  Well, Your Honor, certainly I agree

18    with you that a TRO would have been a lot nicer earlier on.  I

19    think we have probably had enough evidence for a preliminary

20    injunction.  But certainly, a permanent injunction would have

21    required a much higher standard in discovery, I would imagine.

22              But I do think that the case law that we presented

23    discussed both preliminary injunction and TRO as having a

24    little bit of an easier evidentiary process, so to speak,

25    because you are trying to do your best to prevent harm that we
```

1  believe is imminent to give us time to preserve whatever the

2  status quo is we are protecting, up until we get to see whether

3  or not we, you know, warrants a --

4           THE COURT:  Uh-huh.

5           MR. ZAHRALDDIN:  -- permanent injunction, yeah.

6           Plus, you have the overlay in this case of a lot of

7  the same activity, we believe, are violations of the automatic

8  stay.  Which again, you know, I have discussed with you before,

9  I think at the --on the conference, and I floated it out to

10 other folks too, in some very brief preliminary discussions,

11 nothing too deep, that a lot of the same evidence is applicable

12 to sanctions and/or any sort of other finding of actual

13 violations of the stay.  So I agree with you.  I think, you

14 know, we should have already had the benefits of the automatic

15 stay here.

16          THE COURT:  Well, you already have the benefits of

17 the automatic stay.

18          MR. ZAHRALDDIN:  Yeah, well, it doesn't seem like it.

19 We have people going into other courts in other places.  We

20 have presented case law that indicates that even if it is a

21 non-debtor subsidiary, if anything happens in those

22 subsidiaries that would affect the distribution in this case,

23 both the technology and the money owed to Stream from the

24 subsidiary qualify for that.  We have people going in to the

25 trademark office, not --

1        THE COURT:  Yeah, but I didn't have that until today,

2   so.

3        MR. ZAHRALDDIN:  Well, that is -- that happened,

4   because it only happened two weeks ago, that there was --

5        THE COURT:  Oh, so even if I had issued it,

6   supposedly, I had granted it.  I am not saying I would, I am

7   not saying I wouldn't.

8        MR. ZAHRALDDIN:  I --

9        THE COURT:  But had I, that wouldn't have been

10  evidence that I would have -- but the whole point of the matter

11  is, I am sort of thinking this through.  And where, I mean, is

12  this really a TRO at this point?

13        MR. COLBY:  Your Honor, I think the fact that seven

14  or eight weeks have gone by since it was first filed, and no

15  calamity has befallen the Debtor's assents belies, you know,

16  belies the purported basis for it in the first place.  There is

17  no imminent irreparable harm.

18        THE COURT:  Or maybe people stopped doing what they

19  were --

20        MR. COLBY:  It was supposedly about the --

21        THE COURT:  But Counsel, it could be that people

22  stopped doing what they were doing.  I don't know.

23        MR. COLBY:  Well, there was a --

24        MR. ZAHRALDDIN:  Well, I am sorry, I didn't --

25        THE COURT:  No, no, it is Mr. Colby's turn.

1          MR. ZAHRALDDIN:  -- I didn't realize because he is

2    behind me.

3          MR. COLBY:  The Debtors came through the door raising

4    hue and cry about a threat to the Philips license.  And that

5    just doesn't -- hasn't panned out.  I think there is sufficient

6    record to deny the request.

7          In terms of whether or not this could be a permanent

8    injunction, that would require discovery.  And in my -- and so

9    I don't think that is appropriate now.  And in my experience, a

10   preliminary injunction also incorporates some discovery into

11   the process.  And I think it makes no sense whatsoever to begin

12   that process now.  The Debtors have the burden here.

13         THE COURT:  Well, a preliminary --

14         MR. COLBY:  The Debtors have the burden here, and

15   they failed to demonstrate --

16         THE COURT:  Well, I don't know what they failed to do

17   or not --

18         MR. COLBY:  --any need --

19         THE COURT:  -- failed to do at this point.

20         MR. COLBY:  -- for this.

21         THE COURT:  I don't know.  My question simply was

22   where do the parties believe we are?  And the case law that

23   they gave me said that in a preliminary injunction, it is

24   customarily granted on the basis of procedures that are less

25   formal, and evidence that is less complete than a trial on the

1    merits.  And we have been treating this sort of like a trial on

2    the merits as opposed to a preliminary hearing on whether I

3    should issue, well, first the TRO, I don't know about whether

4    that is where we are, or whether I should issue a preliminary

5    injunction.

6            And so that really, I mean, I have been thinking

7    about this all along, having nothing to do with the issue of

8    the level of evidence or the issue of hearsay about

9    particularly where we are given the length of time that has

10   expired in terms of the hearing that started on October 6th.

11   It is almost going to be 60 days later.  I am not sure whether

12   a -- you know, TRO is like, you get it right then and there.

13   This sort of morphed into this something beyond that.  So I

14   mean, I don't know if that is what I am really looking at or

15   looking at a preliminary injunction.  I don't know, I guess I

16   will have to figure that out.

17           But whether it is a TRO or a preliminary injunction,

18   the case law seems to suggest that hearsay and a less stringent

19   evidentiary standard is allowed in a preliminary injunction

20   TRO.  So that really went to two different things.  One was the

21   evidentiary record, and the other was just what are we doing

22   here?  Because this isn't something that I am just thinking of

23   now.  I have been saying for a bit now, like, what exactly are

24   we doing?

25           So with respect to the evidence, the Third Circuit

1   has said what it said with respect to the stringent evidentiary

2   rules, either in the TRO or preliminary injunction.  This is

3   not a hearing on a permanent injunction, clearly.  So with

4   respect to that, I think the rules are not as stringent, which

5   is why I said, you know, I had already read this case while we

6   were taking, which is I said I will, you know, I will allow it

7   for what it is worth and give it whatever weight.

8           But at some point, we have to get this done because I

9   will be -- you know, I don't know.  I have only heard one side,

10  you know?  And sometimes, you only hear one side.  Well, in the

11  ex parte, you get it without anybody's -- you just get it on

12  the papers.  But typically, you know, you come in, you make

13  your arguments.  The other party makes theirs, and then the

14  judge, you know, gives you a TRO and then schedules, if

15  necessary, or you know, within whatever the time period is for

16  a preliminary injection.  But mine were always simple.

17          MR. COLBY:  Yeah.  Your Honor, I mean --

18          THE COURT:  They weren't this complicated.

19          MR. COLBY:  And one of the consequences of this, and

20  I think, again, it speaks to the, really, a basis for denying

21  the request is that the purported basis for it, the longer this

22  goes on, it keeps shifting.

23          So initially, it was all about the Philips license.

24  There was a passing reference to trade secrets in the initial

25  papers.  Mr. Rajan's declaration said nothing about concern

1    about the security of trade secrets.  If it was that mission

2    critical, that important, you would think he would have brought

3    it to the Court's attention, and he didn't.

4              Then, when Mr. Stastney testifies as part of their

5    case, and he is asked over and over again, so you are not about

6    to issue a sublicense?  You are not about to issue a

7    sublicense?  He said no, we have demonstration projects that

8    are months from being completed.  Then, the customer decides if

9    they want to do it.  Then, we have to talk about what that

10   might look like.  And so that whole basis for this motion was

11   what had zero evidentiary support, and it could have been

12   denied then.  We have now moved to this trade secret issue, and

13   that wasn't really part of the --

14             THE COURT:  Was the trade secret never referenced or

15   it was --

16             MR. COLBY:  There was a passing reference.

17             THE COURT:  It was referenced?

18             MR. COLBY:  It was referenced.  But again, if it was

19   such a critical thing, you would think it would have merited a

20   sentence or two in Mr. Rajan's declaration that he had some

21   concerns about the security of trade secrets.  So now, we are

22   litigating that issue.  And there is no evidence --

23        (Phone system chiming)

24             THE COURT:  Are we getting more people?

25             MR. COLBY:  There has been no evidence about what the

```
 1   specific trade secret protections are or are not at SCBV
 2   (phonetic) right now.
 3          THE COURT:  Oh, this is Mister --
 4          MR. ZAHRALDDIN:  Michaels.
 5          THE COURT:  No, Mr. Rajan's --
 6          MR. ZAHRALDDIN:  Mr. Rajan did testify, yeah.
 7          THE COURT:  -- testimony was that there is some,
 8   based on his observation, he believes --
 9          MR. COLBY:  In April.
10          THE COURT:  It doesn't matter.
11          MR. COLBY:  Well --
12          THE COURT:  Well, you know, have they changed?  He
13   believes that it is what it is.  Not -- will you tell me there
14   are some things I am not concerned about?  I will tell you
15   frankly, all of you, there are.  And somebody better have a
16   good explanation why I shouldn't be concerned.
17          So while this may have morphed into some other
18   things, and whether whatever, maybe this was better in
19   violation of a state litigation., I think what I understood
20   prompted this was Mr. Stastney's testimony at the hearing in
21   the Dutch court, for which we have no transcript.  A transcript
22   would have ended all of this.  It would have said what he said
23   or what did not say.  It is a he said/she said, well, maybe he
24   said/he said, in this case.
25          And so yes, while it has gone from we are going to
```

 1  lose our license because Mr. Stastney has testified that he

 2  plans to license this, and that he is not protecting our

 3  assets.  That is pretty much what I was hearing.

 4          And now, it is like he didn't protect it because they

 5  aren't using some sort of whatever term it is.

 6      (Phone system chiming)

 7          MR. COLBY:  It is blocked, Your Honor.  They encrypt

 8  the algorithm.

 9          THE COURT:  If it is not encrypted or whatever.  You

10  are going to bring somebody to say it is, so it's protected.

11  Therefore, we don't need an injunction because we're not.  We

12  have Mr. -- you know, we have all of this other,

13  notwithstanding Mr. Stastney's testimony that he is not going

14  to license, there is evidence that he said he would.  Now, is

15  he doing it?  I don't know.

16          Okay.  I am just telling you what I have seen.  I

17  haven't heard Mr. Stastney's explanation in response to any of

18  this stuff, other than his original testimony.

19          MR. COLBY:  Correct, yeah, which I think addressed

20  that squarely.

21          THE COURT:  Okay.  And so that, to me, is some

22  issues.  And then, there are some other issues about what they

23  are doing, who they are doing it with, and whether they like

24  it.  Whether you guys like it or not, there is a license that

25  was granted by someone else to the Debtor.  And I don't think

1    anybody is arguing that Rembrandt licensed something to the

2    Debtor.  There may be a dispute over what that license entailed

3    and what it allowed the Debtor to do with it.  But it is clear,

4    whatever that license was or is, SCBV did not just come out of

5    nowhere.  It didn't.  There is a -- it used that license,

6    whether it was authorized, unauthorized, given to them,

7    whatever.  Okay?  That is not disputed.

8              What I think you guys, is well, we took it and we did

9    something else with it.  I am not a IP lawyer.  I don't know

10   how IP works.  I mean, I have an idea, but I have never been

11   involved in IP litigation.  I know in bankruptcy what it means

12   in terms of use and reject, and all of that other stuff.  But I

13   can tell you, at some point, this is either assets that the

14   Debtor has and the Debtor did something with the license, or it

15   didn't.  Because there is no dispute that the Debtor had some

16   kind of license.  What the Debtor did with that license and

17   what other parties did with it thereafter, that is all you guys

18   are all fighting about.  That is what you are fighting about.

19             But at the end of the day, the license originated

20   with the Debtor.  It means something.  And what somebody did

21   with it or improved on it, if it originated with the Debtor, it

22   is an asset of the Debtor that the Debtor has done something

23   with or hasn't done something with.

24             And so to that extent, I will tell you, if anybody is

25   doing anything with assets that belong to the Debtor's estate,

1    we are going to have a problem.  That is just the bottom line.

2    I don't care how it got to me.  I don't care if he mentioned it

3    first day, second day, fourth day, eighth day.  If you are

4    doing something that you are not supposed to be doing with an

5    asset that belongs to the Debtor, you have a problem.  And I

6    don't care whether we call it TRO, preliminary injunction, it

7    is not permanent, that is where we are.

8           And so they are saying they mean, SCB -- SeeCubic's

9    -- we are not doing anything with the assets of the Debtor,

10   nothing.  We are not selling it, we are not doing anything.  We

11   are -- everything is for the benefit of whoever ultimately gets

12   it.  That is what I am hearing.  And so at the end of the day,

13   you guys need to give me what I need to figure out what is

14   going on with these assets.  Either they are being protected or

15   they are not, are they being licensed or they are not?  Are

16   they being used by somebody else or they are not?  That is what

17   the issue is for me.  And all of this third-party, sixth-party,

18   whatever, that is what I am focusing on.  And I think

19   sometimes, in the heat of the battle, you guys forget what it

20   is that I need.

21           MR. COLBY:  If I might, Your Honor?

22           MR. ZAHRALDDIN:  Can I speak for one second?

23           MR. COLBY:  We have directly addressed the question

24   about licensing in Mr. Stastney's first testimony when he was

25   called by the Debtors.

```
1                  THE COURT:  Uh-huh.
2                  MR. COLBY:  And there has been no -- and the
3      statement was that they are doing the development projects.
4      The work that they are doing, it is happing at SeeCubic B, as
5      has always been the case, and that any of those proof of
6      concept projects aren't complete.  And any potential future
7      licensing, parallel licensing, sublicensing, whatever it may
8      be, is well off in the future if it is going to happen at all.
9      That is the testimony so far.  There is no testimony contrary
10     to that, and no evidence contrary to that other than documents
11     from 2022 --
12                 THE COURT:  Well, what about 2023?
13                 MR. COLBY:  -- when the situation was entirely
14     different.
15                 THE COURT:  Well, they have got the -- there is a PMB
16     or PPM from 2023.
17                 MR. COLBY:  There --
18                 THE COURT:  I don't recall what it says.
19         (Phone system chiming)
20                 MR. COLBY:  There is a subscription agreement which
21     simply has representations about the existence of lawsuits and
22     whether or not they would --
23                 THE COURT:  I don't recall what it says.
24                 MR. COLBY:  Right.
25                 THE COURT:  And I mean, I was -- I said I don't know.
```

1          MR. COLBY:  So that was not a 2023 statement about

2    licensing.  There is nothing in there about licensing.

3          THE COURT:  I don't recall.  I am going to take the I

4    don't recall, because I was wondering about did they say that

5    it is disputed, what did we do?  But all of that, to me, I have

6    the Debtor saying this, that -- and Mr. Stastney saying

7    whatever he said.  And then they are saying well, no, based on

8    these things, we don't believe  -- this is our contradiction to

9    his testimony, and that we think you should also look at these

10   things, because we don't think you should believe Mr. Stastney.

11   We don't think you should believe him because whatever, for

12   whatever reason.

13         MR. COLBY:  Right.  And those things are the PPMs

14   from 2020 and 2022, where first of all, they are old.  So they

15   don't speak to any potential immediate irreparable harm.  And

16   secondly, those came into existence during a period of time --

17         THE COURT:  I know when they came in.

18         MR. COLBY:  -- prior to --

19         THE COURT:  Uh-huh.

20         MR. COLBY:  -- the Supreme Court case.  So --

21         THE COURT:  When was the Supreme Court decision?

22         MR. KODOSKY:  June 15th, 2022.

23         MR. COLBY:  June.

24         MR. ZAHRALDDIN:  June 15th, 2022, Your Honor.

25         MR. COLBY:  And the PPM is dated Q1 -- or Q2 2022.

```
 1              MR. KODOSKY:  And the trademark application was

 2   October of --

 3              THE COURT:  To say --

 4              MR. COLBY:  We haven't gotten to the trademark

 5   application yet.

 6              THE COURT:  Yeah, because that is --

 7              MR. COLBY:  I am just --

 8              THE COURT:  Counsel?

 9              MR. COLBY:  Yep.

10              THE COURT:  They are what they are.

11              MR. COLBY:  Yep.

12              THE COURT:  And I need an explanation.

13              MR. COLBY:  Yep.

14              THE COURT:  And it better be a good one.

15              MR. COLBY:  Yep, yep.  And so there will be.  I am

16   just simply focusing on, you know, this issue about Philips.

17              THE COURT:  So where we are now is that we have a

18   claim that SeeCubic, Inc. and all of these other people are

19   causing irreparable harm to the Debtor.  Mr. Rajan has

20   testified that, you know, they are not protecting them, they

21   are not doing this.  That is why you are bring Mr. Barenbrug.

22              MR. COLBY:  Barenbrug, correct.

23              MR. ZAHRALDDIN:  Right.  If there was no evidence,

24   there would be no need to rebut them with Mr. Barenbrug.

25              THE COURT:  Well, there is evidence and they are
```

1  going to try to rebut it.

2          MR. COLBY:  Yep.

3          THE COURT:  And then, there is the evidence of all of

4  this trademark stuff, all of this other things, the website.

5  All of those things are evidence to say don't believe Mr.

6  Stastney because he is saying different things over here.  So

7  there is evidence, Counsel.  I am not going to say there is

8  not, because their -- what they have tried to do, is put

9  evidence -- they called Mr. Stastney as a cross, but they have

10  put in all of this other stuff, don't -- Judge, don't believe

11  him.  He is not credible because look at all of these other

12  things he is doing.

13          MR. ZAHRALDDIN:  Your Honor --

14          MR. COLBY:  Right.

15          THE COURT:  Okay.  So that is sufficient for me to

16  say okay, now what do I do with it?  So I didn't intend to come

17  out here and do a colloquy with Counsel about where we are, but

18  I am just trying to get your guys to focus.

19          MR. COLBY:  Yes.

20          MR. ZAHRALDDIN:  I understand that, Your Honor.  And

21  let me just say, because there was a lot, and I am not going to

22  respond to everything.  I mean, there was a nice final argument

23  that he made, and we are going to leave that alone.

24          But I am going to say this.  You asked when did all

25  of this happen and what is it we are worried about?  Mr.

```
 1  Stastney, SeeCubic, Hawk, anyone who is involved as a creditor
 2  in this case, should not be touching anything that is a
 3  Debtor's asset.  Nothing.  And we have been begging for help
 4  since April.  It didn't just happen, it has been continuing.
 5          THE COURT:  Well, then why didn't -- well, we are
 6  where we are.
 7          MR. ZAHRALDDIN:  I understand that.  I understand
 8  that.  But to say oh, just forget about everything that has
 9  happened, et cetera.  Our rights are rooted under Butner and
10  our state law rights.  And the state law right now, and the
11  Federal Bankruptcy Law says everything should have been turned
12  over to us.  Then, if they want to do something with it, and
13  that is Stream, what Stream owns.  Then, if they want to do
14  something, they can come in.  They can file state relief
15  motions.  They can object to our plan.  They did none of that,
16  and that is the problem.
17          THE COURT:  So you are -- you basically want me to
18  say stop doing what you are doing with all of that.  And that
19  is how I am looking it is, is there going to be irreparable
20  harm to the Debtor?
21          MR. COLBY:  Right.
22          THE COURT:  And this proof of concept stuff, I get
23  it.  You know?
24          MR. ZAHRALDDIN:  I will get to it here.
25          THE COURT:  Don't interrupt me.
```

```
 1              MR. ZAHRALDDIN:  I won't interrupt you, I am just
 2    saying --
 3              THE COURT:  I love to interrupt people, but I get to
 4    interrupt.  I do it all the time.
 5              MR. ZAHRALDDIN:  I know, I know.
 6              THE COURT:  I am working on it, but I am not getting
 7    good at it.  Maybe by the end of my -- maybe when I finish my
 8    sentence, well, sooner, I guess.  Maybe by that time ,I will
 9    have gotten not to interrupt.  But the point I am making is
10    that if, in fact, these license -- whatever this process is,
11    gets out, it is not going to be for the benefit of any -- even
12    if it ultimately belongs to the secured creditors, okay?
13              MR. COLBY:  Right.
14              THE COURT:  If it gets out into the general world,
15    public, whatever word you want to use, it is going to be worth
16    zero.
17              MR. COLBY:  Well --
18              THE COURT:  Because everybody else will have access
19    to it.
20              MR. COLBY:  Right.  And Your Honor, I think that
21    speaks to, frankly, an issue I have with the basis of this
22    motion in the first place.  As Mr. Stastney previously
23    testified, it is in the secured creditors' interest to preserve
24    this value.  It is in the secured creditors' interest --
25              THE COURT:  Yeah, but it is also --
```

```
1              MR. COLBY:  -- to have SCBV be successful.

2              THE COURT:  Uh-huh.

3              MR. COLBY:  And to have technology that has value and

4    isn't, you know, stolen by others.

5              THE COURT:  I get that.  But it is also SCB -- SB --

6              MR. ZAHRALDDIN:  SCBV.

7              THE COURT:  -- SCBV to the extent it operates, it is

8    supposed to be for the benefit of who ultimately gets it.  And

9    nobody is supposed to be doing things that does not benefit

10   both the Debtor and the Secured Creditor.

11             MR. COLBY:  Right.

12             THE COURT:  And so I don't know how much of that is

13   preferring one over the other.

14             MR. COLBY:  Yeah, we are --

15             MR. ZAHRALDDIN:  Your Honor, you are also

16   forgetting --

17             MR. COLBY:  We are highly aligned --

18             MR. ZAHRALDDIN:  -- you are also forgetting the

19   unsecured creditors because the unsecured creditors do not

20   benefit from the secured creditors walking away and reinstating

21   what was de facto, de facto reinstating what was part of the

22   omnibus agreement, where none of those people got paid.  And it

23   was for the benefit of the shareholders at the SeeCubic level,

24   okay?

25             THE COURT:  But that is for another day.
```

1          MR. ZAHRALDDIN:  All right.  Well --

2          THE COURT:  So at the end of the day, my job is to

3    make sure that the assets of this estate are protected.  And

4    does that mean that there is nothing going on that they are at

5    risk?  I don't do anything, I say no.  If I find that they are

6    at risk, I say something.

7          And so where we are is, we have heard Mr. Stastney

8    say I am not doing anything.  And they are saying, no, George,

9    look at all of these things that he did, this, that.  I have to

10   now weigh that.  You guys are arguing the end results, but I

11   have to go and say okay, well, the Debtor said this is what

12   they are doing, this is what they are doing.  Mr. Stastney says

13   I am not, you are going to bring in some other people who

14   presumably will support his position.  And then I am going to

15   look at everything and say are these assets at risk of -- of

16   the Debtors, at risk of having -- being irreparably harmed with

17   respect to these assets.  If they are, I, you know, it's not --

18   I'd probably issue a preliminary injunction.  I don't know why

19   a TRO.  If they're not, I don't do anything.  I said there's

20   nothing, denied.  And that's where we are.

21         And so, I think we've gone astray by arguing all

22   these things about who's what and who's -- the bottom line is,

23   and nobody has told me otherwise.  The underlying license is an

24   asset of who?

25         MR. ZAHRALDDIN:  The Debtors.

```
 1                THE COURT:  Both debtors?  One debtor?
 2                MR. ZAHRALDDIN:  The Stream is the ultimate signatory
 3     and -- well, sorry.  Excuse me.
 4                THE COURT:  All right.
 5                MR. ZAHRALDDIN:  Stream --
 6                THE COURT:  Don't worry about it.
 7                MR. ZAHRALDDIN:  Okay.  Yeah.
 8                THE COURT:  I have what I have in the record.
 9                MR. COLBY:  Yeah.  Yeah.
10                MR. ZAHRALDDIN:  Okay.
11                MR. COLBY:  The license is, the license between
12     Philips and one of these entities, that entity is Ultra-D
13     Ventures, which is one of the --
14                MR. ZAHRALDDIN:  Yeah, not under control --
15                MR. COLBY:  -- subsidiaries.
16                MR. ZAHRALDDIN:  -- of Mr. Stastney but independent.
17                MR. COLBY:  It's an indirect --
18                THE COURT:  I don't need all that commentary.
19                MR. COLBY:  It's an indirect subsidiary --
20                THE COURT:  Uh-huh.
21                MR. COLBY:  -- of Stream.
22                THE COURT:  Uh-huh.
23                MR. COLBY:  And then the work, the technical
24     expertise to know --
25                THE COURT:  Back up.
```

```
 1              MR. COLBY:  -- about the people are at SeeCubic B.V.

 2              THE COURT:  I get where they're at.

 3              MR. COLBY:  Yeah, they're at --

 4              MR. ZAHRALDDIN:  Yeah, but --

 5              THE COURT:  But there is a license between Rembrandt

 6  and the Debtor?

 7              MR. ZAHRALDDIN:  Yes, ma'am.

 8              THE COURT:  Okay.  And those people who are at SCBV

 9  were there by virtue of some alleged relationship with

10  Rembrandt.  Alleged.

11              MR. COLBY:  Yeah.  No, and I just -- that's --

12              THE COURT:  And so -- counsel.

13              So the issue is, is what does that license mean?  I

14  don't know and until somebody decides and the Debtor says this

15  is my license and you're using it in SCBV --

16              MR. COLBY:  Right.

17              THE COURT:  -- we've got a problem.

18              MR. COLBY:  So --

19              MR. ZAHRALDDIN:  Well that's -- Your Honor, that's

20  what -- Mr. Michaels is the counterparty to that --

21              THE COURT:  I get that.

22              MR. COLBY:  Yeah, if we're --

23              MR. ZAHRALDDIN:  -- for that license.

24              MR. COLBY:  If we're talking about the Rembrandt

25  license, that's a different issue.  I think that'll be
```

 1  addressed today and probably also by Mr. Barenbrug.

 2        The -- just one slight correction.  The folks at

 3  SeeCubic B.V., really are descendants, direct descendants of

 4  the Philips operation, when Philips decided it wasn't -- they -

 5  -

 6        THE COURT:  And so they had --

 7        MR. COLBY:  -- worked there and they did this.

 8        THE COURT:  So let me back up.

 9        MR. COLBY:  Not Rembrandt, I guess is my point.

10        THE COURT:  Wait a minute.

11        MR. COLBY:  But there was --

12        THE COURT:  So when Rembrandt -- and counsel, I don't

13  know how you get around this, because I think about all these

14  things.  Rembrandt sued Stream, sued Mr. -- among other people,

15  Mr. Barenbrug.

16        MR. COLBY:  Correct.

17        MR. ZAHRALDDIN:  Uh-huh.

18        THE COURT:  Okay.  And there was a settlement --

19        MR. COLBY:  Correct.

20        THE COURT:  -- with respect to that.

21        MR. COLBY:  Correct.

22        THE COURT:  Well, if there wasn't a settlement.

23  You're shaking your head.  Mr. Stastney was somehow involved in

24  that case.

25        MR. CAPONI:  Your Honor, and I'd just correct the

1  record on this.

2          THE COURT:  Uh-huh.

3          MR. CAPONI:  The New York litigation ended with the

4  claims being dismissed.  Rembrandt -- and this was all while

5  Mr. Rajan controlled the company.  Mr. Rajan defended that

6  litigation.

7          THE COURT:  And Mr. -- wait a minute.  And so, Mr.

8  Michaels testimony that he directly talked to Mr. Stastney is a

9  lie?

10          MR. CAPONI:  Mr. Stastney was an employee under Mr.

11  Rajan.

12          THE COURT:  Doesn't matter.  He was involved or not.

13  I don't want to hear about whether he was --

14          MR. COLBY:  Yep.

15          THE COURT:  -- an employee or not.

16          MR. CAPONI:  Well, Your Honor, it's relevant for this

17  factor.

18          THE COURT:  Okay.

19          MR. CAPONI:  This was not an entity controlled by Mr.

20  Stastney --

21          THE COURT:  Okay.

22          MR. CAPONI:  -- with the secured creditors during the

23  course of the New York litigation.  It was controlled by Mr.

24  Rajan.

25          THE COURT:  And Mr. -- wait a minute.  And Mr.

```
1    Stastney was not an officer or a board member or anything else
2    at that time?
3              MR. CAPONI:  He was an officer.
4              MR. ZAHRALDDIN:  He was both, Your Honor.
5              THE COURT:  So don't tell me he was an employee.  He
6    was also an officer.
7              MR. CAPONI:  Well, he was under Mr. Rajan.  He wasn't
8    directing the --
9              THE COURT:  Was --
10             MR. CAPONI:  -- litigation, Your Honor.  Your Honor,
11   if I may just --
12             THE COURT:  But he was an officer.
13             MR. CAPONI:  He was an officer.
14             THE COURT:  And a board member.
15             MR. CAPONI:  And he was sent --
16             THE COURT:  Yes.
17             THE COURT:  -- to negotiate the litigation.
18             MR. CAPONI:  Your Honor --
19             THE COURT:  But so --
20             MR. CAPONI:  -- the point being --
21             THE COURT:  -- so who controlled -- the point of the
22   matter is, there was some sort of settlement.  I don't care
23   what you --
24             MR. CAPONI:  There was not, Your Honor.  May I
25   clarify the record on that because --
```

```
1                THE COURT:  Okay.

2                MR. CAPONI:  -- it's important.

3                THE COURT:  All right.  There wasn't a settlement.

4     What happened?

5                MR. CAPONI:  There was not a settlement.  There was a

6     mediation.  Rembrandt wanted there to be a settlement.

7     Rembrandt filed a Motion after the mediation to enforce a

8     settlement agreement.

9                THE COURT:  Uh-huh.

10               MR. CAPONI:  It was litigated.  Both the magistrate

11    who oversaw the mediation and the District Court ruled, there

12    was no meeting of the minds and there was no settlement.  Full

13    stop, New York litigation ends.  Years later, in the context of

14    getting ready for the bankruptcy that was kicked out as being

15    fraudulent, they -- Mr. Rajan signs a settlement agreement with

16    Rembrandt.

17               So there was no New York litigation resolved via a

18    settlement.  The New York litigation was resolved because the

19    case was dismissed.

20               THE COURT:  Dismissed by the Court or dismissed by

21    the party?

22               MR. CAPONI:  By the Court.

23               MR. ZAHRALDDIN:  Can I object to the testimony?

24               MR. CAPONI:  By the Court.

25               MR. ZAHRALDDIN:  But Your Honor, why can't we --
```

```
 1              MR. CAPONI:  And there is a --

 2              MR. ZAHRALDDIN:  -- look at the actual written

 3    document?

 4              MR. CAPONI:  -- written opinion, Your Honor.

 5              THE COURT:  You know what?  I don't need anybody to

 6    tell me anything.

 7              MR. ZAHRALDDIN:  I'm just asking.

 8              THE COURT:  Don't tell me anything.

 9              Somebody put the -- just put the record in -- put the

10    docket in the record.  I just want --

11              MR. ZAHRALDDIN:  Yes, ma'am.

12              THE COURT:  -- the docket in the record.  I don't

13    need your interpretation, his interpretation.

14              MR. ZAHRALDDIN:  That's what I'm asking.  That's all

15    I'm asking.

16              THE COURT:  Just put it all in.  And the -- it really

17    isn't relevant to me --

18              MR. COLBY:  That's -- yeah.

19              THE COURT:  -- because at the bottom line is either

20    the Debtor believes this is a -- and I have to -- I can, for

21    instance, in the context of a Motion for Relief from State, if

22    the parties dispute ownership, I can, for the purpose of the

23    Motion for Relief, make a determination solely for that

24    purpose, whether in fact a party, for instance, or the mortgage

25    company says I have a mortgage, the Debtor says, you don't have
```

1  one.  I never signed any papers.  I didn't do anything.  Okay.

2  I will have a hearing and I will say for the purposes of this

3  Motion, I will find, for this purpose only, it's not a final

4  determination, I'll find there's a mortgage.

5          But you guys are going to -- either I have to make a

6  final determination or you're going to go to state court and

7  have a final determination.  So -- but it's because they're --

8  you know, the parties are asserting.  The same way the Debtor

9  says, I own this.  Okay.  I own it.  And somebody ultimately

10 has to determine ownership.  I may have to say for the purposes

11 of what I'm doing, determine whether it's more -- it's -- that

12 the Debtor has an interest, doesn't have an interest.  But

13 solely for the purpose of making my decision as to whether I'm

14 going to rule one way or the other.

15          MR. COLBY:  If I could ask --

16          THE COURT:  And so, that's what exists here.

17          MR. COLBY:  If I could ask a question, Your Honor,

18 just so I can be sure to be as responsive as possible to what

19 you're speaking about and focusing on.

20          Are you referring to the Rembrandt license?  Is that

21 what you're discussing?

22          THE COURT:  Well, the license that the Debtor says it

23 has an interest in, that SCBV is using.

24          MR. COLBY:  Right.  So I think there are two that the

25 Debtor says -- has an interest in.  There are two licenses at

```
 1   issue.  There's the Philips license, which we've talked about
 2   quite a bit.
 3            THE COURT:  Uh-huh.
 4            MR. COLBY:  And then there is the 2021 settlement
 5   with Rembrandt, which creates what we've been referring to as
 6   the Rembrandt license.
 7            MR. ZAHRALDDIN:  And Your Honor --
 8            THE COURT:  Oh, don't interrupt him.
 9            MR. COLBY:  And so, I guess I don't think anybody
10   disputes that the Philips license exists.  I don't think the
11   Court needs to make a ruling on that.
12            THE COURT:  But to the extent the Philip license
13   exists, the Debtors asserting, I guess, some sort of interest
14   in that.  I don't know if the Debtor has an interest or not.
15            Do I have to make that determination now?  All I have
16   to say is the Debtor is asserting an interest, believes that
17   these -- this entity is using its asset, because they had to
18   have gotten it from somewhere.  The SCBV did not, at least I
19   haven't seen it --
20            MR. ZAHRALDDIN:  They're not a party.
21            THE COURT:  -- in the record anywhere, a license from
22   Philips and SCBV, unless it got one lately and I haven't seen
23   it.
24            MR. COLBY:  But we have the license, well, first of
25   all, it's with -- it's currently with Ultra-D Ventures.  It is
```

```
1    in the record.  The --

2              THE COURT:  Uh-huh.

3              MR. COLBY:  -- both the license is in the record and

4    the 2014 amendment.

5              THE COURT:  And the license from Ultra-D to SCBV is

6    in there?

7              MR. COLBY:  No.

8              MR. ZAHRALDDIN:  No.

9              MR. COLBY:  There is the --

10             THE COURT:  That's the point, that I don't see

11   anything, but anybody giving anything to SCBV.

12             MR. ZAHRALDDIN:  And --

13             MR. COLBY:  Well, the --

14             THE COURT:  And I don't know who owns this stuff.  I

15   don't know.  Somebody's going to have to figure this out.  I'm

16   not an IP --

17             MR. COLBY:  Yes, the --

18             THE COURT:  -- I'm not trying to do IP.

19             MR. COLBY:  The Ultra-D license includes SeeCubic,

20   B.V.

21             THE COURT:  Oh, it says that they include it?

22             MR. COLBY:  I believe --

23             MR. ZAHRALDDIN:  No, Your Honor, what it says --

24             THE COURT:  You know what?

25             MR. ZAHRALDDIN:  Again --
```

```
1              THE COURT:  We're going astray.

2              MR. ZAHRALDDIN:  We are.

3              THE COURT:  We're going astray.

4              MR. ZAHRALDDIN:  We are.

5              THE COURT:  All I was trying to figure out is, was

6   this a preliminary injunction and trying to give you guys some

7   guidance for where I was and what I was trying to figure out.

8   And from my perspective, if this is assets of the Debtor's

9   estate, I have to do something, if I believe there's

10  irreparable harm.

11             The first thing I have to figure out is, for the

12  purposes of this motion, or for TRO / preliminary injunction,

13  because that's what it's slash called, is this assets that

14  could be possibly assets of the Debtor?  If I look at the

15  documents and go no way, then I don't even get to irreparable

16  harm.

17             MR. COLBY:  Got it.

18             THE COURT:  If I get to and say possible, then I have

19  to say, okay, what, if anything, needs to be done to protect

20  these assets?  The answer could be, yeah, its assets, like,

21  possible assets.  Nothing needs to be done.  It's possible

22  assets, something needs to be done.

23             But that's where I am, and I was hoping people would

24  just kind of focus on that.  I was trying to --

25             MR. COLBY:  Sure.
```

 1            THE COURT:  -- get people to -- I have spent God

 2    knows how much time, again, asking questions that I probably

 3    shouldn't have and just let the parties go.

 4            MR. COLBY:  Well --

 5            MR. CAPONI:  Your Honor, if I may briefly?

 6            THE COURT:  Uh-huh.

 7            MR. COLBY:  Sorry.  Sorry.

 8            THE COURT:  Well, okay.

 9            MR. COLBY:  Sorry, Mr. Caponi.

10            THE COURT:  Mr. Caponi.

11            MR. COLBY:  Am I allowed to interrupt Mr. Caponi?

12    Mr. Zahralddin.  We're on the same team.

13            MR. CAPONI:  He can interrupt me all he wants.

14            MR. COLBY:  Okay.  So that's up with the -- there has

15    been discussion.  I think even Mr. Rajan concedes that the

16    Philips license includes affiliates and that definition would

17    include SeeCubic, B.V.

18            I think there is a separate issue that I'm not an

19    expert on, a separate sort of bankruptcy law issue about

20    whether or not, what the Debtors own is sort of in the assets

21    of the subsidiary or the interest in the subsidiary.  I think

22    we have submitted some briefing on that and if -- to the extent

23    we need to argue it, we can argue it.  I don't know that that's

24    an evidentiary issue.

25            THE COURT:  We're not getting into that today.

```
 1            MR. COLBY:  Right.

 2            THE COURT:  Not today.  And not --

 3            MR. COLBY:  Not today.  Right.

 4            THE COURT:  -- no, and not, you know, if you

 5    submitted something I'll look at.

 6            Mr. Caponi?

 7            MR. CAPONI:  Yes, Your Honor.  To your point, and

 8    it'd well taken.  But I would like to address one issue, which

 9    is the notion.  And I understand Your Honor's desire to get to

10    the heart of it.

11            This is not a we issue.  The Debtor filed a Motion.

12    The Debtor bears the burden of establishing each of its

13    elements, what the property's with specificity, because the

14    Court ultimately has to enter an order.  If the Court enters an

15    order, in order for it be worth the paper it's written on, it

16    has to have specificity.

17            What asset belongs to the estate, how it's being

18    used, and how it's not, et cetera.  To the extent, and as Mr.

19    Colby has pointed out, this thing has morphed.  I mean, I came

20    here, my client, as far as I'm concerned, this is a TRO.

21    That's what the Debtor filed.

22            If the Debtor wanted to file something else, it

23    should have, it could have withdrawn the Motion, filed the new

24    Motion.

25            THE COURT:  Well, there was a TRO preliminary
```

```
1   injunction.

2           MR. CAPONI:  That's fine, Your Honor.

3           To the extent the Court has questions.  To the extent

4   the Debtor has failed to make order out of chaos or created, in

5   my view, chaos out of order, that's the Debtors fault problem

6   -- issue.  It's not clients.  And I would just like to remind

7   the Court, it's the Debtor that bears the burden.  And --

8           THE COURT:  I know that, counsel.

9           MR. CAPONI:  -- I'm happy to answer questions and

10  bring clarity to the Court.  But to the extent that the Debtor

11  filed the -- you know, a TRO Motion / preliminary injunction.

12  Then the Stay.  And then a --

13          THE COURT:  Well, the Stay?  What Stay?

14          MR. CAPONI:  -- a claim in District Court.  And

15  then --

16          THE COURT:  Wait a minute.  The Stay has nothing to

17  do with this.

18          MR. CAPONI:  Your Honor, it has this to do with it.

19  To the extent the Debtor's argument is -- Mr. Zahralddin is

20  arguing.  Like, there was this -- these assets and they're so

21  important and we got to get control of them and that's been our

22  focus.

23          The Debtor's been scattershot throughout this whole

24  -- it is the conductor of a bankruptcy.  It gets to decide the

25  flow, the tempo, what gets raised.  The chaos was created by
```

1    all these things the Debtors filed.

2              THE COURT:  Well, one of them was because --

3              MR. CAPONI:  And then one other thing.

4              THE COURT:  I will take responsibility for one that

5    kind fell through the crack and we just --

6              MR. CAPONI:  Right.

7              THE COURT:  -- left it out there.  So that one --

8              MR. CAPONI:  That's us, Your Honor.

9              THE COURT:  -- that's on the Court.

10             MR. CAPONI:  Everything else is the Debtor.

11             And then I don't think -- I think it has to be

12   mentioned, that this asset that we're talking about in the

13   Netherlands that seems so near and dear to the Debtor's heart

14   is an asset that the Debtor has refused to fund for years, even

15   during the course of this bankruptcy.  I think that's relevant

16   to Your Honor, because if I --

17             THE COURT:  Well, counsel --

18             MR. CAPONI:  -- believed that I had an extremely

19   valuable asset, I had a classic Ferrari that Your Honor is

20   sitting in a garage somewhere and I -- I'm going to pay the

21   rent on the garage so my car -- that car doesn't get towed out.

22   If I don't, I think that says something about --

23             THE COURT:  But your client just --

24             MR. CAPONI:  -- what I think the value of the car --

25             THE COURT:  Well, your client --

1           MR. CAPONI:  -- is in the garage.

2           THE COURT:  -- just told me or you guys just told me

3    you guys' no longer fund.  And does that same apply that you no

4    longer funding and so it's just going to go to the wind?

5           MR. CAPONI:  Ultimately, Your Honor, this thing may

6    go to the wind, and if the assets don't get -- and I think this

7    is the point.  If the employees aren't paid, these employees

8    that -- whose knowledge in their head seem so paramount to the

9    Debtor, why is the Debtor letting them potentially just walk

10   out the door because they're not getting paid?  If these assets

11   in the Netherlands are so near and dear to Rembrandts heart and

12   the Debtor's heart, why are they sitting back, letting them

13   potentially go into a Dutch bankruptcy?

14          THE COURT:  Because you guys have been paying.  Why

15   wouldn't he?

16          MR. ZAHRALDDIN:  Well, that's not it, Your Honor.

17          MR. CAPONI:  It goes to the sincerity of the

18   argument.

19          MR. ZAHRALDDIN:  Your Honor, excuse me.

20          THE COURT:  Whoa, whoa, whoa, whoa.

21          MR. ZAHRALDDIN:  Let me ask a question.  Let me just

22   ask a question.

23          We came in here and asked to fund early on and you

24   said, "No, I can't do it at this time.  I don't see it as

25   assets to the Debtor, and that's what we're going to do."

1          So it -- you know, to sit there and now recreate

2    history when we came in and asked, please, let us go over

3    there.

4          THE COURT:  You did, and I said --

5          MR. ZAHRALDDIN:  Now --

6          THE COURT:  -- go finish your funding, you already --

7    and it wasn't that I was going to let you do it because it

8    wasn't an asset.  I said they already had a source of funding.

9          MR. CAPONI:  Right.

10         MR. ZAHRALDDIN:  I understand, Your Honor.  But

11   here's the -- let me finish, Mr. Caponi, please.

12         Then during the interim, during the interim, they go

13   and take over the asset.  How are we supposed to control the

14   asset when they've gone and filed things in the Netherlands to

15   take control of an asset which they have no collateral

16   involvement in period.

17         THE COURT:  I don't know.  I'm not going to make that

18   determination.

19         But I think that there's enough to go around for

20   everybody.

21         So Mr. Caponi, I said no funding.  They did come in

22   and ask for VSI to pay the money.  I don't know -- but I said

23   no, because they already had a source of funding.  Why was I

24   going to let the Debtor go incur debt when somebody else was

25   already funding?

1          And so, that's really what happened is, I said no and

2    your client graciously or whatever in his best interest, I'm

3    not going to use the word graciously, but figured that it was

4    in his best interest to continue to fund.  And then I don't

5    know who went and filed for independent director.  I don't know

6    who went.

7          MR. ZAHRALDDIN:  Well, it's on the caption, Your

8    Honor.  It's on the caption.

9          THE COURT:  I don't know why, but at some point,

10   whatever involvement the Debtor had, or the Debtors represented

11   or the Debtors -- or whatever Mr. Rajan's role is in the

12   Debtor, was opposed to being involved in SCBV.  And he was

13   removed.

14          So I don't know.  Listen, there's enough blame to go

15   around for everybody in here.  So let's not everybody play the

16   martyr.  Okay.  Let's not play I'm bad, they good.  There's

17   good and bad on every part.  And at the rate you guys going,

18   you don't want to know what my perception is.

19          MR. ZAHRALDDIN:  Your Honor --

20          THE COURT:  You don't.

21          MR. ZAHRALDDIN:  -- I just want to make sure that --

22   I've been asking.  We -- you asked us to have some progress.

23   We filed a plan.  The plan resolves our issues with Rembrandt.

24   The plan has purchase orders.  The plan wants to move forward.

25          THE COURT:  They can have all the purchase orders it

```
 1   want.  Unless you guys are selling stuff, I don't care about

 2   purchase orders.

 3              MR. ZAHRALDDIN:  Well, we'd like to go to production,

 4   but our main piece of equipment and we had to go find -- is

 5   being locked up somewhere in China because of their

 6   interference.

 7              THE COURT:  I thought you guys were mediating that.

 8              MR. ZAHRALDDIN:  We're trying to, Your Honor.  But

 9   every single time we bring something, there's some brand-new

10   issue that slows it down.

11              THE COURT:  Oh, okay.

12              MR. ZAHRALDDIN:  But look.  I simply want to say,

13   we're trying to do what we're supposed to.  But we've been --

14   I've seen it in their papers and otherwise, somewhere we're

15   creating litigation chaos.  They have gone outside of this

16   jurisdiction.  They've messed with stuff within this

17   jurisdiction.  What are we supposed to do?  Say it's okay, not

18   file something to prevent it?

19              THE COURT:  All right.

20              MR. ZAHRALDDIN:  The scatter shot of this --

21              THE COURT:  All right.  There's enough blame -- I've

22   already said, I'm going to say it again.  There's enough blame

23   to go around for everybody and nobody has clean hands as far as

24   I'm concerned.

25              And so, you don't want to be there with me.  You do
```

```
1   not.  You do not want to -- you do not want me to have that

2   view, because it's not going to be good for anybody.  Now --

3            MR. ZAHRALDDIN:  Understood, Your Honor.

4            THE COURT:  -- I understand Mr. DeMarco -- who's Mr.

5   DeMarco?

6            MR. DEMARCO:  That's me, Your Honor.

7            THE COURT:  What do you want to say, Mr. DeMarco?

8            MR. DEMARCO:  I believe my matters been addressed,

9   Your Honor, and I won't derail things further.  If it's

10  necessary, I'll confer with my client and --

11           THE COURT:  All right.

12           MR. DEMARCO:  -- if we need to file something.

13           THE COURT:  So where are we at after an hour of me

14  taking us off the rails?  Is that -- to the extent this is

15  either a TRO or preliminary injunction -- to the extent this is

16  a TRO / preliminary injunction, the standard is, we can have

17  some hearsay, which is what this was supposed to start out

18  about and solely be on a ruling with respect to Mr. --

19           MR. KODOSKY:  Kodosky.

20           THE COURT:  -- Kodosky's argument that -- in response

21  to the hearsay.

22           We have now gone off on a tangent about what I think

23  you guys should be giving me and the bottom line is as I see

24  it, the Debtor is alleging that their interest or interest in

25  whatever that license, in SCBV is not being protected and it's
```

```
 1   not being protected because allegedly Mr. Stastney was going to
 2   license it.  This is the evidence that they provided.  Mr. --
 3   he's not protected it because it's not encrypted and he's doing
 4   all these bad things, and I should stop him.
 5            And Mr. Stastney's response is, I'm not licensed it,
 6   we're not doing bad things, and we're going to put on Mr.
 7   Barenbrug and somebody else to say we're not doing these bad
 8   things.
 9            That's all I really need, and all of this other side
10   show is really not helpful.
11            MR. COLBY:  Yeah.  Thank you, Your Honor.
12            THE COURT:  Okay.
13            MR. COLBY:  I agree.
14            THE COURT:  All right.  With that all being said,
15   counsel, Mr. Kodosky, after an hour, you can start with Mr. --
16   continue with Mr. Michaels testimony.
17            MR. KODOSKY:  Thank you, Your Honor.
18            THE COURT:  Go ahead.
19            And Mr. Caponi, I -- sorry for cutting you off.
20            MR. CAPONI:  No problem, Your Honor.  He has more
21   important --
22            MR. COLBY:  So am I.  So am I.
23            MR. CAPONI:  -- things to say than me.
24            THE COURT:  I tend to do that.  I'm, like, okay --
25   because I know what I want to hear, and you guys are just
```

```
 1  complicating it.

 2          Go ahead, Mr. Kodosky.

 3          MR. KODOSKY:  Permission to approach, Your Honor,

 4  with what is --

 5          THE COURT:  Yes.

 6          MR. KODOSKY:  -- been marked for identification as

 7  Debtors Exhibit Number 85.

 8          THE COURT:  And you have that, John?  On the --

 9          MR. ZAHRALDDIN:  He does.

10          UNIDENTIFIED SPEAKER:  Yes.

11          THE COURT:  Okay.

12          UNIDENTIFIED SPEAKER:  Yeah.

13          THE COURT:  I have 84, which is the definition that

14  Mr. Michaels identified has something to do with some

15  litigation somewhere.  Okay.

16          All right.  85.  Mr. Michaels, are you back?

17          THE WITNESS:  Yes.

18          THE COURT:  Who's talking?  Whoever's talking, please

19  turn your phone off, because I can -- can you hear them, John?

20          UNIDENTIFIED SPEAKER:  I think it was him.  I think

21  it was his background.

22          THE COURT:  Okay.

23          Go ahead.

24  BY MR. KODOSKY:

25  Q   Mr. Michaels, well you are being shown what has been
```

1  marked for identification as debtors Exhibit 85.  Do you

2  recognize this document?

3  A    I do.

4  Q    What is it?

5  A    It's the nondisclosure and non-circumvention agreement

6  that was signed with Bart Barenbrug and 3D Fusion, Inc.

7  Q    The nondisclosure and non-circumvention agreement that he

8  had denied executing as part of his declaration?

9  A    Yes, it is.

10         MR. KODOSKY:  Move to admit, Your Honor.

11         MR. COLBY:  No objection, Your Honor.

12         THE COURT:  Okay.  Admitted.

13      (Debtor's Exhibit 85 admitted into evidence)

14         MR. KODOSKY:  Thank you.

15  BY MR. KODOSKY:

16  Q    Mr. Michaels, and we can set that document aside.  Is it

17  your understanding that SeeCubic, Inc. has a sublicense

18  business model?

19  A    Yes, from the PPM and their testimony.

20  Q    Is your --

21         THE COURT:  Who is talking?

22         MR. COLBY:  I'm not certain, but it looks like Mr.

23  Blumenthal is not muted based on the screen.

24         THE COURT:  Can you --

25         MR. COLBY:  And I thought the box flashed on there

1  when -- it happens when somebody's speaking.

2              THE COURT:  And who's --

3              MR. COLBY:  Now he's muted.

4              THE COURT:  -- he again?

5              MR. COLBY:  Now he's muted.

6              THE COURT:  Who is Mr. Blumenthal?

7              MR. ZAHRALDDIN:  Mr. Blumenthal is the CEO of

8  Rembrandt, Your Honor.

9              THE COURT:  CEO?  Okay.  All right.

10             Okay.  I guess he did not like that answer.

11             Okay.  Sublicensing.  Okay.  Go ahead.

12 BY MR. KODOSKY:

13 Q    Is your understanding that Stream TV is selling components

14 or actual TV's?

15 A    Stream TV is selling actual TV's, and we have a number of

16 units of those TV's.

17 Q    And have you tested content on a Stream TV actual unit?

18 A    Yes.

19 Q    Were you able to remove any of the content from the TV?

20 A    We were able to remove -- I mean, we were able to deliver

21 content to it externally.  But we are not able to access any of

22 the processing of that content internal to the -- that is

23 internal to the TV.

24 Q    Is it your assessment that Stream TV had strong security

25 protocols on content?

1  A    Yes, our team has a number of people that are

2  sophisticated and understand how to deliver and manage content

3  in audio visual equipment and we were not able to get access to

4  it.

5  Q    At the last hearing that was held on October, I believe it

6  was 27th, 2023, did you hear the testimony of Mr. Rajan that

7  the security --

8  A    Yes.

9  Q    -- that the security protocols by SeeCubic, Inc. on

10 content were removed on 8K TV's, automotive, and gaming?

11 A    I did and that -- that was very distressing to myself and

12 Rembrandt staff.

13 Q    Did you hear that some content companies thought the TV's

14 produced by SeeCubic, Inc. were so bad that they were even

15 mapping directly to the device?

16 A    Yes.

17 Q    Did you know that Stream TV has begun to work with content

18 companies and is maintaining security protocols?

19 A    Yes.

20 Q    If the content files are released that contain trade

21 secrets, do you think that is irreparable damage to Stream TV?

22 A    Yes, and to Rembrandt, which is more my concern.  But I

23 understand for the Motion that it's about Stream TV, yes.

24 Q    Thank you.  The Eindhoven engineers that were working at

25 Rembrandt, with a Rembrandt processor, prior to working with

```
 1  Stream TV, is that correct?
 2          THE COURT:  Wait, what was the question?
 3  BY MR. KODOSKY:
 4  A    Yes.
 5          MR. KODOSKY:  Eindhoven engineers.  E-I-N-D-H-O-V-E-
 6  N.
 7          THE COURT:  Oh, Eindhoven --
 8          MR. KODOSKY:  Eindhoven.
 9          THE COURT:  -- engineers.  What about them?  I'm
10  sorry.  He understood, I didn't.  What was the question?
11          MR. KODOSKY:  We're working at Rembrandt with a
12  Rembrandt predecessor prior to working with Stream TV.
13          MR. COLBY:  Objection, Your Honor.  I don't think
14  it's been established that Mr. Michaels was involved with that
15  predecessor at that time.  I don't think it's been established
16  that he has firsthand knowledge.
17          THE COURT:  Okay.
18          MR. KODOSKY:  I'm asking if he knows.
19          THE COURT:  Well, how does he know?  You can ask him
20  how does he know.
21          MR. KODOSKY:  I haven't had the opportunity yet.
22          THE COURT:  All right.  Well, his objection's
23  sustained.  Establish a foundation on how he would know the
24  Eindhoven engineers were working for Rembrandt's predecessor
25  prior to -- what was the question -- prior to --
```

1          MR. KODOSKY:  Prior to working with Stream TV.

2    BY MR. KODOSKY:

3    Q    Do you have any understanding, Mister --

4    A    Yes.

5    Q    -- Michaels?  Based on what?

6    A    My law firm has been representing Stephen Blumenthal and

7    the companies that he's worked with for 30-something years.  I

8    was involved in the litigation and read the testimony, heard

9    the testimony as various Stream TV employees, and have seen

10   numerous documents going back and forth between engineers in

11   Eindhoven and Stephen Blumenthal.  And I -- just up until

12   today, that that has not been disputed that those engineers

13   worked with 3DFusion and Stephen Blumenthal for roughly 18

14   months before they went to go work for Stream TV, or more

15   accurately, SeeCubic BV, a subsidiary of Stream TV.

16   Q    Were there 45 meetings with meeting notes and a list of

17   attendees with Steve Blumenthal?

18   A    Yes, and I reviewed those.

19   Q    Who attended the 45 meetings?

20   A    There are a number -- I think it's 7 to 12 engineers and

21   individuals from the -- the Ein -- what's been referred to as

22   the Eindhoven team.  They're mostly former Phillips employees

23   that left Phillips to come work with 3DFusion and Stephen

24   Blumenthal, and Stephen Blumenthal's former business partner in

25   3DFusion, Ilya Sorokin.

1  Q    Were the four trade secret claims discussed in the 45

2  meetings?

3  A    Those trade secrets were.  They weren't claims at that

4  point.  They were trade secrets that were going back and forth

5  between that team and -- and Stephen Blumenthal.

6  Q    Who were the engineers who signed NDAs with Rembrandt?

7  A    I'd have to look back through the full records, but at

8  least Walter Roelen, Hans Zuidema, Bart Barenbrug.  And I -- I

9  think there are a number of others.  I'd have to look through

10 our documents to refresh my recollection as to the names.

11 Q    And I believe one of the names that you mentioned was

12 Walter Roelen, R-O-E-L-E-N; is that correct?

13 A    Yes.

14 Q    Was Roelen paid by Rembrandt's predecessor?

15 A    Yes.

16 Q    Did he hold himself out as a de facto agent?

17 A    Yes, and he was the director and CEO of the Netherlands'

18 entity of 3DFusion.

19 Q    Was code on some of the trade secrets claims shared with

20 Steve Blumenthal?

21 A    Yes, and -- and in and amongst that entire team.

22 Q    What is the risk for Stream TV and Rembrandt if that trade

23 secret is leaked out?

24 A    Once -- once leaked, it's going to be gone forever.  The

25 entities working in this space are in China, Korea, India,

1  Japan, Taiwan.  I mean, these countries are not known for

2  respecting intellectual property.  You know, to date, as far as

3  we know, Stream TV has never released any of that code, even

4  though they were putting it to use without our permission.  And

5  we were upset about that and eventually reached that license

6  agreement.  To our knowledge, other than -- I believe the only

7  time we accused them of disclosing it was in a patent

8  application for one aspect of the trade secret information that

9  we outlined in our complaints.  But other than that, they've

10 kept it secret as far as we know.

11 Q    If the Phillips license is canceled, what is the damage to

12 Stream TV and I guess, by extension, to Rembrandt?

13 A    Well, Rembrandt has other sources in their other licensees

14 to the Phillips license that we can work with and have been in

15 the past.  For Stream, it would largely be the end of the road.

16 The -- the -- the technology is completely reliant on Phillips

17 2D-plus-Depth system, and they have hundreds -- I think it's

18 even up to about 1,500 patents -- that were -- has now been

19 sold to Leia but is now -- but anybody who had a license,

20 they've -- they've had to honor that, similar to selling a

21 building.  They have to honor the -- the leases to any existing

22 tenants.  So if lost, I -- Phillips is no longer capable of --

23 of issuing a new license, and Leia has its own business

24 strategy for how it wants to work with partners in that -- in

25 that space.  And so it'd be catastrophic.  And there's quite a

1    bit of incentive for Phillips and/or Leia to want to be in a

2    position to cancel that license.  The licenses being issued

3    today are many multiples in order to magnitude higher value

4    than what Stream was able to purchase that license for.

5         MR. COLBY:  Objection, Your Honor.  I move to strike

6    the witness's answer.  He's testifying about what Leia would

7    want to do or what Phillips would want to do.  Mr. Michaels was

8    initially proffered as an expert.  The Court denied that

9    request.  If he wants to testify about Rembrandt and

10   Rembrandt's license fine, but he shouldn't be permitted to

11   testify about Phillips', you know, what their -- what would be

12   more valuable to them and why they'd be incented to cancel the

13   license.  He just has no firsthand knowledge of that.  It's not

14   appropriate.

15        THE COURT:  Counsel?

16        MR. KODOSKY:  I can ask what his understanding is

17   based on.  I believe that he can explain where that foundation

18   is coming from.

19        THE COURT:  Tell me what is -- you can ask him what,

20   you know, his understanding of how he came to that.

21   BY MR. KODOSKY:

22   Q    You mentioned -- Mr. Michaels, you mentioned Leia.  Who is

23   Leia and what is your understanding based on?

24        THE COURT:  How do you spell that?

25        THE WITNESS:  So Leia --

```
 1              MR. KODOSKY:  I'm sorry.

 2              THE WITNESS:  I'm sorry.  Is there an objection?

 3              THE COURT:  How do you spell Leia?  I have it as L-E

 4   -- I'm sure it's wrong.

 5              MR. KODOSKY:  L-E-I-A?

 6              THE WITNESS:  L -- yes.

 7   BY MR. KODOSKY:

 8   Q    Go ahead, Mr. Michaels.

 9   A    So they're an entity based out of California.  And they

10   Have been acquiring companies and technology in the no-glasses

11   3D space.  They bought Dimenco, which is a former subsidiary or

12   spin out of -- of Phillips, and they purchased the Phillips

13   patent estate relating to the hardware for no-glasses 3D TV.

14   And that's a matter of public record from the assignments going

15   back and forth and their press release.  I've also spoken to

16   representatives in the business development office at Leia a

17   number of times and emailed back and forth.

18   Q    Is there a risk to Stream TV and I guess, by extension,

19   Rembrandt when SeeCubic, Inc. and Mr. Stastney have been

20   telling people that they're going to sublicense the whole

21   industry?

22   A    It's literally impossible.  I mean, it -- it is a legal

23   impossibility.  The licenses are a record and prohibit that

24   specifically.  Virtually, any intellectual property attorney

25   would render the same conclusion.
```

```
 1            MR. COLBY:  Objection, Your Honor.  Mr. Michaels
 2   isn't able to testify about what the Phillips license allows or
 3   doesn't allow.  His company is not a party to that.  He's not
 4   an expert.  And so I don't think he has a basis to be -- for --
 5   for the testimony he just offered.
 6            MR. KODOSKY:  I believe that Mr. Micheals -- I can
 7   ask him if he's reviewed the Phillips license.  I believe that
 8   he has, Your Honor.
 9            THE COURT:  Okay, but I -- I thought he said that his
10   -- some of his companies had licenses --
11            MR. COLBY:  Yeah, exactly.
12            THE COURT:  -- with Phillips.
13            MR. KODOSKY:  Mr. Rembrandt has a license with
14   Phillips.  It's not the Ultra-D ventures license.  They're
15   different.  Two different companies, two different licenses.
16            THE COURT:  Well, I guess he can --
17            MR. COLBY:  He's not an expert.
18            THE COURT:  -- say based on his own license, but he
19   can't tell me what they would do with respect to somebody
20   else's --
21            MR. COLBY:  Okay.
22            THE COURT:  -- licenses.
23            MR. COLBY:  That's what we discussed when this came
24   up last name.  He can testify about his own license, but not --
25            MR. KODOSKY:  Your Honor, the license with Phillips
```

1    has been produced as an exhibit.  It's been entered into the

2    record in this case.  And if asked, I believe Mr. Michaels will

3    say that he's reviewed it.

4            MR. COLBY:  But just because somebody's reviewed a

5    document doesn't give them the ability to come in and freely

6    testify their opinion as to what legally it permits and doesn't

7    permit.  Mr. Rajan testified about that.  He's a party to it.

8    He testified to his understanding.

9            THE COURT:  Well, his understanding.

10           MR. COLBY:  Right.

11           THE COURT:  Mr. Stastney --

12           MR. COLBY:  Mr. Stastney testified about it -- his

13   understanding.  Mr. Michaels -- his company is not a party to

14   it.  It's just not appropriate evidence.

15           MR. KODOSKY:  Mr. Stastney is not a party to the

16   contract either -- to the license agreement either.

17           MR. COLBY:  Yeah, he was --

18           MR. KODOSKY:  SeeCubic, Inc. is not a party to the

19   license agreement.

20           THE COURT:  Well, you couldn't -- you should've

21   objected when he said it, and we have it in the record.  It is

22   what it is.

23           MR. COLBY:  And he was overseeing.  During the period

24   of time when the omnibus agreement was in place, he was

25   overseeing the assets of Stream, which included the license and

1    the subsidiaries, and those sorts of things.  So --

2              THE COURT:  That's his understanding of what it

3    meant.

4              MR. COLBY:  Yeah, yeah, and he had personal

5    involvement with it.

6    BY MR. KODOSKY:

7    Q    As part of the diligence to give out the license, what did

8    you review?

9    A    One of the critical documents we reviewed and discussed,

10   even at the first mediation hearing, was whether or not Stream

11   had acquired a license from Phillips and -- because we knew

12   that was essential for them to be able to meet the terms of the

13   settlement agreement and particularly providing millions of

14   units of TVs that Rembrandt is relying upon to capture the

15   value from that license.  It was every single one of our trade

16   secrets that we have listed in that agreement references the

17   Phillips 2D-plus-Depth technology.  It is the -- our technology

18   is based off of that original Phillips, so -- so Phillips

19   license.  So if they did not -- if Stream did not have a

20   Phillips license that fully satisfied the ability to

21   manufacture TVs for us, we would not have entered into the --

22   the settlement agreement as we had.

23   Q    When Mr. Stastney testified back on October 6th and said

24   that SeeCubic was talking to over 100 companies, in your view,

25   is that a violation of the automatic stay in this case?

```
 1              MR. COLBY:  Objection, Your Honor.

 2              THE COURT:  Counsel, response?

 3              MR. KODOSKY:  What's the objection?

 4              MR. COLBY:  The objection is --

 5              THE COURT:  The objection is he's not the judge who's

 6  going to say it's a violation of the stay.  And what's his

 7  basis?  Is he a bankruptcy lawyer?

 8  BY MR. KODOSKY:

 9  Q    Is there a risk or a potential --

10              THE COURT:  Are you withdrawing that question?

11              MR. KODOSKY:  I'll withdraw the question, Your Honor.

12              THE COURT:  All right.  Sustained, Mr. Colby.

13  BY MR. KODOSKY:

14  Q    Is there --

15              THE COURT:  Oh, it's withdrawn.  I don't have to

16  sustain.

17  BY MR. KODOSKY:

18  Q    Is there a risk --

19              MR. COLBY:  I agreed to it anyway, Your Honor.

20  BY MR. KODOSKY:

21  Q    Is there a risk to harm to See -- I'm sorry, to Stream TV

22  and Rembrandt by virtue of SeeCubic, Inc. and Mr. Stastney

23  speaking to over a hundred companies regarding sublicensing?

24  A    Yes.

25  Q    What is your understanding of the current status of the
```

1   Phillips patents?

2   A    The -- the Phillips patents, just to hone in, they have

3   hundreds of thousands of patents.  But the -- the 1,500 or so

4   that are listed as related to no-glasses 3D hardware have been

5   sold to Leia, Inc., and that's been made a public record.  They

6   maintain patents related to contract -- content creation and

7   certain tools, and they would still maintain the rights to some

8   of their software and knowhow that they had licensed out to

9   3DFusion and to Stream over the years.

10  Q    Are you familiar, Mr. Michaels. with the term, "parallel

11  licensing?"

12  A    I am.

13  Q    What's the difference between parallel licensing and sub

14  licensing if there is a difference?

15  A    Well, it's about 180 degrees difference.  The -- a

16  sublicense is that I sell you a building and, or I mean, I rent

17  you a building and allow you to bring in tenants as you see fit

18  and to rent out apartments to others and make a profit on that.

19  And a parallel license is I've rented you a single apartment.

20  If you have a friend who wants to rent an apartment, you must

21  refer them to me, and I will issue the lease for that

22  apartment, and you're to have no part of it.  You have no right

23  to represent me in that -- in that transaction.  And it is my

24  building, and I will control the license.

25          MR. COLBY:  Objection, Your Honor.  I'd move to

```
1   strike the witness's testimony.  It sounds an awful lot like

2   the expert testimony that he was attempted to be proffered to

3   give, which was denied.  There is no basis in the questions for

4   why that's relevant to the Rembrandt license.

5           MR. KODOSKY:  And five minutes ago, Your Honor, that

6   he reviewed as part of his due diligence, the language.  He is

7   a member of the patent bar.  Having reviewed the language, I

8   certainly feel it's appropriate for him to give his

9   understanding of the difference between the -- between the two.

10          MR. COLBY:  Yeah.  So I think a lay witness is not

11  permitted to give an opinion that's based on scientific,

12  technical, or otherwise specialized knowledge.  And it sounds

13  as though that's precisely what he's being offered for.

14          MR. KODOSKY:  He's a patent attorney with --

15          MR. COLBY:  He's either an expert, and it wasn't

16  disclosed.

17          THE COURT:  Well, he's not as -- but I think I will

18  allow it for what's it's worth to say what is a parallel

19  license.  And he's said it in terms of an apartment -- and

20  sublicense.  I mean, the term sublicensing -- is that a

21  technical term?  You believe it's a technical term?  If it's a

22  technical, and he's offering it as an expert, then, yes, I

23  would agree, I would sustain.  But how -- I mean, is this based

24  on his -- some understand -- how does he know this?

25  BY MR. KODOSKY:
```

1   Q    Mr. Michaels, how did you obtain your understanding of the

2   term parallel licensing?

3   A    I've worked on thousands of licenses.  I represented

4   Lucent, a number of companies in the display industry; Corning

5   -- I've done a number of licenses with Corning; Samsung, Canon,

6   Nikon, Picvue Electronics.  Take your pick.  I mean, I -- I

7   don't know that I can list them all now, but the -- I have a

8   fair understanding of the types of licenses that are offered

9   and negotiated.  These are pretty basic, I mean, I -- I don't

10  even know that it -- these are pretty basic concepts in terms

11  of what's being offered.  It's just -- it's not exclusive

12  versus exclusive, you know, are somewhat self-explanatory

13  terms.  But this was a non-exclusive license.  I also have a

14  business background, and the -- the value of a non-exclusive

15  versus an exclusive license or a license that carries with it

16  the right to sublicense is something that I have immense

17  experience as a business professional and with respect to how

18  Rembrandt it conducts its business.  So I'm happy to testify to

19  any of those facts.  But in this particular instance, I can

20  spec -- I can testify with specificity as to how it affects the

21  value ascribed to the technology that we license out as to

22  whether or not we are licensing something with the right to

23  grant sublicenses or not.

24  Q    Mr. Michaels --

25           THE COURT:  Whoa, whoa, whoa, whoa.

1          MR. COLBY:  That sounded an awful lot like an

2    expert's CV.  If Mr. Michaels is being offered as an expert, we

3    think that's inappropriate and shouldn't be allowed.  If Mr.

4    Michaels wants to testify about something specific to Rembrandt

5    and the Rembrandt license, which is at issue here, that may be

6    a different story, but that sort of untethered expert testimony

7    is improper because it's undisclosed expert testimony or it's

8    improper lay opinion that requires technical or specialized

9    knowledge.

10          MR. KODOSKY:  And cert --

11          MR. COLBY:  That's precisely what the witness just

12    said.

13          MR. KODOSKY:  I think, Your Honor, that they opened

14    the door with Mr. Stastney's testimony on this in the first

15    place.  And to the extent that he's got direct experience

16    working with thousands of licenses and speak to what parallel

17    licensing means, it sounds like he said that it's a pretty

18    basic concept that would benefit the Court to have that

19    testimony.

20          THE COURT:  Basic.  So it's a basic concept that

21    anybody would know without having to be an expert.  I know what

22    a sublicense is, and I'm not an expert.

23          MR. COLBY:  This is -- but it's testimony.  It's sort

24    of free floating --

25          THE COURT:  I mean --

MR. COLBY: -- expert testimony about what -- Mr. Stastney did address this, but again, that's based upon -- and Mr. Rajan, I believe, addressed this too. That's based upon the fact that they have been part of companies that were the counterparty to the Phillips license. Mr. Michaels is not.

THE COURT: And he was saying -- and so I will sustain -- can you sustain in part -- to the extent his testimony was as Rembrandt -- he said, I know as Rembrandt that we're a party to these things, I'll allow that. But just general free flowing, no, no, no.

So you have to ask him in the context of -- because he said he was -- he represented Rembrandt, he was involved, he know what all these things are. What does he -- based on that experience, what is his understanding of what a parallel license is versus a sublicense.

MR. COLBY: And I --

MR. KODOSKY: As allowed, Your Honor?

THE COURT: Wait a minute.

MR. COLBY: I apologize for interrupting, and I'm trying to be economical with my objections to keep moving, but I also think it's important to stay focused on the issues that the Court identified.

THE COURT: Why? I don't know -- well, and maybe they think it's important, and I get why they think it's important because they think that it's important. And maybe

```
 1   I'm just -- never mind.  Never mind.  Then we're going to go

 2   off on a whole tangent.

 3           Just go ahead.  You can ask him and restrict it to

 4   his experience with Rembrandt.

 5   BY MR. KODOSKY:

 6   Q    Restricted to your experience with Rembrandt, Mr.

 7   Michaels, does that change your answer at all?

 8           MR. KODOSKY:  Go ahead.  I'm sorry.

 9           THE COURT:  What answer?  We didn't allow the answer.

10   BY MR. KODOSKY:

11   Q    Please answer the question as limited to your experience

12   with Rembrandt.

13   A    Sure.  My experience with Rembrandt is that we are --

14   Rembrandt is willing to license its technology on a non-

15   exclusive basis with a -- with without a right to sublicense

16   for a much smaller amount in terms of cash and TVs that will be

17   provide to us.  And we would, if somebody wanted to exclusively

18   license our technology or obtain a license with the right to

19   sublicense others.  For example, if Stream were to enter the

20   market with a no-glasses 3D TV, and Samsung or LG, or any large

21   manufacturer wanted to go into business to manufacture a

22   similar TV, they would approach Phillips, Rembrandt, and

23   potentially Stream as well, and we would be able to negotiate a

24   fee all over again.  And at this point with a successful TV on

25   the market, it would be worth even more.  So it has a
```

1  substantial value to us to be in control of that technology,

2  and it would have a substantial value to us that Stream and

3  Rembrandt are collectively selling TVs that are the only no-

4  glasses 3D TVs on the market.  So it would -- I don't believe

5  this is radical thinking that if you were the only one that can

6  provide something that other people value, you can command a

7  much higher price.  So sub licensing or send -- send -- selling

8  something to Hyundai Motors that they get manufactured with

9  somebody who has no obligation to Stream or Rembrandt

10  significantly hurts the value of the product that Rembrandt is

11  hoping to acquire.  And it would certainly hurt the value of

12  Stream -- both of its intellectual property, its current

13  assets, its ability to sell other TVs, et cetera.

14  Q    Did you hear Mr. Rajan testify at the last hearing that

15  SeeCubic, Inc is doing $600,000 a month in revenue?

16  A    Yes.

17          THE COURT:  Who's doing 600,000 in revenue?

18          MR. KODOSKY:  SeeCubic, Inc.

19          THE COURT:  SeeCubic, Inc., okay.

20  BY MR. KODOSKY:

21  Q    If the 600,000 in revenue is being diverted to another

22  company, does that have an impact upon the Debtors or

23  Rembrandt?

24  A    Yes.  The -- Rembrandt has current litigation pending

25  against SeeCubic, Inc.  Our motion for preliminary injunction

1    was denied because there was a monetary potential for a license

2    fee even though that license fee is valued at roughly $2

3    billion.  And to our knowledge, SeeCubic, Inc. does not have $2

4    billion to pay it.  But diverting income and revenue to a

5    different entity certainly compromises their ability to satisfy

6    the likely judgment that's coming against them for their

7    activities to date.

8    Q    Did you hear Mr. Rajan testify in the last hearing that he

9    believed that SCBV is essentially -- that SeeCubic, Inc. is

10   bloating the expenses in the subsidiaries by $650,000 a month,

11   basically to have excess employees to work on SeeCubic Inc.

12   projects as opposed to the four or five employees that would be

13   needed to -- that he would believe would be necessary to work

14   on the Stream TV projects?

15   A    I -- I heard the testimony and have my own opinion.

16   Q    What is your opinion?

17             THE COURT:  Whoa --

18             MR. COLBY:  Objection.

19             THE COURT:  -- whoa, whoa, objection.

20             MR. COLBY:  He can ask the question if he heard the

21   testimony.  I was preparing to object to the next question.

22             THE COURT:  Which is?  What was the next question?

23             MR. COLBY:  I'm just waiting.

24             MR. KODOSKY:  What is your opinion.

25             MR. COLBY:  But I believe the question was --

```
 1              THE COURT:  About what?

 2              MR. COLBY:  -- what is your opinion about that.

 3              MR. KODOSKY:  The number of employees that SCBV

 4   needs, whether it's to be involved with Rembrandt associated or

 5   affiliated projects or SeeCubic Inc projects.

 6              MR. COLBY:  So Mr. Michaels has no factual basis

 7   whatsoever to be testifying about the work that's happening at

 8   SeeCubic BV or SeeCubic Inc.  He may have an opinion about

 9   whatever Rembrandt work is happening, if there is any, but

10   should not be permitted to testify as to his opinion as to

11   staffing levels in a company he has no involvement with.

12              THE COURT:  Counsel?

13              MR. KODOSKY:  All Stream work, Your Honor, is

14   Rembrandt work.

15              THE COURT:  Well, that's all fine and well, but what

16   knowledge does Mr. Micheals has of the operations of SC BV?

17              MR. KODOSKY:  If the question is whether or not four

18   or five key employees over the Netherlands versus the 30 or 40

19   that SeeCubic is using to bloat the expenses over there.

20              THE COURT:  How would he know?

21              MR. KODOSKY:  That's what I was hoping to ask him.

22              THE COURT:  No, you didn't ask -- okay.

23              MR. KODOSKY:  He said that he's got an opinion on it.

24              THE COURT:  So what?  I can have an opinion on it

25   too.  That doesn't mean anything.  No offense, Mr. Kodosky.
```

```
 1    I'm not trying to be flippant.  But you have to establish some

 2    basis as to how he would know, one, how many employees are

 3    necessary, how many projects, what's his basis for that?

 4    Presumably, he was involved in some develop -- I don't know why

 5    he would know that.

 6              MR. COLBY:  What work is being done.

 7              THE COURT:  Wait a minute.

 8              MR. COLBY:  Oh, sorry.

 9              THE COURT:  No, I said one, he would have to know how

10    many employees for a -- what type of contract.  How many is

11    involved.  The basis for his knowledge.  And that, you know,

12    based on his involvement in other projects, this is -- he can

13    tell me that.  That doesn't necessarily mean it's bloated.  But

14    he can tell me what he thinks is a good number, but he has to

15    tell me how he would know that, just in general.

16              MR. KODOSKY:  I believe he said that he was here at

17    the last hearing.

18              THE COURT:  I get he can hear whatever he wants.  My

19    question is what is his personal knowledge as to why.  If he

20    says I have been involved in projects developing whatever

21    they're developing, and typically you need ten employees to do

22    this type of work.  Then that's his opinion as to how many

23    employees are needed for that type of work.  Then you can tie

24    it up later, but you've got to tell me how he would even know

25    that.  Not necessary even related to SC BV.
```

```
1              MR. COLBY:  That's my -- yeah.

2              THE COURT:  Just to how many -- you know, we've --

3    I've been involved in a project for Rembrandt when they were

4    developing the glasses, I don't know.  And you have -- in that

5    project, we were doing proof of concepts for this dollar

6    amount, and we had X amount of engineers or this amount of

7    employees, and then you could somehow relate that.  But he just

8    can't say I think I heard somebody say.

9              MR. COLBY:  Even, Your Honor, even I would still

10   maintain that the objection goes beyond that.  Even if Mr.

11   Michaels were to testify in my past experience at Rembrandt, we

12   did this type of work and we did this many people, if he's --

13   he can't, by definition, because he doesn't know -- opine on

14   the staffing levels at SeeCubic BV.  And so if he can't do

15   that, who cares, frankly what they're --

16             THE COURT:  Well, he can if they're similar --

17   similar projects.

18             MR. COLBY:  But he doesn't know if it's similar

19   projects.

20             THE COURT:  Well, that's not --

21             MR. COLBY:  So like there's no way --

22             THE COURT:  Well, you haven't asked -- you haven't

23   asked him what he knows.

24             MR. COLBY:  -- no way to connect it over so it's --

25             THE COURT:  I don't know what the point is.
```

```
 1          MR. COLBY:  -- it's by definition not relevant is
 2   what I was getting to.
 3          THE COURT:  But you don't know because he hasn't
 4   asked him what he knows and how he knows, other than he heard
 5   Mr. Rajan say it.  That's the point.  The point is you can't
 6   just because you heard somebody say, say I think this.  You
 7   have to say based on my own knowledge -- this is how we staffed
 8   it.  Based on my knowledge, this is what they're doing because
 9   Mr. Stastney has testified to what these projects are and who
10   they're for.  He may say based on my experience, we did this
11   based on what I heard Mr. Stastney say, I think this.  But you
12   got to give me something other than he heard somebody say.
13          MR. KODOSKY:  Actually, Mr. Stastney refused to tell
14   us who their projects were for.
15          THE COURT:  Doesn't care what he told you who it was
16   for.  He told you what they were doing.  But that doesn't
17   matter.  You still have to establish how Mr. Micheals would
18   know what is proper staffing.
19   BY MR. KODOSKY:
20   Q    What personal knowledge, Mr. Micheals, do you have
21   regarding proper staffing levels at SC BV?
22   A    My -- I used to be CEO of New Pics, LLC (phonetic).  We
23   received roughly four million dollars in New York State Energy
24   Research Development grants.  We built our displays from
25   scratch.  We built all of our own production equipment.  We
```

 1  built those displays with the head of the company, the founder,

 2  Chad Mower (phonetic).  And he had a technical assistant, and I

 3  would go over every once in a while, to assist.  But we were

 4  able to build the world's largest plasma address liquid crystal

 5  display at the time with two full time people and me helping

 6  out every once in a while.

 7  Q    Tell us how that relates to SC BV?

 8          MR. COLBY:  I object.

 9          THE WITNESS:  The --

10          THE COURT:  Well, woah.  He's objecting.

11          MR. COLBY:  Yeah, I object.  There again, we've

12  gotten very far from what's supposed to be the core issue of

13  this TRO hearing.  Mr. Michaels' view on staffing levels have

14  nothing to do with whether or not there's some threat to the

15  Phillips license or whether or not there are adequate

16  protections around trade secrets.  We are so far afield right

17  now, and we just need to focus on the issues the Court

18  identified and move on.

19          THE COURT:  All right, Mr. Kodosky, he's objecting on

20  the basis of relevance.  How is this relevant to me deciding

21  whether I'm going to issue a preliminary injunction?

22          MR. KODOSKY:  I have nothing further, Your Honor.

23  We'll reserve for rebuttal.

24          THE COURT:  All right.

25          MR. KODOSKY:  Thank you.

```
 1              THE COURT:  All right.  For redirect, okay.

 2              Mr. Colby, you got about -- I'm going to -- what is

 3   the motion?  What do they say?  Okay.  Of course, they say

 4   whatever I want.

 5              MR. COLBY:  It's nice to be the judge.

 6              THE COURT:  Yeah.  Three dollars will get me a cup of

 7   coffee.

 8              All right.  Go ahead.

 9                         CROSS-EXAMINATION

10   BY MR. COLBY:

11   Q    Mr. Michaels, you described earlier today a process when

12   you examined the Stream TV technology.  Do you recall that

13   testimony?

14   A    Yes.

15   Q    That was in 2019, correct?

16   A    It would have -- that would have been in 2017, '18, '19.

17   We've done so again in '20, '21, and '22.  I don't know that --

18   again, I think early 2023, we've looked at various aspects of

19   the Stream TVs.

20   Q    Okay.  You've not conducted that type of examination of

21   any technology that's being used by SeeCubic BV in 2023,

22   correct?

23              MR. KODOSKY:  Object.  Misstates his testimony.  He

24   said that some of it was in 2023.

25              MR. COLBY:  He said 2022.  I'm asking --
```

1       THE COURT:  He said early 2023.

2       THE WITNESS:  In '23.

3  BY MR. COLBY:

4  Q    Okay.  So but the units that you examined, those came from

5  who?  From Stream TV?

6  A    Yes, and more accurately, people they sold TVs to supply

7  some of those TVs for Rembrandt.

8  Q    Okay.  And the units that are being used by the folks at

9  SeeCubic BV in 2023, you've not examined those in 2023,

10 correct?

11 A    I have not.

12 Q    So you're not in a position to testify about what trade

13 secret protections are in place on the technology that's being

14 used by SeeCubic BV in 2023, correct?

15 A    Our understanding -- that, I don't believe, is correct.

16 And our understanding comes from SeeCubic's position in the

17 Delaware litigation.  Part of the unknown, and that we would

18 find out in discovery very early, is whether or not SeeCubic

19 has been making anything.

20      One of the issues that was raised by both parties is

21 whether or not everything that SeeCubic has been providing or

22 offering for sale was provided by Stream, which would mean that

23 it was licensed and therefore, they would not be liable for

24 patent infringement and for trade secret misappropriation for

25 offers to sell or sales of those TVs.  If you are representing

1    to us that SeeCubic is --

2           THE COURT:  Wait a minute.  That's enough.  That's

3    enough.  That's enough.  That's enough.

4    BY MR. COLBY:

5    Q    Mr. Micheals, I'm simply asking whether or not you've

6    conducted that type of examination on the units that are being

7    used by SeeCubic BV in 2023.  I think the answer was no,

8    correct?

9    A    I have not conducted that in -- that -- I'm not aware that

10   SeeCubic has made anything.  And so my understanding is that

11   they were largely selling or entirely selling products made by

12   Stream TV.  If SeeCubic is actually making product, I

13   appreciate that information.  That will be helpful.

14   Q    I'm asking about --

15   A    But right now --

16           THE COURT:  So he said no because they haven't

17   produced any.

18   BY MR. COLBY:

19   Q    Right.  I'm asking about SeeCubic BV.

20   A    I understand.

21   Q    Okay.

22   A    Oh, SeeCubic BV.

23   Q    Yes.

24   A    I -- SeeCubic BV, my understanding is that their efforts

25   were incorporated into the TVs sold by Stream TV.  So yes, I

1  believe I have reviewed what they have been preparing to my

2  knowledge today.

3  Q    And to the extent that that's true, the last time that you

4  conducted that exam -- that type of examination was in early

5  2023?

6  A    Yes.  I'd have to look at the -- it was about the time

7  that we -- I sent the email to Ian Lifton (phonetic) and then

8  shortly thereafter, we had accessed additional units to review.

9  Q    And Mr. Micheals, you -- the proof-of-concept projects

10 that have been talked about in this hearing, you have not had

11 any opportunity to examine the technology that is -- I'm sorry.

12 Let me start that over again.  The proof-of-concept projects,

13 you're not involved in those, correct?

14 A    I am not personally involved in those projects, no.

15 Q    You're not an employee of SeeCubic BV?

16 A    I am not an employee of SeeCubic BV.

17 Q    You're not a principal of SeeCubic BV?

18 A    I am not.

19 Q    You've not been a party to any conversations that SeeCubic

20 BV may have had with the counterparties to those proof-of-

21 concept projects?

22 A    Only in the respect of our communications with the

23 independent director.

24 Q    Right.

25 A    And I should add, Mathu Rajan and Bud Robertson (phonetic)

1  to the extent they had knowledge and were involved in those

2  conversations.

3  Q    Right.  You personally -- you personally haven't been

4  involved in those conversations, correct?  With the

5  counterparties on these proof-of-concept projects, right?

6  A    With the counterparty, no.  Not -- I haven't directly

7  spoken to any of the counterparties.

8  Q    The units that you examined in early 2023, do you know

9  when they were manufactured?

10 A    I do not, but it is -- I don't know the exact date of

11 manufacture.  But I believe that it was prior to the omnibus

12 agreement being signed.

13 Q    Okay.  So prior to 2020 or earlier?

14 A    Yes.

15 Q    So you've not examined any of the devices that have been

16 manufactured, if any, at SeeCubic BV since 2020?

17 A    Not that I'm aware of, no.

18 Q    Mr. Micheals, you don't know whether or not the projects

19 that are currently being worked on at SeeCubic BV, you don't

20 know whether or not those use any Rembrandt technology,

21 correct?

22 A    I'm not sure I follow exactly the negatives in your

23 question.  It is our understanding that those projects are

24 incorporating Rembrandt technology and Phillips technology.

25 Q    You're not involved in those projects, correct?

1  A    I am not directly talking to the third parties, and I am

2  not an employee or officer of SC BV.  Those are the questions

3  you asked me.  But I'm -- I've been provided information about

4  those projects, and I've heard testimony about those projects

5  by Shadron Stastney.  So I -- so our understanding, giving you

6  my best understanding, is that it includes our technology.

7  Q    Right.  Your understanding is based upon what you've heard

8  here in this courtroom?

9  A    It's based on conversations with people that have examined

10  those products.  It's based on what -- we included pictures in

11  our Delaware complaint of what SeeCubic was offering.  It's

12  part of the evidence.  It's based on what SeeCubic has put on

13  its own website.  I mean, there's -- there's a very large

14  complaint with a large number of exhibits in the Delaware

15  complaint that was filed back in March that details our basis

16  for bringing that case and making those allegations.  And I can

17  go on at length, but we have beliefs and understanding that

18  that tech -- those projects include our technology.

19  Q    Right.  I guess I'm asking a more precise question.  Given

20  that you have no first-hand involvement in those projects, you

21  don't know whether or not they rely on any Rembrandt

22  technology.  You don't know that first-hand, correct?

23  A    I don't agree with that statement.

24  Q    You do agree with the statement that you don't have any

25  involvement in those -- any first-hand involvement in those

1   projects, correct?

2   A    I do.

3   Q    Mr. Michaels, you've not been party to any conversations

4   between SeeCubic Inc and Phillips, correct?

5   A    I have not been on the phone when SeeCubic has spoken to

6   Phillips.  That is correct.

7   Q    And you have no first-hand involvement in the current --

8   you have no first-hand involvement in the current security

9   arrangements around trade secrets in IP at SeeCubic BV,

10  correct?

11  A    I'm -- you need to repeat -- I didn't follow that, I'm

12  sorry.  I'm not --

13  Q    Sure.

14  A    Just not understanding what you --

15  Q    Sure.  You don't work at SeeCubic BV, correct?

16  A    I do not work at SeeCubic BV.

17  Q    Right.  So you're not involved in -- you have no first-

18  hand involvement in whatever protections SeeCubic BV currently

19  has around trade secrets and IP, correct?

20  A    I do not.

21        MR. COLBY:  Just one minute, Your Honor.

22        THE COURT:  Uh-huh.

23        MR. COLBY:  I don't have any other questions at this

24  time, Your Honor.

25        Mr. Caponi may.

```
 1                        CROSS-EXAMINATION
 2   BY MR. CAPONI:
 3   Q    Good afternoon, Mr. Micheals.  Steve Caponi from K&L
 4   Gates.  How are you?
 5   A    Good.
 6   Q    Good.  So you were involved with the New York litigation
 7   we've been discussing today, correct?
 8   A    Yes.
 9   Q    And you participated in the mediation, correct?
10   A    Yes.
11   Q    And the mediation when the mediation concluded, did not
12   result in a settlement, correct?
13   A    Incorrect.
14   Q    You filed a motion with the magistrate arguing that a
15   settlement had been reached and the magistrate rejected that
16   argument, correct?
17   A    Incorrect.
18   Q    Are you aware that the magistrate issued a written
19   decision rejecting the notion that the mediation had resulted
20   in a settlement?
21   A    I am aware that the magistrate provided a writing.  It was
22   not a decision and it held that there were two types of
23   potential agreement, a phase 1 or a phase 2.  And then she
24   recommended that the action be taken to the district court to
25   litigate further and have a hearing as to whether or not it was
```

1  a phase 1 agreement.  And as part of that, the -- we were

2  proceeding down that path when the bankruptcy case was filed.

3  We notified the court to stay the proceedings to continue the

4  case.  We were then proceeded to -- when the bankruptcy was

5  dismissed, we then proceeded to reenter mediation and

6  settlement discussions that resulted in the settlement

7  agreement that we have today.

8  Q    When was the mediation?

9  A    We started our mediation in 2018 and had numerous sessions

10 related to settlement and mediation, many of them outside the

11 presence of --

12 Q    Mr. Micheals, I appreciate that.  My question was more

13 direct.  What year was the mediation?

14          MR. ZAHRALDDIN:  Objection, Your Honor.

15          THE COURT:  Which mediation?  He said --

16          MR. CAPONI:  The mediation in New York.

17          THE COURT:  He said they'd started in whatever and

18 then it was stayed and then they started after the bankruptcy.

19          MR. CAPONI:  I'm getting there.

20 BY MR. CAPONI:

21 Q    When did the mediation in New York start, Mr. Michaels?

22 A    It started in 2018.

23 Q    And when did the magistrate issue a writing, as you call

24 it, saying that a settlement agreement had not been reached?

25 A    I'd have to look back.  I think it was 2020-ish.  Because

1   it had come out -- or maybe it was 2021, because we were

2   actively working on our response and preparing for the hearing

3   when Stream filed for bankruptcy in the first instance.

4   Q    And it's your testimony that the magistrate found that

5   there was a possibility that a settlement had been reached and

6   you just needed further proceedings in front of the district

7   court?

8   A    It is our -- I mean, it says what it says.  I mean, it's

9   right in the record.  I'm not trying to -- I would rather not

10  even characterize it.  But it is certainly not true that she

11  made a decision.  She didn't have the power to do what you're

12  proposing.  But it -- she provided a writing that is on the

13  record that can be reviewed.  We talked about how we're getting

14  far afield.  I -- there is a written settlement agreement that

15  the parties reached.

16  Q    Excuse me, Mr. Micheals, I'm not asking you to --

17           THE COURT:  All right, woah, woah, woah, woah.

18           MR. KODOSKY:  Objection, Your Honor.

19           MR. ZAHRALDDIN:  Objection, Your Honor.

20           THE COURT:  Woah, woah, listen.  I get it.  She wrote

21  an opinion.  It says what it says.  He has his interpretation.

22  She's a magistrate.  They only have so much power.

23           MR. CAPONI:  Okay.  One more question, Your Honor.

24           THE COURT:  They only have so much power.

25  BY MR. CAPONI:

1    Q    Mr. Michaels, that magistrate that you said had no

2    authority to determine whether there had been a settlement,

3    that was the magistrate who oversaw the mediation, correct?

4    A    It was Magistrate Parker, yes, Katharine Parker.

5    Q    So to answer my question, the judicial officer in front of

6    whom you mediated was the magistrate that issued that opinion,

7    correct?

8    A    Yes.

9    Q    Thank you.

10            MR. ZAHRALDDIN:  Objection, Your Honor.

11            THE COURT:  What basis?  It's -- look.  I'm not -- I

12    don't know what this --

13            MR. ZAHRALDDIN:  Mischaracterizing the witness's

14    testimony.

15            THE COURT:  It is what it is.

16            MR. ZAHRALDDIN:  He restated it and said, oh, it's an

17    opinion.

18            THE COURT:  The magistrate -- listen.

19            MR. ZAHRALDDIN:  It's a typical gotcha maneuver.

20            THE COURT:  The magistrate said what they said.  The

21    ultimate determination belongs with a different court.  I'm not

22    an idiot and I wish you guys would stop it.  The magistrate --

23    the same way there are certain things that I can make a final

24    determination on and there's certain things I cannot.  I could

25    issue whatever I want on matters that I do not have the

```
 1  authority to make a final determination.  I issue.  I say what
 2  I say.  I send it to the district court.  The district court
 3  makes the final determination.
 4          So I can say whatever I want to say on matters that I
 5  do not have the authority to make a final decision and I am in
 6  basically the same role on certain things as the magistrate
 7  judge.  So I don't know what you guys are wasting your time
 8  for.  The magistrate can say whatever he or she wanted.  Is
 9  there a ruling by the district court, otherwise, I don't want
10  to hear it.
11          You guys can fight, put it in the record, it doesn't
12  matter to me what is what.  Okay.  And I don't know what this
13  has to do with anything, and I don't know why you even -- I
14  mean, why he's even talking about that.  It is what it is.
15          So Mr. -- you want to follow up, Mr. Caponi?
16          MR. CAPONI:  Yes, Your Honor.
17          THE COURT:  Because you want to tell me the district
18  court?
19          MR. CAPONI:  Just to tie the bow on it.
20  BY MR. CAPONI:
21  Q   Mr. Michaels, the district court adopted and approved the
22  magistrate's writing, as you refer to it, correct?
23  A   I don't remember.  I mean, it's in the record.  We reached
24  a settlement agreement.  None of this is -- I don't --
25  Q   Mr. Micheals, that wasn't my question.
```

```
 1              THE COURT:  All right, so.

 2              MR. KODOSKY:  Objection, Your Honor.

 3              THE COURT:  So he said he doesn't remember.  Somebody

 4    want to tell me, was the report -- because it would have

 5    been --

 6              MR. CAPONI:  Yes, Your Honor.  We'll give it to Your

 7    Honor.

 8              THE COURT:  Yeah.  Resubmit it.

 9              MR. CAPONI:  The magistrate's report was affirmed by

10    the court.

11              THE COURT:  A report and -- I would have done a

12    report and recommendation.  My report and recommendation don't

13    mean anything because the district court tells me they go and

14    got it.

15              MR. CAPONI:  Your Honor, I will submit it to you.

16              THE COURT:  Right.  And somebody gives me -- because

17    he said they resumed mediation.  I don't know how you -- I

18    don't know.

19              MR. CAPONI:  You'll see it in the record, Your Honor.

20    It's crystal clear.

21              THE COURT:  All right.

22              MR. CAPONI:  Thank you.

23              THE COURT:  And if somebody want to give me the

24    docket, they can give me the docket.

25              Yes, counsel?
```

 1              MR. DEMARCO:  Yes, Your Honor.  Just request that my

 2    client be able to finish the answer to that question.  I

 3    believe he was still talking when there was an interjection --

 4              UNIDENTIFIED SPEAKER:  Interruption.

 5              MR. DEMARCO:  -- between.

 6              THE COURT:  All right.  So his answer was he does not

 7    recall whether the District Court adopted it or not, which does

 8    not necessarily mean it was the end of the litigation.  It

 9    could have meant the District Court sent you guys back to the

10    magistrate.  I don't know.  Somebody give me the dockets.

11              MR. DEMARCO:  That's right.

12              THE COURT:  Okay.  Because I think his testimony is,

13    is that we started a mediation and then the District Court said

14    there wasn't or the magistrate said something.  That was the

15    bankruptcy, then we went back and resumed mediation, which

16    possibly could have happened because unless the District Court

17    dismissed the matters, it would have still been pending.  So

18    somebody give me the dockets.  I don't know what the relevance

19    is.  Can somebody tell me what the relevance is?

20              You brought it up, Mr. Zahralddin.  Your client

21    brought it up.

22              MR. ZAHRALDDIN:  Well, we -- you're right, Your

23    Honor.  So the relevance of the settlement is only the fact

24    that we got to a settlement eventually.  Whether or not --

25    there was determinative -- even if -- let's say -- because I

```
1   haven't looked at the very end of this record in a while.

2   Let's say the settlement was pushed aside.  That doesn't end

3   the litigation.  That means it's open litigation.  All I know

4   is when they approached us --

5            THE COURT:  All right.  Just --

6            MR. ZAHRALDDIN:  -- there was a settlement.

7            THE COURT:  Put the docket in an I will --

8            MR. ZAHRALDDIN:  Yes.

9            THE COURT:  To the extent it's relevant.  I don't

10  know what the relevance is, but put it in.  Put in in.

11           MR. ZAHRALDDIN:  We will do so.  Thank you, Your

12  Honor.

13           THE COURT:  All right.

14           MR. DEMARCO:  I have no further questions, Your

15  Honor.

16           THE COURT:  All right.  Any further for you, Mr.

17  Colby or Ms. Brumme?

18           MR. COLBY:  No, Your Honor.

19           THE COURT:  Okay.  Any redirect?

20           MR. ZAHRALDDIN:  Briefly, I think, Your Honor.

21           THE COURT:  All right.

22           MR. KODOSKY:  Just very briefly, Your Honor.

23           THE COURT:  Okay.  Yes and it has to be limited to

24  what these two gentleman asked, okay?

25           MR. KODOSKY:  Understood.  Thank you, Your Honor.
```

```
1                        REDIRECT EXAMINATION
2    BY MR. KODOSKY:
3    Q    Mr. Michaels, you were asked whether or not you were -- if
4    you had participated in any of the conversations that SeeCubic
5    Inc. has had with Phillips.  Do you recall receiving that
6    question from Mr. Colby?
7    A    Yes.
8    Q    If SeeCubic, Inc., has no license agreement with Phillips,
9    what business or what basis -- or I guess, what potential for
10   harm exists by SeeCubic, Inc., having conversations with
11   Phillips about the license agreement?
12             MR. COLBY:  Objection, Your Honor.
13             THE COURT:  Yes.
14             MR. COLBY:  It's a question about two parties of
15   which Mr. Michaels doesn't belong.
16             MR. KODOSKY:  He asked the original question, Your
17   Honor --
18             MR. COLBY:  He's asking --
19             MR. KODOSKY:  -- as to whether or not he participated
20   in any of those conversations.  And I'm asking if they should
21   even be having those conversations with Phillips, if it's -- if
22   they're not a party to the agreement.
23             MR. COLBY:  He has no first hand knowledge of what
24   those conversations were.
25             MR. KODOSKY:  He asked him the question.
```

```
 1            MR. COLBY:  If --

 2            THE COURT:  Wait.  Woah.  Woah.

 3            MR. COLBY:  -- if any, so how could he render an

 4   opinion on harm that could come from conversations that he's

 5   not a part of, has no idea what they're about?  No idea if they

 6   occurred, when they occurred, who they were with.

 7            THE COURT:  Or if they even occurred.

 8            MR. COLBY:  Or if they even occurred.

 9            MR. KODOSKY:  He asked the question, Your Honor.

10            THE COURT:  I know the question, counsel, was Mr.

11   Michaels, were you party to any conversation between SeeCubic

12   Inc. --

13            MR. KODOSKY:  Yes.

14            THE COURT:  -- and --

15            MR. KODOSKY:  Phillips.

16            THE COURT:  -- Phillips.  Okay.  He said no, so the

17   question is -- okay.  Your question is, should they have been

18   having a conversation.  Based on what?  I'm asking him.

19            MR. COLBY:  Yeah.

20            MR. KODOSKY:  And I'll ask him the same question

21   related to Rembrandt.

22   BY MR. KODOSKY:

23   Q    If Rembrandt was contacted by SeeCubic Inc., regarding the

24   Stream TV license agreement with Rembrandt, would that be

25   appropriate?
```

1          MR. COLBY:  Objection.  It calls for speculation.

2          MR. KODOSKY:  It goes to the harm.  He stood up here

3    30 minutes ago saying we're not showing any harm.

4          THE COURT:  All right, but that's not the point,

5    Mister --

6          MR. KODOSKY:  Kodosky.

7          THE COURT:  -- Kodosky.  The question is, when you

8    get to redirect, you get to ask him questions related to the

9    questions that were asked by the other parties on cross.  The

10   only questions that Mr. Colby had and I'm -- and I apologize.

11   I'm about to forget Mr. Colby's name and I apologize.  Same as

12   Kodosky.  I'm -- it's getting late.  I'm stuttering on names.

13   The only thing that he asked him was what -- with respect to

14   did you examine the Stream TV technology?  He said he did.

15          Did he examine the SCBV units?  No.  And was he able

16   to determine if they were different?  Asked him about the proof

17   of concept projects, the current projects.  Then he asked him,

18   did -- he was party to any conversation with Phillips and then

19   he had firsthand knowledge of any security arrangements between

20   SCBV currently have with respect to the units that are, if any,

21   being produced.  So you can ask him anything with respect to

22   those areas.

23          MR. KODOSKY:  He was -- Your Honor, he was

24   specifically asked whether or not he participated in any of the

25   conversations between SeeCubic, Inc. -- and I've got it written

```
 1   down on my notes and Phillips.

 2            THE COURT:  And he said he wasn't.

 3            MR. COLBY:  So --

 4            MR. KODOSKY:  My answer is no.

 5            MR. COLBY:  And --

 6            MR. KODOSKY:  My question to him is --

 7            THE COURT:  Woah, woah, woah.

 8            MR. KODOSKY:  Let me finish --

 9            THE COURT:  Let him finish, Mr. Colby.

10            MR. KODOSKY:  -- Mr. Colby.  My question to him is,

11   is it appropriate for a nonparty to the license agreement to be

12   having conversations with the licensor?

13            THE COURT:  But the --

14            MR. KODOSKY:  He's a licensor, Rembrandt.

15            THE COURT:   But the assumption is is that they were

16   talking about the license with Phillips and the Stream entities

17   and we have no information about what SeeCubic, Inc., was

18   talking to Phillips about.

19            MR. KODOSKY:  And my only question is, is it even

20   appropriate for a nonparty to be speaking to the licensor about

21   somebody else's license agreement?

22            THE COURT:  But we don't -- be the -- sustained.

23            MR. KODOSKY:  Okay.  Thank you, Your Honor.

24            THE COURT:  Sustained.  Sustained.  Okay.  next

25   question.  That's it?
```

```
 1              MR. KODOSKY:  Thank you, Your Honor.  That's all.

 2              THE COURT:  All right.  Anything else from anybody

 3    with respect to Mr. Michaels?

 4              MR. COLBY:  Not from me, Your Honor.

 5              MR. CAPONI:  Not from me, Your Honor.

 6              THE COURT:  All right.  Mr. DeMarco, do you have any

 7    questions?

 8              MR. DEMARCO:  No, Your Honor.  Just if my client may

 9    be allowed to, I guess, return home to Florida -- his folks.

10              THE COURT:  To do what?

11              MR. DEMARCO:  Just to step down.

12              THE COURT:  Oh, okay.  All right, Mr. Michaels,

13    unless you want to stick around and listen, you are excused.

14    I -- you may --

15              THE WITNESS:  Thank you, Your Honor.

16              THE COURT:  -- you can stay and listen, but not as a

17    witness, just as an observer or as counsel for -- co-counsel

18    for Mister --

19              MR. BLUMENTHAL:  Blumenthal.

20              THE COURT:  I'm sorry.  I was trying to --

21              THE WITNESS:  Understood Your Honor.  I will stick

22    around but I'm going to go stop my video and go on mute.

23              THE COURT:  Okay.  Thank you.  All right.  So does

24    the Debtor rest with respect to its request for a TRO,

25    preliminary injection, rest in its case in chief with the right
```

```
1    to recall, I guess?

2              MR. ZAHRALDDIN:  We do, Your Honor.

3              THE COURT:  All right.  Mr. Colby, it's -- do you

4    want to start with Mr. Stastney or do you want to --

5              MR. COLBY:  So, take our cues from the Court.

6              THE COURT:  Well, how long do you think?

7              MR. COLBY:  Well, I think for a direct, I'm guessing,

8    but 60 to 90 minutes.

9              THE COURT:  Oh, Lord.  Okay.  That will take us to

10   7:00 -- I was prepared to go to 7:30.

11             MR. COLBY:  If we're lucky --

12             THE COURT:  Right.

13             MR. COLBY:  -- it'll take us to 7:30.  There's also a

14   matter we were just hoping to get some clarity on and that is

15   exactly what we'll be doing on Wednesday, so we know whether or

16   not we need to be here or not be here.

17             THE COURT:  Wednesday -- what is on for Wed --

18             UNIDENTIFIED SPEAKER:  Wednesday is the 2019 motion,

19   Your Honor.

20             MR. COLBY:  And so -- sorry.  Before we get into it,

21   I guess I'm asking the Court's preference whether we start with

22   Mr. Stastney, which we're happy to do all the issues are still

23   fresh or whether we talk about what we're doing on Wednesday.

24   I suspect that will eat up a little bit of time.

25             THE COURT:  A lot of time.  It always does.
```

```
 1              MR. COLBY:  The way these things go.

 2              THE COURT:  Well, it would make -- well, do you think

 3    it would make sense to have Mr. Stastney's direct testimony and

 4    then we can have him just come back for cross and then redirect

 5    or would you prefer it to be all on one day?

 6              MR. COLBY:  I think it's generally better when it's

 7    all on one day.

 8              THE COURT:  Okay.  I do, too, but I'm giving you that

 9    option.  So that means that we're not going to start Mr.

10    Stastney and that means we can devote some time to figuring out

11    what will happen on Wednesday.  I will be honest, at this

12    point, my mind is a little -- what are we -- what is listed for

13    Wednesday?  Was Mr. -- is Mr. Parks' on -- application on?

14              UNIDENTIFIED SPEAKER:  No, ma'am.  We moved that to

15    December the 11th.

16              THE COURT:  Okay.  What's on -- that -- everybody's

17    understanding of what's on for the 20 -- for the 29th, right?

18              MR. KODOSKY:  It's simply the 2019 motion.

19              THE COURT:  Which is to --

20              MR. KODOSKY:  The 2019 motion.

21              THE COURT:  -- whether they were required on the 2019

22    whatever to disclose --

23              MR. KODOSKY:  Well, required and obviously, it's

24    continuing disclosure.

25              THE COURT:  All right.
```

```
1              MR. KODOSKY:  Even -- I mean, it's --

2              THE COURT:  That's it?

3              MR. KODOSKY:  That's it.

4              THE COURT:  Do we need just legal argument on that or

5    do we need some evidence?

6              MR. CAPONI:  Your Honor, so from our perspective, we

7    think it's a legal issue.

8              THE COURT:  That's what I'm thinking.

9              MR. ZAHRALDDIN:  It's my motion.

10             MR. CAPONI:  But it's the Debtor's motion.

11             MR. ZAHRALDDIN:  It's my motion, so you know --

12             MR. CAPONI:  As I said before, the Debtor is the

13   conductor of their own symphony.

14             MR. ZAHRALDDIN:  -- I would, except for someone who

15   keeps trying to take it over, so --

16             THE COURT:  All right.  Listen.  All right, guys.

17   I'm the only one that can be snarky.

18             MR. ZAHRALDDIN:  I'm not trying to be snarky.  I'm

19   stating a fact.  You asked me and then Mr. Caponi had to answer

20   instead.

21             THE COURT:  All right.

22             MR. CAPONI:  Sorry.  I thought you pointed at me.  I

23   didn't mean to jump in.

24             THE COURT:  Okay.  all right.  I'm the only one that

25   gets to jump in.  So Mr. --
```

```
1            MR. ZAHRALDDIN:  Your Honor --

2            THE COURT:  -- Zahralddin.

3            MR. ZAHRALDDIN:  -- I think that --

4            THE COURT:  You believe --

5            MR. ZAHRALDDIN:  -- only Mr. Rajan would be a witness

6  on Wednesday.

7            THE COURT:  About what?

8            MR. ZAHRALDDIN:  Well, Mr. Rajan has the knowledge

9  about the various parties.  In their responses, the opponents

10 to the motion indicated that we were trying to get information

11 that we already know about, et cetera.  I don't believe that's

12 the case.  I believe that it doesn't matter what was given in a

13 prior proceeding.  2019 is an ongoing and temporal disclosure

14 requirement.  It can happen at any time and it really just

15 comes from whether or not a parties (sic) were acting in

16 concert.

17           The only thing that's relevant prior to this, I think

18 has already been put into the record.  You know about the

19 omnibus agreement.  You know about the continuing lack of

20 compliance with post remand injunctions.  So the only thing

21 that we would need to put forward is what's happened here as

22 well as the -- we -- I guess we have documents or we have

23 discussions of documents in the prior proceedings in Chancery

24 Court, but we've never seen those and they have not been

25 produced here, which is the important issue.
```

1          So if Your Honor believes we don't need an

2    evidentiary hearing --

3          THE COURT:  Counsel, I don't beli -- I don't tell

4    people how to run their cases.  I just thought the issue was

5    who was subject to the rule.

6          MR. ZAHRALDDIN:  Yes.

7          THE COURT:  And you believe that the response, which

8    I have not looked at -- I'll look at tonight or tomorrow,

9    probably tomorrow and research whatever I need to do.

10   Hopefully not all night long.  And hopefully my staff won't

11   be -- my law, my two law -- well, my law clerks will not have

12   to spend their night, either, looking at, you know, trying to

13   figure this out and we'll have discussions about what is the

14   issue.  But you believe that on the 2019 C, that the

15   information should be disclosed because --

16         MR. ZAHRALDDIN:  The parties were acting in concert.

17         THE COURT:  What parties were acting in concert?

18         MR. ZAHRALDDIN:  Hawk, SeeCubic.  I think about -- I

19   believe it's 50 some odd shareholders that were subject to the

20   omnibus agreement, whoever these eight or nine or other people

21   that Mr. Caponi has mentioned in court, Mr. Morton (phonetic),

22   Albany (phonetic).  They have filed concerted actions.  They

23   filed the motion to dismiss together.  They filed the motion

24   for a trustee together and all of that --

25         THE COURT:  So you believe disclosures by groups,

1    committees and entities.  And you believe that the -- either

2    the group -- well, we know they're not a committee.  They're

3    either groups or entities who are required to disclose a

4    verified statement setting forth the information in paragraph

5    C, which you know, just the information portion.

6              MR. ZAHRALDDIN:  Yes, Your Honor.

7              THE COURT:  Okay.  And that you believe that really

8    what I have to determine is whether these groups of creditors,

9    parties, whatever we're calling them, fit the definition of

10   group or entities who are required to comply --

11             MR. ZAHRALDDIN:  Yes.

12             THE COURT:  -- with the 2019 --

13             MR. ZAHRALDDIN:  An entity is a definition broader

14   than a person.

15             THE COURT:  Right.  I know.  Okay.

16             MR. ZAHRALDDIN:  And it's in the bankruptcy code and

17   it encompasses all kinds of things.

18             THE COURT:  So -- and the response was we're not

19   required to comply because we don't meet these definitions.

20             MR. ZAHRALDDIN:  And they said they had individual

21   counsel, et cetera, but that's not the test, so we will look at

22   that on Wednesday.

23             THE COURT:  All right.  Okay.  But isn't that just a

24   legal issue as to what does that mean, who is required to be --

25   to comply with 2019?  I guess if I made a finding as to what

1  that means, I would then have to apply that legal definition to

2  the various entities who the Debtor has asserted must comply.

3          MR. ZAHRALDDIN:  And any actions --

4          THE COURT:  And then I will need some evidence of who

5  these people are, unless you stipulate that -- who they are.

6  Not their relationship, but you believe that these are the

7  various persons, who you believe it applies to and why you

8  believe.  And Mr. Caponi says these are the various people, but

9  I don't think it applies.  We all agree that who the various

10 people, person entities groups are?

11         MR. ZAHRALDDIN:  Well, some have not been disclosed,

12 other than on the record, we've heard hints of things.

13         THE COURT:  Okay.

14         MR. ZAHRALDDIN:  And we have stuff that's been put

15 into the record in the Chancery Court.

16         THE COURT:  All right.

17         MR. ZAHRALDDIN:  But you know, if --

18         THE COURT:  So I'm going to need some evidence

19 because even if I conclude that this is what it means, I still

20 have to say, do these people constitute a group, do they

21 constitute an entity and how?  I can -- so if I have a legal

22 argument, that's great, but I need to apply the legal argument

23 to the facts of the matter.

24         MR. ZAHRALDDIN:  And it would be things that are

25 occurring -- that occurred now and before and they're all

```
1    judicial actions --

2              THE COURT:  So you can --

3              MR. ZAHRALDDIN:  -- whether contract --

4              THE COURT:  So can you guys stipulate to that or --

5              MR. ZAHRALDDIN:  I would love to do that and just do

6    argument.  We can stipulate that the omnibus agreement exists.

7    We can stipulate that the side letter agreement exists.

8              THE COURT:  What you do -- this is what you do.  You

9    can talk to Mr. Caponi.  You guys can stipulate to the facts.

10   I'm not telling you you have to.  And then you just come in,

11   you say this is what this means and this is why it doesn't

12   agree, it doesn't apply in these facts or you can't agree and

13   you bring somebody who has to tell me who the groups are, the

14   entities are and then make your legal arguments and I have to

15   figure out do these groups, entities, not committees, are they

16   subject to the 2019.  So you guys can either agree to all these

17   things or you can make a record.

18             MR. ZAHRALDDIN:  Yes, ma'am.

19             THE COURT:  So that's what I expect.  And what time

20   is this scheduled for on Wednesday?

21             UNIDENTIFIED SPEAKER:  Oh, I think it's --

22             MR. ZAHRALDDIN:  11:30, I think.

23             THE COURT:  We have an 11:30 list?

24             THE CLERK:  It's Number 3 on the 11:30 list.

25             THE COURT:  How many we have on the 11:30 list?
```

```
 1                THE CLERK:  Three.

 2                THE COURT:  Oh, okay.  Show up at 12:00.

 3                MR. ZAHRALDDIN:  Okay.

 4                THE COURT:  Who else we have?  Back up.  Let me see

 5      who we have before --

 6                THE CLERK:  Number two is something settled, stipped

 7      to be filed.

 8                THE COURT:  Okay.  And then number one.

 9                THE CLERK:  And number one --

10                THE COURT:  Settled --

11                THE CLERK:  Number one is a confirmation hearing for

12      like a chapter 11 investment, 1982 Investment, LLC.

13                THE COURT:  And did they file a report of planned

14      voting?  Because if they didn't, I don't think I'm having a

15      confirmation hearing.  That could take a while.

16                THE CLERK:  Yeah.  October 13.  Wait.  Hold on.

17                THE COURT:  I have to -- I'm -- I just don't want you

18      guys to come here.  And sit and have to wait and Wednesdays

19      tend to be on 11:30 I never know what I'm going to get.  We

20      have two matters before you.  One is resolved.  Right?

21                THE CLERK:  Correct.

22                THE COURT:  And the second one is a confirmation

23      hearing?

24                THE CLERK:  Yeah.  I just want to get on to the

25      actual docket.
```

1                    THE COURT:  Right.  If they don't have a report of

2      plan voting, I'm not having confirmation hearings --

3                    THE CLERK:  I see it.  It's a Chapter 11.

4                    THE COURT:  -- then you guys might as well show up at

5      11:30.

6                    THE CLERK:  October 13th.  Report of planned voting

7      filed on October 13th.

8                    THE COURT:  Oh, yeah.  Well, I guess I'm having a

9      hearing.  12:30.  Show up at 12:30.

10                   MR. ZAHRALDDIN:  Okay.

11                   THE COURT:  That shouldn't take -- unless did we file

12     any objections to confirmation you see on the docket?  No?

13                   THE CLERK:  Looking for objections, no.

14                   THE COURT:  Yeah.  No objections.  Might be just a 20

15     minute proposition where they go through and give me the report

16     of planned voting, say everybody voted in favor and then we --

17                   THE CLERK:  Because at one point, there was a motion

18     to convert it, but that got withdrawn.

19                   THE COURT:  Right.  I still haven't gotten -- been

20     able to get on here.  Okay.  12:00, guys.  Just show up at

21     12:00.

22                   UNIDENTIFIED SPEAKER:  Okay.

23                   THE COURT:  That should give them a half an hour

24     to -- because I don't see an objection and then usually they

25     just make a proffer and I'm done in 15 minutes.

1          MR. ZAHRALDDIN:  So we're going to start at 12:00,

2  start with whatever witnesses and evidence gets put in and then

3  whenever that's in, argument.

4          THE COURT:  Yes.  And hopefully that's not going to

5  take too long.

6          MR. ZAHRALDDIN:  Well, I'm hopeful we can stipulate

7  the things that are in the record below.  There won't be that

8  many of them.

9          THE COURT:  Right.  Here are the groups.  Here are

10 the people and here's the other people.

11         MR. CAPONI:  I mean, look, I'd like to, Your Honor,

12 but I'm not optimistic, given -- what I just heard was there's

13 eight unidentified people.  I mean, Debtor doesn't -- can't

14 identify the people.  I think that's going to require evidence.

15         MR. ZAHRALDDIN:  That's the point of disclosure, Your

16 Honor.  Mr. Caponi maybe he needs to understand that, but when

17 he raises the issue --

18         THE COURT:  Oh, come on now.  Come on, guys.

19         MR. ZAHRALDDIN:  I'm just saying, Your Honor --

20         MR. CAPONI:  I don't understand the law, Your Honor.

21         MR. ZAHRALDDIN:  Your Honor, he's telling me that I

22 can't identify the people, he hasn't identified, potentially is

23 required to identify.  I don't understand that circular

24 argument.

25         THE COURT:  All right.  So your position is, there

1   were some people who have been identified and others who should

2   have been, but have not been because they didn't comply with

3   the rules.  And you're going to put on evidence that there was

4   a mention of this person, that person, that person, and we

5   believe these people are covered by the rules and should have

6   been disclosed.  By who, I don't know because if they're not --

7            MR. ZAHRALDDIN:  Well, Your Honor, part of the issue

8   is we're going to have certain lists of people that were in the

9   Chancery Court that were revealed there.  And then we have

10  heard here from Mr. Caponi and others of other people, mostly

11  equity holders that are sitting behind SeeCubic, behind perhaps

12  Albany or Hawk.  Albany is the trustee for Hawk.

13           THE COURT:  Okay.

14           MR. ZAHRALDDIN:  And what we're going to ask is, did

15  these people disappear?

16           THE COURT:  Is Hawk some people in Ca -- where --

17  Hawk is in Canada?

18           MR. ZAHRALDDIN:  Hawk is in the Channel Islands.

19           THE COURT:  Who is it?

20           MR. ZAHRALDDIN:  Hawk is the second lien creditor we

21  believe --

22           THE COURT:  Oh, I know they are --

23           MR. ZAHRALDDIN:  -- has been converted.

24           THE COURT:  -- but I'm like, enlighten me, because

25  Channel Islands is not coming --

1           MR. CAPONI:  Off of England.

2           THE COURT:  Off of -- okay.  So they're the

3   British -- no, not the British, but --

4           MR. CAPONI:  Yes.

5           THE COURT:  Is there somebody in Canada?

6           MR. ZAHRALDDIN:  Not that we know of --

7           THE COURT:  Oh, well then it was Britain.

8           MR. ZAHRALDDIN:  -- but we could be surprised.

9           THE COURT:  I don't know.  I thought -- I knew it was

10  another country.  I was opting for Canada.

11          MR. ZAHRALDDIN:  We have people in the UK.  We have

12  some folks in the Channel Islands.

13          THE COURT:  I know.  That -- okay.  I get it.  I

14  recall.

15          MR. ZAHRALDDIN:  And look Your Honor, the rule -- and

16  I think the opposing counsel took and/or the parties took

17  umbrage at the fact that there are some pretty strict penalties

18  for not disclosing.  We didn't make up the penalties that are

19  in the rule.  There's some pretty serious penalties in there.

20          THE COURT:  Do I have some option or I have to put --

21  I have to --

22          MR. ZAHRALDDIN:  It does say that in the Court's

23  discretion, here are the things that could happen and of course

24  there's plenty of --

25          THE COURT:  Yes.  But you --

```
1              MR. ZAHRALDDIN:  -- case law that said that --
2              THE COURT:  Unless -- listen --
3              MR. ZAHRALDDIN:  -- there's some -- they're pretty
4    draconian remedies, but you don't have to do that.  There can
5    be other things that can be done.
6              THE COURT:  Right.  Typically, if somebody has a
7    valid legal basis for making an argument, I don't know any
8    court who's going to penalize you, unless you have your
9    argument has no basis whatsoever and it's just off the wall.
10             MR. ZAHRALDDIN:  Well, I'm not talking about fee
11   shifting, Your Honor.  I'm not talking about that.
12             THE COURT:  I'm not saying that.
13             MR. ZAHRALDDIN:  Yeah.
14             THE COURT:  I'm talking about assessing penalties,
15   assessing --
16             MR. ZAHRALDDIN:  Right.  Got you.
17             THE COURT:  -- failure to comply with the rules.  If
18   you have a valid argument -- I don't know how you penalize
19   people, but if you have an argument that has no basis in law,
20   none whatsoever, and you're making it up, then you have a
21   problem.  I'm just saying yes.  Okay.  It provides for it.
22   But, you know --
23             MR. ZAHRALDDIN:  So hopefully we can get to something
24   that's stipulated because everything else is on the record.
25             THE COURT:  If you can agree to these things, but you
```

```
 1   can't agree to the rest and then you put some testimony.  Or
 2   you can't agree to anything.  So, 12:00 on Wednesday.  Is
 3   anybody going to appear by Zoom?  If Mr. Rajan still has the
 4   flu, he's on the zone.
 5             MR. ZAHRALDDIN:  I'll tell him that, Your Honor.
 6             THE COURT:  No -- I had it once.  I'm going to just
 7   tell all of you.  You do not want that.  I had COVID and that.
 8   COVID was a breeze.  This thing, hope.  I think I had to cancel
 9   a hearing, I was so sick.  I have not been that sick in about
10   10 years.  So if he has the flu --
11             MR. ZAHRALDDIN:  Stay home.
12             THE COURT:  Stay home.  Or anybody that has the flu.
13             MR. ZAHRALDDIN:  Right.
14             THE COURT:  I have my shot now.  You can do whatever
15   you want, but you don't want to get --
16             MR. CAPONI:  Yeah.  I don't know, on our side, Your
17   Honor.  Obviously, we're going to have to see what evidence
18   gets put on to decide what our response is going to be, so I'd
19   be --
20             THE COURT:  Would you at least talk to Mr.
21   Zahralddin --
22             MR. CAPONI:  We will.
23             THE COURT:  -- and say --
24             MR. CAPONI:  Absolutely, Your Honor.  I mean --
25             THE COURT:  Who are the people you believe and who
```

```
1   are the people you should have been disclosed and hopefully
2   that'll shrink it, but if not, you'll have to put your -- you
3   know, another day of --
4            MR. CAPONI:  Yeah.  I think it's unlikely to end
5   Wednesday, but, you know, we've -- I'll make good progress.
6            THE COURT:  Jesus.
7            MR. ZAHRALDDIN:  I think it will end Wednesday
8   because I'm a glass half full guy.  I believe we sent over a
9   list of things.  I'll look at it and revise it.
10           MR. ZAHRALDDIN:  I think it would have come over last
11  week, but I'll look at it again and see if I can cut it down --
12           THE COURT:  All right.  So --
13           MR. ZAHRALDDIN:  -- based on the Court's discussion
14  with me and we'll see if we can get therapist.
15           THE COURT:  All right.  In the meantime, you guys
16  have to figure out a time to have Mr. Stastney's testimony and
17  the two Dutch witnesses.
18           MR. ZAHRALDDIN:  And the one California witness.
19           THE COURT:  And the one California witness.  We need
20  all -- is -- two, three day -- guys come on.  Can we like --
21  never mind.  I'm going to give you your day in court, but the
22  more -- you know, I -- are we going to finish this before the
23  end of the year?
24           MR. ZAHRALDDIN:  I hope so, since it's our assets at
25  risk.
```

```
 1              THE COURT:  Well, counsel, they were at risk when you
 2   ca -- never mind.
 3              MR. ZAHRALDDIN:  Well, it --
 4              THE COURT:  It --
 5              MR. ZAHRALDDIN:  -- that doesn't make it any --
 6              MR. CAPONI:  Like any good dance partner, we're
 7   following the Debtor's lead, so we'll end when they -- you're
 8   tired of dancing.
 9              MR. ZAHRALDDIN:  I didn't think it was going to end
10   with a dance with Mr. Caponi.  I have to tell you that.
11              THE COURT:  Well, whatever.  I -- you need to
12   seriously exchange dates with each other --
13              MR. ZAHRALDDIN:  Yeah.
14              THE COURT:  -- about --
15              MR. ZAHRALDDIN:  We're simply waiting, Your Honor.
16   We're -- our witness is actually --
17              MR. CAPONI:  I've asked.
18              MR. ZAHRALDDIN:  -- waiting for them and then they've
19   got to figure out -- I mean, we're on two different time zones,
20   so we'll figure it out.
21              THE COURT:  Just let me know.  I will try to
22   accommodate.  Right now, I looked in my December.  I didn't --
23   am I -- or maybe I was in January or --
24              MR. ZAHRALDDIN:  Not between Christmas and New
25   Year's, I hope.
```

```
 1              THE COURT:  I typically close chambers between
 2   Christmas and New Year's.
 3              MR. ZAHRALDDIN:  I know.  You mentioned that and I
 4   was --
 5              THE COURT:  I guess I won't be this year --
 6              MR. ZAHRALDDIN:  No, no, I was happy to hear that.  I
 7   don't want to be here.
 8              THE COURT:  Because I want to get this done, at lest
 9   some of this case done before the end of the year.  I do plan
10   to be away, I don't know, between January 2nd and the 9th.
11   Otherwise my husband might divorce me.  So I may be a way --
12              MR. ZAHRALDDIN:  I don't want to see you in that
13   condition, if not getting a lunch makes things bad I don't want
14   to do that.
15              THE COURT:  Listen I'm not a big -- I don't like
16   vacations.  This will --a vacation.  So right now the 2nd
17   through the 9th.  And I will know for sure by the end of this
18   week when we'll be away.
19              MR. CAPONI:  Your Honor, we're just -- because the
20   Debtor's have just finished their case and chief on the TRO,
21   we're just getting started.  So I think that proceeding has to
22   run its course.  I think as new proceedings, new issues come
23   up, and we begin hearings on them -- speaking only for myself
24   and without speaking to my client about it first -- we would be
25   amenable to, you know, equitable time limits in order to make
```

1    the parties prioritize on what's important.

2          THE COURT:  That would make sense, and I did not do

3    that.  I typically try not to because I don't want to deprive

4    people of their opportunity to present their case, but right

5    now, we have been going for -- part of it was my -- today was

6    my question, which I should've never asked or commented that

7    took us astray, but we may have to -- I may have to ask the

8    parties for how much time, and say I'm going to strictly

9    enforce the time.  That way we can concentrate, and I will try

10   my best not to ask questions or comments, and then that way we

11   can get through.

12          And hopefully -- because at the end of the day, a lot

13   of this is about Stream and not about Technovative, so I'm not

14   quite sure whether this would -- you know, no matter what

15   happens in the other actions, otherwise -- other than granting

16   a motion to dismiss, would do away with the Stream stuff or

17   appointing a Chapter 11 Trustee.  And that still won't make it

18   go away because then some other body -- another person would

19   have to come and figure out what they want to do.  So I'm not

20   quite sure how this is going to streamline anything for me, but

21   I will do my best to get some of it off and decided so the

22   parties can have a better idea of what they're doing, with

23   respect to Technovative, anyway.

24          MR. CAPONI:  Just one last note.  On Wednesday, I

25   don't know what the Debtor's intents are, what witnesses

1  they'll need, what we may need to respond to.  My understanding

2  is that they have Mr. Stastney on their list.  He's not

3  available in person on Wednesday.  I believe he could testify

4  by Zoom, if his testimony is necessary.  I just don't know

5  whether or not --

6          MR. COLBY:  Well, certainly, we're -- we gave it to

7  him last week.  I know it was a holiday, so I'm not going to

8  hold him to that and I hope you don't either, Your Honor, or

9  me.  I'm happy to see if we even need Mr. Stastney, if he were

10  available, in case we need to call him, because I don't want to

11  be in a situation where they object to --

12          THE COURT:  Well, I mean --

13          MR. COLBY:  -- and I have to find an alternative.

14          THE COURT:  -- the Zoom seems to be working.

15          MR. COLBY:  Right.

16          THE COURT:  It has worked.

17          MR. CAPONI:  And we have no objection to Mr. Stastney

18  appearing by Zoom.

19          THE COURT:  Okay.  And then we'll just give him the

20  Zoom link, and if someone else wants to participate -- I just

21  want people to identify themselves when they're here, because I

22  can't see and support -- and we have had incidences where

23  people have just gone off about observers just not liking what

24  I'm saying or not liking the consequences of what the Debtor --

25  or Debtor's friends, and just being very rude and obnoxious.

```
 1                 MR. COLBY:  I understand.

 2                 THE COURT:  I want to avoid that.  I mean, it could

 3     be in court and do it, too, but at least I can call the

 4     Marshall to come get them.

 5                 So we will start at 12 on Wednesday.  If Mr. Stastney

 6     needs to testify as a witness, he can appear by Zoom.

 7                 Any other witness -- Mr. Rajan (phonetic), if he's

 8     sick, he's Zoom.

 9                 Any other witness?

10                 MR. CAPONI:  I'd have to look, Your Honor, to see,

11     because we -- it was -- I don't know if I have the list.

12                 Was there anybody else we listed, Mr. Shaw?  Do you

13     know?

14                 MR. SHAW:  Eileen, if we need her.

15                 THE COURT:  Oh.  Hi, Eileen.

16                 UNIDENTIFIED SPEAKER:  Hi, Judge.  I'm trying to log

17     in.

18                 THE COURT:  Well, we're getting ready to shut down,

19     so don't worry about it.  I'll call you later about those

20     emergencies.

21                 Oh, wait.  Hold on, Eileen.  Hold on.

22                 You have access to dates that are available in

23     December.  Just give them --

24                 UNIDENTIFIED SPEAKER:  Yep.

25                 THE COURT:  All right.  What --
```

```
 1              UNIDENTIFIED SPEAKER:  Yeah, if you can give me just

 2   two seconds.

 3              THE COURT:  Okay.

 4              UNIDENTIFIED SPEAKER:  I can, hopefully.

 5              MR. CAPONI:  Your Honor, while she's looking for the

 6   dates, just because you mentioned you don't necessarily see

 7   everything that hits the docket, I just wanted to let the Court

 8   know that the district court did deny the motion to withdraw

 9   the reference.  That issue was kind of hanging out there.

10              MR. COLBY:  You saw that already.  I would've thought

11   you'd already seen that, Your Honor.

12              THE COURT:  Oh.

13              MR. COLBY:  Yeah.  She had basically said that the

14   motion to be withdrawn --

15              THE COURT:  Wait, when was it issued?

16              MR. CAPONI:  November 16th.

17              MR. COLBY:  Yeah.

18              THE COURT:  They typically mail me a copy.

19              MR. CAPONI:  It echoed our discussion where it said

20   that if she needs to do a trial, she'll do a trial.

21              THE COURT:  Yeah, after I do the magistrate work.

22              MR. COLBY:  It echoed the thing, so same thing.

23              THE COURT:  That's typically what happens is they're

24   like, you do everything.

25              MR. COLBY:  There are other aspects of it
```

```
 1  highlighted, but Your Honor can read it.

 2          MR. CAPONI:  You can read it, Judge.

 3          THE COURT:  What does she want me to do?

 4          MR. CAPONI:  She didn't -- it's Judge Marsten

 5  (phonetic) and the only highlights are they -- whoever wrote it

 6  adopted most of what Skadden put into their pleadings on the

 7  prior history.  I'm sure that's what they want to talk about.

 8          THE COURT:  Oh, okay.  Well, what am I supposed to do

 9  with that?

10          MR. COLBY:  I don't think anything, Your Honor.

11          MR. CAPONI:  Nothing, Your Honor.  I just wanted to

12  let you know that the decision came down because I know you --

13          MR. COLBY:  Yeah.

14          MR. CAPONI:  -- mentioned you don't always get

15  notified.

16          THE COURT:  No, I don't, and I don't read the

17  documents.  No, I have asked the IT to make this one of their

18  cases.  I can make certain cases where any filings I get notice

19  of.

20          MR. COLBY:  I'm surprised you didn't get it.

21          THE COURT:  And I thought they had already done that,

22  but apparently not yet.

23          We did or you didn't see?  Okay.

24          MR. CAPONI:  Okay.  Okay, so you did see it.  All

25  right.
```

```
1              THE COURT:  Somebody saw it.

2              MR. CAPONI:  All right.

3              THE COURT:  The 16th.  When was that?  And I didn't

4    see it?

5              MR. CAPONI:  Yeah.

6              MR. KODOSKY:  Your Honor, I didn't find out about it

7    until Wednesday of last week, so --

8              THE COURT:  They typically do send us a copy, a

9    courtesy copy, but I don't have a JA, so who knows where my,

10   you know -- I don't know.  All right.

11             MR. CAPONI:  Your Honor, I ask one --

12             UNIDENTIFIED SPEAKER:  It's plugged in.  I'm in now.

13             MR. CAPONI:  All right.

14             THE COURT:  All right.  What do I have available in

15   December?

16             UNIDENTIFIED SPEAKER:  Okay.  I have Monday, December

17   4th.  I don't see anything on your calendar.

18             THE COURT:  Anything personal on the 4th?

19             UNIDENTIFIED SPEAKER:  I don't have anything with --

20   I'm looking at your calendar and I don't see anything there for

21   December 4th.

22             THE COURT:  All right.  I'm good then, the 4th.

23             What else?

24             UNIDENTIFIED SPEAKER:  This next week, we did have

25   something but it got cancelled for the 5th.  It was settled.
```

1   Hold on.  That was Hollis (phonetic).  That was --

2           THE COURT:  So that would be the -- so we would have

3   all day on the 4th?

4           UNIDENTIFIED SPEAKER:  Um-hum.

5           THE COURT:  A half a day on the 5th, because I would

6   hear my regular list?

7           UNIDENTIFIED SPEAKER:  Right, exactly.

8           THE COURT:  What's on the 6th?

9           UNIDENTIFIED SPEAKER:  All right.  On the 6th.  Let

10  me see what I have on December the 6th.  Okay.  I don't think

11  we have anything.

12          THE COURT:  That's a --

13          UNIDENTIFIED SPEAKER:  We have a trial on the 6th.

14          THE COURT:  What trial?  Who's that?

15          UNIDENTIFIED SPEAKER:  Financial Investments.  It's a

16  trial and a motion to be considered to get a default order at

17  12:30.

18          THE COURT:  Okay, so that's out.

19          UNIDENTIFIED SPEAKER:  Um-hum.  And let's see.  The

20  7th, I have just a regular 9:30 and an 11:00.  Hold on one sec

21  here.  It looks like we do have a 9:30 and an 11:00 on the 7th.

22  Let me see.

23          THE COURT:  Anything --

24          UNIDENTIFIED SPEAKER:  You have MJ Fencing (phonetic)

25  and our holiday party.

```
 1              THE COURT:  That's -- the holiday party is for the

 2   EDPA.  That one?

 3              UNIDENTIFIED SPEAKER:  Yeah.

 4              THE COURT:  I haven't attended in two years.  I guess

 5   I have to go.

 6              UNIDENTIFIED SPEAKER:  Okay.  Yes.  I think that's

 7   not until 6:00, though.

 8              THE COURT:  Right, but I did promise to show up this

 9   year.

10              MR. CAPONI:  It's the inner-workings.

11              THE COURT:  All right.

12              UNIDENTIFIED SPEAKER:  You have until, like, say

13   12:30 to --

14              THE COURT:  To 6:00.

15              UNIDENTIFIED SPEAKER:  I'd say 5:00.

16              THE COURT:  I only go for a little bit.  Okay.  So

17   that's -- so we have that date, the 7th, right?

18              UNIDENTIFIED SPEAKER:  Right.  The 7th, correct?

19              THE COURT:  So from 12:30 to 6:00?

20              UNIDENTIFIED SPEAKER:  Um-hum.

21              THE COURT:  Okay.

22              UNIDENTIFIED SPEAKER:  All right.  The following

23   week, let me just see.  All right.  On the 11th, we do have

24   Stream TV.

25              THE COURT:  Well, we can't -- we're not adding
```

1    anything to that.  Keep going.

2          UNIDENTIFIED SPEAKER:  Okay.  The 12th, let me see.

3    It looks like -- oh, I have nothing.

4          THE COURT:  That's a Thursday?

5          UNIDENTIFIED SPEAKER:  The 12th is a Tuesday.

6          THE COURT:  Tuesday.

7          UNIDENTIFIED SPEAKER:  I mean, we have our regular

8    list.

9          THE COURT:  So we have the afternoon from 12 to 6,

10   7 --

11         UNIDENTIFIED SPEAKER:  Yeah.

12         THE COURT:  -- on Tuesday the 12th.

13         What about the 13th?  That's a Thursday.

14         UNIDENTIFIED SPEAKER:  The 13th --

15         MR. CAPONI:  Wednesday.

16         THE COURT:  A Wednesday.

17         UNIDENTIFIED SPEAKER:  Let me look.

18         THE COURT:  Look on -- on the Wednesdays, my personal

19   calendar, I always have -- I have my injections every other

20   week.

21         UNIDENTIFIED SPEAKER:  Yeah.

22         THE COURT:  So I don't even know what -- I did it

23   last week, so the 11th I have to go.

24         UNIDENTIFIED SPEAKER:  So you did it last Wednesday

25   which is the 29th.

```
 1              THE COURT:  No, the 29th --

 2              UNIDENTIFIED SPEAKER:  No, no, no.

 3              THE COURT:  -- is this Wednesday.

 4              UNIDENTIFIED SPEAKER:  I'm sorry.  Which was the

 5  22nd, so you would have that on the 6th.

 6              THE COURT:  Right, that's the next one.

 7              UNIDENTIFIED SPEAKER:  Right.  And then you would

 8  have the next one on the 20th.

 9              THE COURT:  Yes, okay.

10              UNIDENTIFIED SPEAKER:  Injection.

11              THE COURT:  Yeah, um-hum.

12              UNIDENTIFIED SPEAKER:  So on -- it looks like the

13  13th is a good day, as well.

14              THE COURT:  Would that --

15              UNIDENTIFIED SPEAKER:  A Wednesday.

16              THE COURT:  The afternoon from the 12 to 6?

17              UNIDENTIFIED SPEAKER:  From the 12 -- from 12:00 on.

18  We have something at 11:30, but that's our typical 11:30

19  Chapter 11 cases.

20              THE COURT:  Okay.

21              UNIDENTIFIED SPEAKER:  So we have the 13th is good,

22  and then the 14th, we have -- I believe we have Stream TV on

23  the 14th, as well.

24              THE COURT:  For what?

25              UNIDENTIFIED SPEAKER:  A continued hearing, isn't it?
```

```
 1                THE COURT:  A what hearing?

 2                UNIDENTIFIED SPEAKER:  It's a continued.

 3                THE COURT:  I think we kept that date open in case

 4   they needed it.  Keep it open, see what they tell us.  We'll

 5   see what you guys tell us.

 6                UNIDENTIFIED SPEAKER:  Yeah.

 7                THE COURT:  All right.

 8                UNIDENTIFIED SPEAKER:  Okay.

 9                THE COURT:  And then the 15th, what do we have?

10                UNIDENTIFIED SPEAKER:  And the 15th, I have nothing,

11   which is a Friday.  Let's see if you have anything.

12                THE COURT:  Typically not, unless I have --

13                UNIDENTIFIED SPEAKER:  A Penn Dental --

14                THE COURT:  Hmm, I'll call and figure it out.  There

15   is one appointment on there, it's Soffer, S-O-F-F-E-R, nothing

16   can come --

17                UNIDENTIFIED SPEAKER:  Okay.

18                THE COURT:  I think that might be the 22nd.

19                UNIDENTIFIED SPEAKER:  Oh, okay.

20                THE COURT:  So, never mind.

21                UNIDENTIFIED SPEAKER:  On the 15th, I've got, see

22   Penn Dental.

23                THE COURT:  What time?

24                UNIDENTIFIED SPEAKER:  At 1:00.

25                THE COURT:  Ugh, all right.  Let me -- let's hold up
```

```
 1   on that and I'll figure that out.

 2              UNIDENTIFIED SPEAKER:  Okay.  And then if we go to

 3   the following week --

 4              THE COURT:  Which is Christmas week, right?

 5              UNIDENTIFIED SPEAKER:  Which is the week before

 6   Christmas, yes.

 7              THE COURT:  Oh.

 8              UNIDENTIFIED SPEAKER:  We have a trial on 12/18.

 9              THE COURT:  That's --

10              UNIDENTIFIED SPEAKER:  Well, it's actually status and

11   a trial on Trains Joel Specialty (phonetic), again.  So --

12              THE COURT:  I think that one will go.  That's a

13   Monday, right?

14              UNIDENTIFIED SPEAKER:  Correct.  And then on Tuesday,

15   the 19th, we have no trials.

16              THE COURT:  Well, we can have the afternoon.  I hope

17   somebody is writing this.  The 19th, 12 to 6.

18              UNIDENTIFIED SPEAKER:  The 19th is good.

19              THE COURT:  Next?

20              UNIDENTIFIED SPEAKER:  Let's see.  The 20th, I don't

21   have anything on your calendar.

22              THE COURT:  That's a Wednesday?

23              UNIDENTIFIED SPEAKER:  That's a Wednesday, correct.

24              THE COURT:  So we have 12 to 6 on Wednesday the 20th.

25              UNIDENTIFIED SPEAKER:  Yeah, the 20th looks good, as
```

1  well.  And then let's see, the 21st, we have typical, you know,

2  I don't have anything --

3        THE COURT:  From 12 to 6 for Thursday?  12 to 6 for

4  that day.

5        UNIDENTIFIED SPEAKER:  Sorry?

6        THE COURT:  12 to 6?  That's the 20th, you said?

7        UNIDENTIFIED SPEAKER:  The 21st.

8        THE COURT:  21st.

9        UNIDENTIFIED SPEAKER:  The 20th and the 21st are

10  good, Judge.

11        THE COURT:  All right.  And what about the -- that's

12  all right.  It's first thing in the morning.

13        UNIDENTIFIED SPEAKER:  Oh, okay.  All right then.  So

14  the 20th and 21st are good.  All right.  And then the 22nd you

15  have something.  Dr. Soffer?

16        THE COURT:  Nothing can come between that.  What time

17  is that?  4:00 probably.

18        UNIDENTIFIED SPEAKER:  It's at 4:00, correct.

19        THE COURT:  Right.  So you guys can have some 10:30

20  to 3 on that day.

21        MR. CAPONI:  That's 20.

22        THE COURT:  Okay.

23        UNIDENTIFIED SPEAKER:  Okay, and then it's Christmas.

24        THE COURT:  Anybody want hearings the week of

25  Christmas?  Oh, wait.  The 22nd, forget it.  That Monday is

```
1   Christmas, right?

2           MR. CAPONI:  Correct.

3           UNIDENTIFIED SPEAKER:  Christmas is Monday the 22nd,

4   yes.

5           THE COURT:  26th, anybody want?  No.  27?

6           MR. COLBY:  Going once, going twice.

7           THE COURT:  28?  No.  And then you have to because

8   I'm not going to -- if I go away, I'm leaving on the 2nd and I

9   won't be back until the 9th, so think about that.

10          MR. COLBY:  We will make every effort to fit it in.

11  We have a range of options.

12          THE COURT:  You have a range of options.

13          MR. COLBY:  We will do what we can.

14          THE COURT:  Okay.  And that's to finish both,

15  assuming that we don't finish the hearing on the 19th, on

16  Wednesday.  That's to finish that and to finish Mr. Stastney's

17  testimony, the two Dutch witnesses, and Mr. who from

18  California?

19          MR. ZAHRALDDIN:  Mr. Banerjee (phonetic).

20          THE COURT:  Banerjee?

21          MR. ZAHRALDDIN:  Croschek (phonetic) Banerjee.

22          THE COURT:  Okay.  All right.  I think we should be

23  able to get at least -- how many witnesses do we have?  Four

24  witnesses?  Even if we do one day for each one of these

25  witnesses, four hours, four or five hours, we should get all
```

1    four of them done.  I think we have enough dates to get four

2    people done.

3            MR. COLBY:  Well, in effort to keep it short, I think

4    that colloquy today was helpful.  I don't know if you noticed,

5    but after we had that, I was very brief with Mr. Michaels,

6    so --

7            THE COURT:  It wasn't to tell you to be brief, but I

8    mean, I think sometimes as litigators, you guys think you're

9    playing to a jury, and sometimes, you get caught up into hours.

10   I litigated once.  I know sometimes I lost the forest for the

11   trees -- whatever.  I didn't see the forest.  I saw the trees,

12   and it's very easy to get done.  And so I understand.  I just

13   sometimes think that people don't focus on what is it that I

14   need to give the Judge on the trier of fact to get what I want.

15   And I'm not -- you know, even though sometimes I get a little

16   irate, I tend very much to try to be very -- take my emotions

17   out of any decision that I make, for the most part.

18           MR. COLBY:  We appreciate that.

19           MR. ZAHRALDDIN:  May I release my witness, Judge?

20           THE COURT:  Oh.  What witness?

21           MR. ZAHRALDDIN:  Eileen.

22           THE COURT:  Oh, yes, Ms. -- yes, Eileen.

23           MR. ZAHRALDDIN:  All right, Eileen.  I'm hanging up

24   on you.

25           THE COURT:  All right, and this will be over.

1            MR. ZAHRALDDIN:  Thank you.

2            UNIDENTIFIED SPEAKER:  I have a question.

3            MR. ZAHRALDDIN:  Oh, she has a question.

4            UNIDENTIFIED SPEAKER:  Judge, all these dates are for

5    the adversary?

6            THE COURT:  Yes.  They are for the preliminary

7    injunction --

8            UNIDENTIFIED SPEAKER:  Okay.

9            THE COURT:  -- TRO.

10           UNIDENTIFIED SPEAKER:  Okay.  And what happened to

11   the motion for Stie (phonetic)?  That was scheduled also for

12   today, but I guess you never got to it, right?

13           MR. ZAHRALDDIN:  Well, Your Honor, I think what we

14   discussed was if we could get to a compromise on the worldwide

15   piece of it, that we would wait to see when Your Honor had a

16   little more room on the calendar.  So depending upon what days

17   come back, maybe we can --

18           THE COURT:  Well, I thought the parties were going to

19   try to see if you could submit an order that had been entered

20   in --

21           MR. ZAHRALDDIN:  Absolutely.  And what I did --

22           THE COURT:  Are you working on that?

23           MR. ZAHRALDDIN:  I stayed late on Wednesday instead

24   of going out and seeing all the people that came back home, got

25   out a version of the order, and we attached, I think, three --

```
 1   no, I think four or five -- I might be, you know, misstating
 2   that, but we attached several from other cases to the motion so
 3   they could look at those cases, they could send us orders.
 4   Otherwise, I am waiting for them to send me something back.  I
 5   just --
 6           THE COURT:  And then if you guys can agree on
 7   language, do I even need to hear anything and it's an agreed
 8   order?  If not --
 9           MR. ZAHRALDDIN:  I'll send competing orders in.
10           THE COURT:  Then just send me and all I'm going to
11   have -- because first of all, one, why should I do it.  That's
12   legal argument.  Why should I?  And then if I do, this is what
13   it should say.  That shouldn't take too long.  Shouldn't.
14           MR. ZAHRALDDIN:  Shouldn't.
15           THE COURT:  Shouldn't take too long.
16           MR. ZAHRALDDIN:  Shouldn't.
17           THE COURT:  Shouldn't.  All right.  So why don't you
18   continue the discussions with counsel on that order, and then
19   if you can submit an agreed order, we'll try to put it on, on
20   one of those days.
21           MR. ZAHRALDDIN:  And what I also will do is I will
22   try to respond to the latest questions in the mediation and see
23   if I can't push that, as well, because that might solve at
24   least part of what we requested in our stay violations motion.
25           THE COURT:  All right.  And I understand with respect
```

1  to the stay violations motion, you may be able to come to a

2  stipulated record on that, relying and citing to the records in

3  the various hearings that we've had.

4          MR. ZAHRALDDIN:  Yes, Your Honor.

5          THE COURT:  And that would, you know, make it easier

6  that we wouldn't have to be in court and would actually be

7  addressing some of the issues.

8          Anything further from anyone?

9          MR. ZAHRALDDIN:  Your Honor, the only other thing

10  that my client has requested is that to the extent that there

11  is relief requested in the TRO that doesn't -- that Mr.

12  Barenbach (phonetic) and I've got to get Mr. Hodges (phonetic)

13  -- the two folks from the Netherlands --

14          THE COURT:  This is Barenbrug (phonetic)?

15          MR. ZAHRALDDIN:  Yeah.  To the extent that they or

16  Mr. Banerjee have no impact on some of the relief that we've

17  requested -- for example, the trademark issue has nothing to do

18  with anybody in the Netherlands, etcetera.  Would you consider

19  looking at those issues and maybe disposing of them beforehand?

20          THE COURT:  What issue?

21          MR. ZAHRALDDIN:  The trademark.  The filing of a --

22  and I can't say it any other way --

23          THE COURT:  Oh, wait.  You're asking me with respect

24  to violation of the automatic stay by filing with Mister --

25          MR. ZAHRALDDIN:  Or giving us a TRO.  For example, to

1    please stop filing things falsely with the USPTO.

2            THE COURT:  Well, that wouldn't -- well, I wouldn't

3    say please stop filing things falsely.  I might say don't file

4    anything until we resolve this matter.

5            MR. COLBY:  Yeah, I think -- I mean, we -- I

6    understand --

7            MR. ZAHRALDDIN:  Either one would be nice.

8            MR. COLBY:  I understand Mr. Zahralddin to be

9    requesting for partial relief.

10           MR. ZAHRALDDIN:  That's what I --

11           MR. COLBY:  They just closed their case.  Now, we

12   haven't had any chance to respond --

13           MR. ZAHRALDDIN:  Understood.

14           MR. COLBY:  -- with our own witnesses, so I think

15   that's premature.

16           THE COURT:  Well, I would think --

17           MR. ZAHRALDDIN:  It can --

18           THE COURT:  -- without granting anybody's request,

19   don't file anything.  I don't think I should have to tell

20   anybody that.  Don't do it until at least you come here and I

21   figure something else, unless, listen, if you want to -- again,

22   if your counsel tells you that you believe you can proceed, and

23   you proceed and you do at your own risk, and if I find that,

24   you know, even if counsel may have had reasonable basis to tell

25   you to do something, that has nothing to do with 360 2K.

```
 1              MR. ZAHRALDDIN:  Yeah.

 2              THE COURT:  Okay?  I always tell people, I error on

 3   the side of caution.  If there's even a likelihood that your

 4   actions are going to violate the State or could be deemed a

 5   violation, come ask for a relief.  That's all I tell people.

 6              MR. ZAHRALDDIN:  And Your Honor, Mr. Colby is right.

 7   I should not be asking for --

 8              THE COURT:  No.

 9              MR. ZAHRALDDIN:  -- that relief prematurely, but if

10   we get to a point where we're not looking at rebuttal, I may

11   ask again.

12              THE COURT:  Well, all I can tell you is my -- I

13   caution people.  Proceed at your own risk.  I'm not saying I'm

14   going to tell you what you did was improper, but if it turns

15   out it is and it's a violation of the State, it's a costly,

16   very costly, decision.  So again, people can do whatever they

17   want.  I would just say --

18              MR. COLBY:  Thank you, Your Honor.

19              THE COURT:  -- don't do it.

20              MR. ZAHRALDDIN:  Let's just hear the evidence on it

21   and the explanation and then --

22              THE COURT:  Well, let me just say you can have all

23   the -- people will go do things and they can have a valid

24   explanation.  That doesn't mean it's not a violation.  It only

25   means what your sanctions are going to be.
```

```
 1              MR. ZAHRALDDIN:  I understand.

 2              THE COURT:  I'm not -- and I don't want anybody to

 3    say that I'm finding that it was or wasn't or any of those

 4    things.  I'll hear the explanation and I'll, you know -- I've

 5    only heard one side.  I've only seen one document, one side

 6    documents, but just a caution people.  Proceed at your own

 7    risk.

 8              MR. ZAHRALDDIN:  Understood.

 9              THE COURT:  All right.

10              MR. CAPONI:  That's all the Debtor's have, Your

11    Honor.

12              THE COURT:  All right.  That concludes the matters

13    that are scheduled before the Court today.  Court is adjourned

14    until -- tomorrow is Tuesday, right?

15              MR. CAPONI:  Um-hum.

16              THE COURT:  10:30.

17              UNIDENTIFIED SPEAKER:  Yep.

18              THE COURT:  10:30.  Thank you.

19              MR. COLBY:  Thank you, Your Honor.

20              THE COURT:  All right.

21         (Proceedings adjourned)

22

23

24

25
```

<u>C E R T I F I C A T E</u>

I hereby certify that the foregoing is a true and correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


*John Buckley*
_____
John Buckley, CET-623
Digital Court Proofreader